**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

                    Plaintiff,          **Case No. 11-20129**
    -v-

RONALD ROBERTS, D-1, and SCOTT
SUTHERLAND, D-2,

                    Defendants.
_____/

**EVIDENTIARY HEARING, VOLUME I**

BEFORE THE HONORABLE **ROBERT H. CLELAND**
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
**July 14, 2011**

APPEARANCES:

FOR THE PLAINTIFF:   SAIMA MOHSIN
                     HALA JARBOU

FOR THE DEFENDANT:   WILLIAM HACKETT
(Sutherland)

(Roberts)            CRAIG TANK

**To Obtain a Certified Transcript Contact:**
Christin E. Russell, CSR, RPR, FCRR, CRR - (248) 420-2720
Proceedings produced by mechanical stenography.
Transcript produced by computer-aided Transcription.

1                              TABLE OF CONTENTS
       _____
2
     EVIDENTIARY HEARING:
3
                           E X A M I N A T I O N S
4
     WITNESSES FOR DEFENDANT:                                PAGE
5
     **BRANDY IRWIN**
6    Direct Examination by Mr. Tank                             7
     Cross-Examination by Ms. Mohsin                           10
7    Redirect Examination by Mr. Tank                          18

8    WITNESSES FOR THE GOVERNMENT:

9    **DANIEL WOODS**
     Direct Examination by Ms. Jarbou                          25
10   Cross-Examination by Mr. Hackett                          46
     Cross-Examination by Mr. Tank                             74
11   Redirect Examination by Ms. Jarbou                        77

12   **CHRISTOPHER QUARELLO**
     Direct Examination by Ms. Jarbou                          81
13   Cross-Examination by Mr. Hackett                          93
     Cross-Examination by Mr. Tank                            117
14   Redirect Examination by Ms. Jarbou                       120
     Further Examination by Mr. Tank                          124
15

16                             E X H I B I T S

17   EXHIBIT                                                 PAGE

18   GX #1  (photograph)                                       33
     GX #2  (photograph)                                       33
19   GX #3  (photograph)                                       39
     GX #4  (photograph)
20   GX #5  (photograph)                                       91
     DX A   (photograph)                                      123
21

22

23

24

25   CERTIFICATE OF COURT REPORTER                            127

1   Detroit, Michigan

2   July 14, 2011

3   2:55 p.m.

4                          *      *      *

5        (Call to Order of the Court; all parties present.)

6            THE COURT:  The Court calls the case of United States

7   vs. Scott Sutherland and Ronald Roberts.  11-cr-20129.

8            Counsel, for the record?

9            MS. MOHSIN:  Your Honor, good afternoon.  Saima Mohsin

10  appearing on behalf of the United States.

11           THE COURT:  For the defendants?

12           MR. HACKETT:  William Hackett on behalf of Scott

13  Sutherland.

14           MR. TANK:  Craig Tank on behalf of Mr. Roberts.

15           THE COURT:  Defendants are both personally present.

16  We are here for the defendant's motion to suppress evidence,

17  that was discovered upon the investigator's encounter with

18  these defendants in the city of Detroit.

19           Mr. Sutherland, through counsel, moved for

20  suppression.  Mr. Tank, very briefly on behalf of Mr. Roberts,

21  joined or filed a notice of joinder, although it seems apparent

22  that circumstances are not quite identical with respect to each

23  of these defendants.  We can discuss that as time goes along.

24           But the first thing Mr. Hackett I think should discuss

25  with me is to what extent the search of the house in question

1    is of any concern here.  Is it?

2            MR. HACKETT:  The search --

3            THE COURT:  Why don't you come to the lectern and

4    stand up when you speak to the Court.

5            MR. HACKETT:  I apologize.

6            THE COURT:  Thank you.

7            MR. HACKETT:  I believe that the search of the house

8    really doesn't have much to do with my client.

9            THE COURT:  So you're not, you're not focusing your

10   motion on the search of the house?

11           MR. HACKETT:  I do not believe he has standing at this

12   point to challenge --

13           THE COURT:  That is exactly my question.

14           MR. HACKETT:  -- the search of the house.  But he does

15   have standing to challenge the search of his person.

16           THE COURT:  So we're only talking here about the

17   search of the person?

18           MR. HACKETT:  And the vehicle.

19           THE COURT:  Subsequently the vehicle, right.  Well,

20   one thing led to another.  Okay.

21           Mr. Tank, is there any suggestion in your notice of

22   "joinder" that there's anything problematic about the search of

23   the house that your client has any standing to complain about?

24           MR. TANK:  There is no indication of that in the

25   notice that I provided, your Honor.  That is correct.

1          THE COURT:  Very well.  So the only thing then --
2    well, I guess I don't know what it is that your client would be
3    complaining about or joining in.
4          MR. TANK:  Your Honor, and I was in error with respect
5    to, to what had taken place, is that that's exactly right, is
6    that the subsequent search that took place immediately that
7    happens there is, is the issue that we would be joining in.
8          THE COURT:  You mean, the search of Mr. Sutherland?
9          MR. TANK:  Well, and the subsequent search of the home
10   where Mr. Roberts, who I believe had standing thereafter.
11         THE COURT:  Oh, well, then you are complaining about
12   the search of the home.
13         MR. TANK:  I am.
14         THE COURT:  Well, then the question is what standing
15   does your client have to complain about that?  I shouldn't say
16   home.  House.  It was boarded up.
17         MR. TANK:  I think there's a variety of witnesses that
18   can come forward to indicate that he, in fact, resided there;
19   that it was his home; that based on that, he had a reasonable
20   expectation of privacy.
21         THE COURT:  That's yours to prove, right?
22         MR. TANK:  Agreed.
23         THE COURT:  Okay.  You're going to prove that?
24         MR. TANK:  I believe that there's ample evidence of
25   that, your Honor.

EVIDENTIARY HEARING - 7/14/11                                    6

```
 1            THE COURT:  Okay.  I think it's going to be yours,
 2   right?  Unless I'm missing something, I think it's your burden
 3   out of the starting blocks, as the saying goes, to present
 4   something that would show standing.
 5            MR. TANK:  Okay.
 6            THE COURT:  Who is first chair here, Ms. Mohsin, is it
 7   you?
 8            MS. MOHSIN:  Your Honor, yes.  And please allow me to
 9   make the record clear that AUSA Hala Jarbou is also joining me.
10   She will be putting some of the witnesses on.  And I also have
11   seated to my right, Special Agent Juan Herrera, for the record.
12            THE COURT:  Very well.  Anything that I've said
13   organizationally that is at odds with the way that you would
14   view the case?
15            MS. MOHSIN:  No, your Honor.  I believe that that is
16   correct.
17            THE COURT:  Okay.  Mr. Tank then, if you're going to
18   be complaining about the search of the building, we need
19   something of record more than we have now, which is zero,
20   indicating your client's standing to complain about the
21   building.
22            MR. TANK:  Your Honor, would you like me to retrieve a
23   witness from the hallway?
24            THE COURT:  You may proceed however you want.
25            MR. TANK:  Okay.
```

                    BRANDY IRWIN - DIRECT EXAMINATION

1              (Witness is sworn.)

2              THE COURT:  Have a seat here.

3              Mr. Tank?

4              MR. TANK:  Yes, your Honor.

5                         BRANDY IRWIN

6   called as a witness at 3:00 p.m. testified as follows:

7                      DIRECT EXAMINATION

8   BY MR. TANK:

9   Q.  Ma'am, could I have you state and spell your name, please.

10  A.  It's Brandy Irwin, B-R-A-N-D-Y, I-R-W-I-N.

11  Q.  If I might, I would like to take you back to around

12  February of -- February the 12th of 2011 of this year.  Was

13  there a place or a home that you resided in, ma'am?

14  A.  Yes.

15  Q.  Where?

16  A.  It was off of pretty much Seven and Hoover, off of Dresden.

17  Q.  All right.  And was that address, if you recall, was it

18  17378 Dresden?

19  A.  Yes.

20  Q.  When you resided there, was there anyone else that resided

21  in the home?

22  A.  Yes.

23  Q.  Who?

24  A.  Ronnie.

25  Q.  When you say Ronnie, who are you referring to ma'am?

BRANDY IRWIN - DIRECT EXAMINATION                                    8

1   A.  Right there.

2   Q.  Okay.  Can you speak up?  Because we have to make a record

3   of it.

4   A.  He's right there, Ron.

5         MR. TANK:  Let the record reflect that she's pointing

6   to Mr. Roberts.

7         THE WITNESS:  Mh-hm.

8   BY MR. TANK:

9   Q.  Now, ma'am, when you say that you resided in the home,

10  where did Mr. Roberts reside in the home?

11  A.  Upstairs.

12  Q.  Okay.  And when you say that he resided upstairs, could you

13  describe the home for the Court, please?

14  A.  The house?  We had a flat screen on the mantle.  There was

15  a couch, kitchen table, dishes, food in the kitchen.  I had my

16  own room.  He had his room.

17  Q.  Okay.  And I guess, could you describe the exterior of the

18  house, please?

19  A.  The windows were boarded because there was brand new

20  windows, and then there was a door, but it wasn't boarded up.

21  Q.  Okay.  And so how long -- approximately, when did you begin

22  to reside there with Mr. Roberts?

23  A.  Probably about the beginning, middle of January.

24  Q.  Okay.  And he continued to reside there until approximately

25  February the 12th of this year?

BRANDY IRWIN - DIRECT EXAMINATION

1   A.   Mh-hm.   Yes.

2   Q.   Okay.   Now, when you say reside there, let's say on a

3   weekly basis, about how many nights a week, ma'am, would he

4   sleep in the house or spend the night there?

5   A.   He was there pretty much every single day.

6   Q.   Now, as it relates to yourself and Mr. Roberts, is there a

7   relationship that exists between the two of you?

8   A.   No.

9   Q.   Okay.   So you're not romantically involved?

10  A.   No.

11  Q.   Nor have you ever been with Mr. Roberts?

12  A.   No.

13  Q.   He just simply resided in the upstairs of the home?

14  A.   Yes.

15  Q.   Okay.

16         MR. TANK:   And, your Honor, at this point in time, I

17  don't know as it relates to the standing issue that I have

18  anything more with this witness.

19         THE COURT:   All right.   Ms. Mohsin, do you have any

20  questions?

21         MS. MOHSIN:   Your Honor, I certainly do have

22  questions.   However, if the Court wants me to limit it to

23  standing or if I'm going to have an opportunity to

24  cross-examine this witness at a later juncture.

25         THE COURT:   Well, you'll certainly have an

BRANDY IRWIN - CROSS EXAMINATION

1    opportunity, if the witness is called again.

2         MS. MOHSIN:  Okay.

3         THE COURT:  Though, I wouldn't limit yours or Mr.

4    Tank's opportunity.  But he's finished with his questioning.

5    As to those matters, do you have any questions?

6         MS. MOHSIN:  I do.

7         THE COURT:  All right.

8         MS. MOHSIN:  I wanted to make sure, your Honor, I

9    would have an adequate opportunity later.  Thank you.

10         THE COURT:  All right.

11                    CROSS-EXAMINATION

12   BY MS. MOHSIN:

13   Q.  Ms. Irwin, good afternoon.  My name is Saima Mohsin.  I'm a

14   prosecutor.  I'm going to ask you a few questions.

15         If you don't understand my questions, I want you to

16   let me know so that I can either rephrase them, and I just want

17   to make sure you understand what I'm asking you before you

18   answer.  Okay?

19         You indicated that you lived at the premises 17378

20   Dresden?

21   A.  Mh-hm.

22   Q.  You lived there with your infant child?

23   A.  Yes.

24   Q.  How did you come to live there?

25   A.  I met him through a friend, who all my friend's girlfriend

BRANDY IRWIN - CROSS EXAMINATION

1  that I was staying with previously.  And she was a little

2  messed up and they were trying to help me get on my feet for my

3  son.

4  Q.  So you did not have a place to live prior to moving into

5  Dresden?

6  A.  I did, but it wasn't a very safe environment.  So I moved

7  for me and the sake of my child.

8  Q.  And Wayne Worth was the friend that, that brought you to

9  the Dresden location?

10  A.  Yes.

11  Q.  Is that yes?

12  A.  Yes.

13  Q.  And Wayne Worth brought you to the Dresden location and

14  introduced you to Ronald Roberts; is that accurate?

15  A.  I actually talked to him on the phone, but I had met him in

16  person.  He helped me move my stuff.

17  Q.  He helped you move your stuff in?

18  A.  Yes.

19  Q.  Is that accurate?

20  A.  Yes.

21  Q.  And in exchange, you paid rent?

22  A.  I was just staying there.  They were trying to help me get

23  on my feet.  Once I had a job, I was supposed to start paying

24  them money.

25  Q.  Who were you supposed to start paying money to?

BRANDY IRWIN - CROSS EXAMINATION

1   A.  Ron.

2   Q.  Okay.  You said "them."  You mean him?

3   A.  Yes.

4   Q.  So you were supposed to start paying rent to Rockin' Ron --

5   to Ronald Roberts at some point; is that correct?

6   A.  Yes.

7   Q.  How much rent were you supposed to pay?

8   A.  Probably about 200.

9   Q.  How long did you live there?

10  A.  I was there not even a full month.

11  Q.  And did you pay him any money during that time?

12  A.  No.

13  Q.  Okay.  Was he the owner of the property?

14  A.  We were just staying there while they were fixing it up,

15  because I guess there had be a fire, like --

16  Q.  I didn't understand your answer.  Can you repeat that,

17  please?

18  A.  We were staying there because somebody was supposed to stay

19  there so that nobody would break in and take the stuff because

20  it had been a fire there, and they were like, what is it,

21  renovating or whatever, fix it up.

22  Q.  Okay.  So Ronald Roberts was renovating the house while you

23  were there?

24  A.  Yes.

25  Q.  And when you say "they," who else?

BRANDY IRWIN - CROSS EXAMINATION

1   A.   There was a couple other people.  By the time I got there

2   though, they had already had everything done.  We were just

3   sitting there until they came back to get it, the bank or

4   something.

5   Q.   It was or was not being renovated during the time you were

6   remaining -- you were residing there?

7   A.   They would do a little bit of work, but not very much,

8   because --

9   Q.   Who is "they"?

10  A.   -- it was already done.

11  Q.   Who is "they"?

12  A.   Well, he was there most of the time; that was the only

13  person I really seen.  I wasn't really there at night or during

14  the day too much.  I would sleep there and that was it, so --

15  Q.   You slept there, but you were not there during the day?

16  A.   Not very often.

17  Q.   And you slept there every night?

18  A.   Yeah.

19  Q.   For a period of one month?

20  A.   Yes.

21  Q.   And Ronald Roberts was there every day?

22  A.   Most of the time, yes.

23  Q.   Okay.  And every night?

24  A.   Yup.

25  Q.   Now, you remember being interviewed by the FBI, correct?

1   A.  Yes.

2   Q.  And you were interviewed on March the 9th of 2011?

3   A.  I'm not sure about the date, but probably.

4   Q.  Special Agent Bill Fleming, do you remember him?

5   A.  Yes.

6   Q.  Came to your house?

7   A.  Mh-hm.

8   Q.  Asked you some questions, correct?

9   A.  Yes.

10  Q.  Questions were all directed towards your role, your

11  residency at 17378 Dresden?

12  A.  Yes.

13  Q.  Asked you questions about Ronald Roberts?

14  A.  Yes.

15  Q.  And he asked you specific questions about who lived at that

16  house, right?

17  A.  Yes.

18  Q.  And do you remember telling him that Ronald Roberts only

19  stayed there one to two nights per week?

20  A.  No.

21  Q.  So is it your testimony that you did not tell the FBI that

22  Ronald Roberts spent one to two nights a week at that

23  residence?

24  A.  I may have said it.  I don't really remember.

25  Q.  So you don't recall telling him that?

BRANDY IRWIN - CROSS EXAMINATION

1   A.   No.

2   Q.   You might have said it, but you don't recall saying that as

3   you sit here today?

4   A.   No, I don't.

5   Q.   You recall that he was there every single day?

6   A.   Yeah.

7   Q.   And do you recall being asked what was expected of you

8   while you were to remain at that property by Special Agent

9   Fleming?

10   A.   No.

11   Q.   Do you recall telling Special Agent Fleming that in

12   exchange for you staying there, you would be required to

13   perform odd jobs like painting around the house?

14   A.   Yeah.   Yes.

15   Q.   Okay.   You didn't tell him that you would be paying rent;

16   is that correct?

17   A.   No.

18   Q.   You didn't tell him that rent was expected from you.   You

19   told him you were just going to be there for a while?

20   A.   No.

21   Q.   Doing odd jobs?

22   A.   Because they were very rude.

23   Q.   Pardon me?

24   A.   I said, no, because they were very rude.

25   Q.   "They" being the FBI --

1    A.   Yes.

2    Q.   -- was being rude?  So are you telling me you didn't tell

3    them the truth?

4    A.   No.  I told them the truth.  I may not have said everything

5    to them because they were rude.  I asked them to leave and I

6    asked for an attorney and they wouldn't give me one, so.

7    Q.   Okay.  And so your testimony here today is that you did not

8    tell them everything, you just told them some things; is that

9    accurate?

10   A.   Yes.

11   Q.   Okay.  But what your testimony here today is the truth; is

12   that correct?

13   A.   Yes.

14   Q.   Do you remember telling the FBI that you met Roberts and he

15   was a member of the Devil's Disciples motorcycle gang?

16   A.   I knew that he was.  Yes.

17   Q.   Do you remember telling the FBI that?

18   A.   Yes.

19   Q.   And do you remember telling the FBI that Roberts gave you a

20   tour of the house, and that you were not permitted on the

21   second floor of the house?

22   A.   Yes.  The first day I went upstairs and I seen it and that

23   was it, because that was his room, and so.

24   Q.   And you were not allowed to go upstairs?

25   A.   No.

BRANDY IRWIN - CROSS EXAMINATION

1   Q.   And you did not go upstairs?

2   A.   Um-umm, just like he didn't come in my room.

3   Q.   You were aware that Ronald Roberts did not own the

4   property?

5   A.   No.

6   Q.   No, you were not aware of that?  You believed he did own

7   the property?

8   A.   Well, oh, no.  Because he had to work there, so no, I did

9   know.  I'm sorry.

10  Q.   You did know that he did not own the property?

11  A.   Yes.

12  Q.   And did he ever present to you any documents that showed

13  that he worked there?

14  A.   He, we were supposed to get a print off but I never seen

15  it, because I really, after the cops came to it the first time,

16  I really was not there that much.

17  Q.   Prior to the police officers arriving on February the 12th

18  of 20 -- of 2011, you did not see any documentation to show

19  that he had a right to be at that property?

20  A.   No.  I had been gone for two weeks before that.

21          MS. MOHSIN:  Nothing further for the witness, your

22  Honor.

23          THE COURT:  Anything else, Mr. Tank?

24          MS. MOHSIN:  Your Honor, before we continue, I would

25  like to ask for a sequestration order.  It's my understanding

1    that there are a ton of witnesses here on behalf of the

2    defense.  I do have some things to say about that as well,

3    because we were not provided with any notice at all of any of

4    these witnesses, despite repeated requests both in writing,

5    verbally and via e-mail for a witness list.

6          But I have some concerns about any of these witnesses

7    being within earshot of the testimony of this witness in

8    particular.  So I would ask that the Court order the witnesses

9    to be sequestered.  And I would reserve my right to present

10   additional information to the Court regarding the failure by

11   the defense to comply with repeated requests for a witness

12   list.

13         THE COURT:  Any reaction, Mr. Hackett?

14         MR. HACKETT:  No objection, Judge, sequestering the

15   witnesses.  I apologize.

16         MR. TANK:  I have none, your Honor.

17         THE COURT:  It's up to you then to handle the

18   sequestration, Mr. Hackett.

19         And do you have any other witnesses on this point, Mr.

20   Tank, that you want to call?

21         MR. TANK:  I have some, I guess redirect as it relates

22   to this witness.

23         THE COURT:  Go ahead.

24                         REDIRECT EXAMINATION

25   BY MR. TANK:

1    Q.  Ma'am, what did you mean when you said that the agents --

2    I'm paraphrasing here.  You said something along the lines

3    something -- someone was rude to you?

4    A.  Yes.

5    Q.  And could you explain that or elaborate on that further?

6          MS. MOHSIN:  Objection in regard to relevance, your

7    Honor.

8          THE COURT:  Agree.  It's irrelevant.

9          Go ahead, Mr. Tank.  Anything else as it pertains to

10   standing?

11         MR. TANK:  I have nothing, your Honor.  Thank you.

12         THE COURT:  Thank you.  The witness may step down.

13         Next witness, if any, Mr. Tank, on this point?

14         (Witness excused at 3:10 p.m.)

15         MR. TANK:  Your Honor, I believe that will be the only

16   witness that I'll offer at this point, your Honor.

17         THE COURT:  Okay.  And, Ms. Mohsin, any reaction to

18   the suggestion that this testimony provides an adequate basis

19   for standing, at least to cast the burden of persuasion of the

20   Government?

21         MS. MOHSIN:  As a threshold matter, your Honor, it's

22   the Government's contention that the defendant has failed to

23   meet his burden to present a prima facie case to the Court that

24   he does, in fact, have a reasonable expectation of privacy in

25   the premises that would give him standing, as it were, to

EVIDENTIARY HEARING - 7/14/11

1   contest that the search and subsequent seizure of evidence at

2   that location.  And for those reasons, your Honor, we would ask

3   that the Court deny the defendant's motion.

4          THE COURT:  I'm inclined to agree with that.  But, Mr.

5   Tank, what is your reaction to the suggestion?

6          MR. TANK:  Your Honor, my suggestion is, is that as we

7   sit here and we listen to the testimony, I think that there's

8   been enough.  It's a relatively low threshold as it relates to

9   standing, or for the reasonable expectation of privacy.

10          I would submit to the Court that the testimony that's

11   been offered through direct testimony is, in fact, enough, and

12   it would establish that that is his residence or that is the

13   place in which he resides.  I believe the testimony is,

14   although some would argue that it would be contested or things

15   along those lines, but the testimony is clearly enough that he

16   resides or that that acted as his residence and that it did so

17   for at least a month during the relevant time frame.

18          THE COURT:  Is there any indication that either of

19   these individuals had any actual recognizable right to be in

20   the premises?  The documents that are already made a matter of

21   record show a house that appears to be boarded up entirely.

22          MR. TANK:  I would agree, your Honor.  If I were to --

23          THE COURT:  It's just, it's a building.

24          MR. TANK:  Okay.

25          THE COURT:  He was, he was present in a building.

1              MR. TANK:  Right.

2              THE COURT:  Mere presence in a building does not

3    confer standing to complain about an investigatory search of

4    the building.

5              MR. TANK:  Your Honor, I believe, and I've spoken with

6    witnesses, there are witnesses that, in fact, exist that would

7    elaborate that, that his employer had him working inside of the

8    home; that he resided there as they were working inside of the

9    home; that the employer had the permission of a mortgage

10   company or somebody that had repossessed the property to

11   continue to be there; and that the consent or the permission

12   for him to reside there rested or came from his employer.  I

13   don't --

14             THE COURT:  We don't have evidence of that, do we?

15             MR. TANK:  I don't have the witness, that being the

16   employer, here present with us today, your Honor.  That is

17   absolutely correct.

18             THE COURT:  Well, there are other fish to fry, I

19   think, in the meanwhile.  And we'll take evidence with respect

20   to the personal search of Mr. Sutherland and how that led to

21   other events, which included the search of the house.  It may,

22   it may pale somewhat, I suppose, in significance.  But at this

23   point, at this point, I'm dubious as to whether Mr. Roberts has

24   presented any suitable showing of standing to complain about

25   the search of the house.

 1          We do need to proceed though with the Government's

 2   showing on the other search, which I think, Ms. Mohsin, you

 3   would agree, you bear the burden of proceeding and the burden

 4   of persuasion with respect to a warrantless search.  Is that

 5   correct?

 6          MS. MOHSIN:  We do, your Honor.

 7          THE COURT:  I mean, assuming that something happened

 8   that is equivalent to a search at all, which is a point that

 9   you contest.

10          MS. MOHSIN:  We bear the burden in this hearing, we do

11   agree, your Honor.  And we're prepared to go forward.

12          THE COURT:  Let's go ahead then.

13          MS. MOHSIN:  If the Court would permit me, though, I

14   did want to raise an issue, and that is that there were no

15   discussions between the attorney for Mr. Sutherland and the

16   Government regarding the witness that he was going to produce

17   at this hearing.  And I wanted to make a brief record about it.

18          THE COURT:  Go ahead.

19          MS. MOHSIN:  Because it is a matter of some concern.

20   It's my understanding that approximately 11 or 12 individuals

21   have been subpoenaed to appear here on behalf of the defense to

22   give testimony about what, I don't know.

23          The Government did make a written demand for

24   discovery, reciprocal discovery in a letter dated April 14th of

25   2011.

1            And subsequently, I sent counsel a letter dated May

2    23rd, which asked specifically for the disclosure of the

3    identities of any witnesses that the defense intended to call

4    at the evidentiary hearing that was scheduled, as well as any

5    impeachment material or reciprocal discovery related material.

6            And then in a string of conversations and e-mails with

7    AUSA Jarbou, the defense attorney agreed, dating back to early

8    June, that he was going to provide, in fact, he promised to

9    provide the Government with the names of the witnesses to come

10   to court this afternoon at two o'clock.

11           And in fact, at ten after two, to be handed a stack of

12   subpoenas for witnesses that have been subpoenaed by the

13   defense with a subpoena date of several weeks ago is a matter

14   of great concern, because we are surprised by the number and

15   identity of these witnesses.  We haven't had an opportunity to

16   determine who these individuals are, what roles they have in

17   this case.

18           And I just raise that for the Court because there is a

19   history and an agreement the defense would provide this

20   information to us.  We're somewhat disadvantaged here.

21           THE COURT:  I hear you saying in all of that, that it

22   would not be appropriate for the Court to rush the Government

23   to a conclusion of this hearing without a sensible opportunity

24   to investigate and meaningfully respond to testimony that any

25   of these other erstwhile, unknown individuals might offer later

1    on this afternoon.

2           MS. MOHSIN:  That's correct, your Honor.  It's 20

3    after three.  We have our witnesses present.  We were surprised

4    by these other witnesses.

5           THE COURT:  I understand that.  I will tell you that

6    you will not be rushed to a conclusion without a sensible

7    opportunity to investigate and to respond, and to question

8    meaningfully whatever might be ultimately, if anything,

9    presented by the defense with respect to these otherwise

10   unknown individuals.

11          MS. MOHSIN:  With that, I thank the Court.  And we are

12   ready to proceed with our first witness, who Hala Jarbou will

13   call.

14          THE COURT:  Very well.

15          MS. JARBOU:  May I have just one moment, your Honor?

16          MR. HACKETT:  Your Honor, may I respond briefly?  Just

17   briefly.

18          THE COURT:  Yes.  Okay, briefly, Mr. Hackett.

19          MR. HACKETT:  Your Honor, the witnesses that they were

20   supplied subpoenas with are all the police officers that were

21   involved in the case.  It's not like they were unknown.  All

22   the reports were provided to them.

23          THE COURT:  Twelve police officers involved in the

24   case?

25          MR. HACKETT:  Actually, we believe there's more that

1    are not in the reports.

2              THE COURT:  Well --

3              MR. HACKETT:  From what we're getting.  But yes, they

4    are police officers.  They are mentioned in the reports.  They

5    have the reports that have been turned over to the Prosecutor's

6    Office pursuant to the discovery request.  And, you know, it's

7    not a very big surprise.

8              THE COURT:  Okay.  I have your point.

9              MR. HACKETT:  Thank you.

10             THE COURT:  Go ahead with the first Government

11   witness.

12             MS. MOHSIN:  AUSA Jarbou is retrieving that witness.

13             MS. JARBOU:  Your Honor, the Government will call

14   Officer Daniel Woods.

15             THE COURT:  All right.

16             (Witness is sworn.)

17                         DANIEL WOODS

18      called as a witness at 3:17 p.m. testified as follows:

19                      DIRECT EXAMINATION

20   BY MS. JARBOU:

21   Q.  Good afternoon, sir.  Could you state your name and spell

22   your last name for the record, please?

23   A.  Daniel Woods.  Last name is spelled W-O-O-D-S.

24   Q.  Sir, how are you employed?

25   A.  I'm a police officer for the City of Detroit.

1    Q.   How long have you been with the City of Detroit as a police

2    officer?

3    A.   Three years.

4    Q.   And were you -- how long have you been in law enforcement,

5    the same amount of time?

6    A.   Three years.

7    Q.   What is your current assignment?

8    A.   I work for the tactical mobile unit, City of Detroit Police

9    Department.

10   Q.   What do your duties entail?

11   A.   We're basically patrol support, precinct support.  We

12   travel -- we're a city-wide unit that travels throughout the

13   city.

14          If a specific precinct or district gets backed up on

15   runs or they have a high volume of action going on, then they

16   will deploy us to that area to help out.

17   Q.   Have you received firearms training?

18   A.   Pardon?

19   Q.   Have you received firearms training?

20   A.   Yes.

21   Q.   And have you had an occasion to arrest someone for a

22   weapons-related violation?

23   A.   I have.

24   Q.   Approximately how, how many of those types of arrests in

25   the last three years have you made?

DANIEL WOODS - DIRECT

1   A.   I would say dozens.  I don't have an honest estimate.  I'm

2   just going off of a feel, I would say dozens of arrests.

3   Q.   Officer Woods, I want to direct your attention to February

4   12th, 2001 (sic).  Were you working on that date?

5   A.   Yes, ma'am.

6   Q.   What shift were you working?

7   A.   We were working the power shift, which would be seven p.m.

8   to three a.m.

9   Q.   So in the early morning hours of February 12th, 2001 (sic),

10  were you in the area of Dresden and, is it Gietzen, in the city

11  of Detroit?

12  A.   Yes, ma'am.

13  Q.   And why were you there?

14  A.   Routine patrol.  We were working in the eastern district

15  that evening.

16  Q.   At some point at approximately 1:30 in the morning, you

17  actually were in front of that house?

18  A.   Yes, ma'am.

19  Q.   Was that the first time in the early morning hours of

20  February 12th, 2011 that you were there?

21  A.   No, ma'am, that was the second time.

22  Q.   Okay.  How much earlier were you there, approximately?

23  A.   Maybe 20 minutes earlier, 20 minutes, 25 minutes, something

24  like that prior --

25  Q.   Okay.

DANIEL WOODS - DIRECT

1   A.   -- we were there.

2   Q.   I'm sorry.  So 20, 25 minutes earlier, you were on Dresden?

3   A.   Correct.

4   Q.   All right.  And just routine patrol?

5   A.   Yes, ma'am.

6   Q.   And what, if anything, caught your attention at that time?

7   A.   We observed a vehicle parked on the, what would have been

8   the southbound, facing southbound on Dresden with a lone white

9   female sitting in front of it.  And she was sitting in front of

10  a house that appeared to be abandoned.

11  Q.   And specifically that house was 17378 Dresden?

12  A.   Yes, ma'am.

13  Q.   So the car was parked across the street, I'm sorry, or in

14  front?

15  A.   It was parked across the street, but in front of the house.

16  Q.   Okay.  So one white female in that vehicle?

17  A.   Yes, ma'am.

18  Q.   What, if anything, did you do in regards to that?

19  A.   We briefly stopped, had an informational encounter with

20  her, asked her if everything was okay, if she needed any

21  assistance.  She stated that she was fine; she was just waiting

22  on her friends who were in the house across the street from

23  her.

24  Q.   So this is approximately one a.m. or 1:10 in the morning?

25  A.   Somewhere in that range, ma'am.  Yes, ma'am.

1    Q.   And, excuse me, but I think I forgot to ask you this.  You,

2    were you working alone?

3    A.   No.

4    Q.   Or with a partner?

5    A.   I was working with a partner.

6    Q.   And who was that?

7    A.   Lieutenant Christopher Quarello.

8    Q.   Were you in full uniform?

9    A.   I was.

10   Q.   Was your partner in full uniform?

11   A.   He was.

12   Q.   And were you driving a fully marked patrol vehicle?

13   A.   We were.

14   Q.   Now, you indicated that this woman was seated in a vehicle

15   in front or across the street from 17378 Dresden, and you

16   characterized it as a boarded-up house?

17   A.   Yes, ma'am.

18   Q.   What, I guess, what do you mean by that?

19   A.   All of the windows on the main floor of the residence were

20   boarded up.  We could see some scattered debris in the side

21   yard.

22   Q.   How long did your encounter with that female last?

23   A.   Just a few moments, maybe 30 seconds.

24   Q.   Did anything happen after that?

25   A.   A call came out from one of our other units requesting

DANIEL WOODS - DIRECT

1   assistance, and we headed to that location.

2   Q.  Did you at any time return back to that Dresden home?

3   A.  We did.

4   Q.  And how, approximately how much longer?

5   A.  That was, like I said, maybe 20 minutes, 25 minutes after

6   the initial encounter with the young lady in front of the

7   house.

8   Q.  Okay.  So now we're talking about 1:30 in the morning?

9   A.  Yes, ma'am.

10  Q.  And why do you go back to that house?

11  A.  Because she indicated that she was waiting for her friends.

12  She pointed to the house in question.  It appeared to be an

13  abandoned house.  So we wanted to go back and investigate.

14  Q.  And what did you do?

15  A.  We parked around the corner from the location, north of the

16  location.  We walked back through the yards on foot, coming up

17  behind the house.

18  Q.  Both you and Lieutenant Quarello?

19  A.  That's correct.

20  Q.  Besides the -- and when you say boarded up, I assume the

21  windows are boarded up?

22  A.  Yes, ma'am.

23  Q.  Besides that, what else did you observe about the home?

24  A.  Like I said, there was, there was various, looked like

25  maybe debris, construction debris or if they had -- the inside

1   of the house had been gutted, in the backyard.  And like I

2   said, every window on the first floor of the residence was

3   boarded up.

4   Q.  And you indicated you and your partner parked how far away?

5   A.  Approximately a block away, north of the location.

6   Q.  And then did you proceed on foot?

7   A.  We did.

8   Q.  What, if anything, did you observe, hear, see at that

9   point?

10  A.  As we proceeded to the location, we made our way into the

11  backyard.  There was no light in the back.  The south-facing

12  end of the building, there was an upstairs window.  There was a

13  light on up there.  It was not boarded up and the window was

14  cracked, not as being damaged, but as being raised slightly.

15        We could hear two distinct male voices talking

16  upstairs, couldn't clearly make out what they were talking

17  about, but could definitely tell there were two male voices.

18        We were standing, waiting downstairs on the backyard

19  of the residence, trying to figure out how we were going to

20  handle the situation, when we observed the young lady from the

21  vehicle that was still sitting in the vehicle across the

22  street, exit the vehicle and begin walking towards the house.

23  Q.  Okay.  Let me stop you there.

24        MS. JARBOU:  Your Honor, may I approach?

25        THE COURT:  Yes.

DANIEL WOODS - DIRECT                                    32

1   BY MS. JARBOU:

2   Q.  Officer Woods, I'm handing you what's been marked as

3   Government's proposed Exhibits 1 and 2.  Could you identify

4   Number 1 for me?

5   A.  This is the front of the house on Dresden that we were

6   speaking of.

7   Q.  And what does it depict?

8   A.  It depicts the frontal elevation of the house, with all the

9   lower windows on the house being boarded up.

10  Q.  And Number 2, if you can identify that?

11  A.  Number 2 is the southern elevation of the same house, also

12  showing the lower windows of the residence to be boarded up.

13  Q.  Is it fair to say those pictures are taken in what appears

14  to be daylight?

15  A.  Yes.

16  Q.  Okay.  Aside from that, does that house fairly and

17  accurately -- is that house fairly and accurately depicted in

18  those photos --

19  A.  Yes, ma'am.

20  Q.  -- as you observed it on February 12th, 2011?

21  A.  It is.

22       MS. JARBOU:  Your Honor, the Government would move for

23  admission of Government's proposed Exhibits 1 and 2.

24       MR. HACKETT:  No objection, Judge.

25       MR. TANK:  I have no objection, your Honor.

```
 1            THE COURT:  Received.
 2            MS. JARBOU:  May I publish those, may I publish those
 3  to the Court?
 4            THE COURT:  Are those the same that you attached to
 5  the --
 6            MS. JARBOU:  I believe they are.
 7            THE COURT:  To your response?
 8            MS. JARBOU:  I believe they are.
 9            THE COURT:  I've seen them.
10            MS. JARBOU:  Thank you.
11    (GX #1-2 received at 3:25 p.m.)
12  BY MS. JARBOU:
13  Q.  Officer Woods, you indicated you heard some voices.  Could
14  you identify -- you identified them as male voices?
15  A.  Yes, ma'am.
16  Q.  Was there any sort of identity that you could place?
17  A.  Not that I recall at the time, ma'am.
18  Q.  Okay.  Now, when you parked your vehicle and you and
19  lieutenant approached the dwelling, what was the purpose of you
20  approaching?
21  A.  Like I said, the young lady that indicated that she was
22  waiting on friends of hers that were inside of this, this
23  location, it appeared to us that it was an abandoned or vacant
24  location.  We wanted to investigate to make sure that there was
25  no illegal activities going on at that location.
```

DANIEL WOODS - DIRECT

1  Q.  Okay.  And what sort of illegal activities have you seen in

2  abandoned type homes?

3  A.  Very commonly we will see EWOP, which is entering without

4  permission of the owner.  We will see drug trafficking taking

5  places in there, squatting, numerous things of that type.

6  Q.  Okay.  So you indicate as you approached the home or as you

7  were near the home, that the same female then -- or that you

8  observed the same female?

9  A.  That's correct.

10  Q.  And what did you observe?

11  A.  We observed her exit the vehicle that she was still sitting

12  in and walk across the street to the house, walk up on the

13  front porch where she was -- we heard her having a -- I heard

14  her have a brief conversation with somebody at the front door.

15         It was at this time that we decided to -- I talked to

16  Lieutenant Quarello.  We said, all right, well, let's see go

17  ahead and see what's going on.  As we started making our way

18  from the front -- from the rear yard towards the front of the

19  house, we observed the two white males coming off of the porch

20  from the house and heading towards the vehicle that was parked

21  in the driveway.

22  Q.  Okay.  And what happened to the female?

23  A.  She had stepped inside the house.

24  Q.  Do you see those two white males in the courtroom today?

25  A.  I do.

DANIEL WOODS - DIRECT

1    Q.  Could you identify a piece of clothing and, and point to

2    those two individuals?

3    A.  Both of them are sitting at the defendants' table.  White

4    male in the orange jumpsuit, bald, bald-headed.  The other

5    gentleman in the orange jumpsuit sitting to my right with the

6    brown hair and goatee.

7           MS. JARBOU:  May the record reflect identification of

8    Defendants Roberts and Sutherland, your Honor?

9           THE COURT:  Yes.

10   BY MS. JARBOU:

11   Q.  Officer Woods, what happened at that point?

12   A.  At that point, we identified ourselves as police officers,

13   instructed them to stop.  They both did so.  We asked them, my

14   partner actually asked them if anybody -- if either of the two

15   of them lived at this location.  They stated that they did not.

16   Q.  They both stated they did not?

17   A.  They both stated -- the one that did most of the talking

18   was Mr. Roberts.

19   Q.  Okay.  And you've identified Mr. Roberts as the one, you're

20   pointing to --

21   A.  Correct.

22   Q.  -- the one on the end?

23   A.  Sitting to my right, on the end with brown hair.

24           He stated that he did not live there, but he worked

25   for a fire restoration company, and they were doing -- they had

```
 1   restored the house.  And the company asked him to stay in the
 2   house to make sure that it wasn't vandalized.
 3   Q.  Do you recall Mr. Sutherland saying anything?
 4   A.  I don't recall Mr. Sutherland saying much at all during the
 5   encounter.
 6   Q.  All right.  And what happened next?  Did you or your
 7   partner inquire further?
 8   A.  My partner inquired as to if they had any paperwork that
 9   showed that they were supposed to be in the house.
10   Q.  Written permission?
11   A.  Written permission.  Any work paperwork that would have
12   shown that they were doing fire restoration on that particular
13   residence, and they were unable to provide that.
14   Q.  Neither Mr. Roberts nor Mr. Sutherland?
15   A.  That's correct.
16   Q.  What happened next?
17   A.  We detained them both to be investigated for EWOP.
18   Q.  Entering without owner's permission?
19   A.  Entering without an owner's permission.  They were standing
20   by the car in the driveway at that place.  My partner had moved
21   over towards the front door of the house.  Because the female
22   had stepped inside, he was trying -- I believe he was trying to
23   keep an eye on her while I was dealing with Mr. Roberts and Mr.
24   Sutherland.  Mr. Sutherland had some -- a big bundle of keys
25   and so forth in his hand.
```

1    Q.  Let me stop you there.

2    A.  Yes, ma'am.

3    Q.  Prior to that testimony, regarding the EWOP that you call

4    it, is that an arrestable offense in the city of Detroit?

5    A.  Yes.  It's an arrestable offense.  It's also a ticketable

6    misdemeanor as well.

7    Q.  Specifically, is there a Detroit ordinance that specifies

8    written permission?

9    A.  Yes.

10   Q.  Okay.  You indicate that at that point Mr. Sutherland had

11   some things in his hand?

12   A.  Correct.

13   Q.  What did he have in his hand?

14   A.  A bundle of keys in one hand, and I don't remember what he

15   had in his other hand.  I think maybe it was his glasses or

16   sunglasses, something of that nature.  But he had a big bundle

17   of keys in one hand and something he was holding in the other

18   hand.

19   Q.  What happened then?

20   A.  I asked him to turn and place that -- those items on the

21   hood of the car.  He turned to do so.  When he did -- he was

22   wearing a long black, like leather trench-style coat.  When he

23   turned, raised his hands to put the items on the roof of the

24   car, his coat buckled slightly, and I could see the pistol grip

25   of a pistol in the front right side of his waistband.

DANIEL WOODS - DIRECT

1  Q.  Okay.  And when you say long trench, how long are we

2  talking about?

3  A.  I think it came down to like his knees, like maybe three

4  quarter lengths, you know, down to the knees.

5  Q.  What happened when you saw that weapon?

6  A.  I immediately stepped in behind him.  He was still turned

7  towards the car.  He had turned towards the car to put the

8  stuff on the roof of the car.  I stepped in behind him, placed

9  my hand in his back; asked him to leave his hands on the hood

10 of the car; asked him if he had any weapons.  He stated that he

11 did not have any weapons.

12 Q.  And this was after you had observed the weapon?

13 A.  This is after that I had observed the weapon.  He stated he

14 did not have any weapons.

15         I reached into his waistband, recovered a 9 millimeter

16 pistol from his waistband, secured it in my waistband, asked

17 him if he had a concealed pistol license to carry a weapon.  He

18 stated he did not, at which time I placed him in handcuffs for

19 CCW.

20 Q.  What's going on -- when you do this, what's going on with

21 Mr. Roberts?

22 A.  Mr. Roberts was just standing there with his hands kind of

23 semi up watching what was going on.

24         MS. JARBOU:  May I approach again, your Honor?

25         THE COURT:  Yes.

DANIEL WOODS - DIRECT

1   BY MS. JARBOU:

2   Q.  I'm showing you what's been marked as Government's proposed

3   Exhibit Number 3.  Can you identify that, for the record?

4   A.  Yes, ma'am.  This appears to be a picture of the firearm

5   that I took from Mr. Sutherland's waistband.

6   Q.  Okay.

7        MS. JARBOU:  Your Honor, the Government will move for

8   the admission of Government's proposed Exhibit Number 3.

9        THE COURT:  Any problem with that, counsel?  Mr.

10  Hackett?

11        MR. HACKETT:  Your Honor, could I just briefly look at

12  it?  I just want to make sure it's the same picture that I

13  received.

14        THE COURT:  Counsel suggests that it is.

15        MS. JARBOU:  I apologize, your Honor.  I didn't show

16  it prior to.

17        MR. HACKETT:  No objection.

18        MS. JARBOU:  But counsel did have it in discovery.

19        MR. TANK:  No objection.

20        THE COURT:  Received.  Go ahead.

21     (GX #3 was received at 3:32 p.m.)

22  BY MS. JARBOU:

23  Q.  Officer Woods, you said Mr. Roberts, at that point, was

24  just standing there.  What occurred after you handcuffed Mr.

25  Sutherland?

DANIEL WOODS - DIRECT

1   A.  I, when I initially removed the weapon from Mr.

2   Sutherland's waistband, I called out to my partner -- partner

3   to let him know that I had -- there was a weapon involved.  He

4   was still standing near or on the front porch looking inside

5   the residence.

6          At that point, I turned to Mr. Roberts after I had

7   secured Mr. Sutherland.  I patted him down to make sure that he

8   had no offensive weapons.  He did not.  I placed him in

9   handcuffs and that was, that was when they were both detained

10  at that point.

11         Mr. Roberts was not in custody at this point.  He was

12  just simply being detained.  Mr. Sutherland was in custody at

13  this point, for CCW.

14  Q.  And why was Mr. Roberts, at that point, being detained?

15  A.  We were still investigating the EWOP.

16  Q.  And you indicate that Lieutenant Quarello is at the door or

17  near the door?

18  A.  At the door or near the door.  I was -- I don't know if he

19  actually stepped inside the house or not at one point, but he

20  was up near the front door of the residence while I was dealing

21  with Mr. Roberts and Mr. Sutherland.

22  Q.  Did you, at any point, relay the fact that you had found a

23  weapon --

24  A.  I did.

25  Q.  -- to Lieutenant Quarello?  What happened then?

1  A.  At that point, we notified over the radio that we had a

2  situation where there was a weapon involved, notified other

3  units.  Other units began responding.

4          Lieutenant Quarello was still standing near the door

5  and I believe talking to the young lady that was inside,

6  although I couldn't see her at this point because I was still

7  outside of the house.

8          We waited for other units to arrive.  They made a

9  protective sweep of the inside of the residence to make sure

10 there were no other people inside or there were no other

11 weapons inside.

12         During the protective sweep, one of the other officers

13 recovered a shotgun from the upstairs of the residence, leaning

14 near the window where we had heard the two subjects talking.

15 Q.  At some point, did anything happen in regard -- was there a

16 vehicle?

17 A.  There was a vehicle.

18 Q.  Where was that?

19 A.  It was parked in the driveway.

20 Q.  Okay.  And what type of vehicle; do you recall?

21 A.  I want to say it was a Taurus or Sable.  I can't remember

22 specifically without my notes.

23 Q.  And what specifically happened in regards to that vehicle?

24 A.  Once we determined that Mr. Sutherland had the keys to the

25 vehicle, we were going to impound the vehicle for proper

DANIEL WOODS - DIRECT

1    ownership.

2            We did an inventory of the vehicle.  I began searching

3    the passenger compartment.  Somebody else had opened the trunk.

4    Upon opening the trunk, I don't recall which officer it was,

5    one of the other officers said, "will you look at this."

6    Q.  I'm sorry.  Were you present?

7    A.  I was.  I was physically searching the passenger

8    compartment of the vehicle.  Another officer had opened the

9    trunk with the keys that we had -- that Mr. Sutherland had in

10   his hands.

11           When they opened the trunk, they said you need to come

12   take a look at this.  I went to the trunk.  In the trunk, we

13   found an AR-15 style assault rifle.

14   Q.  And this, was this a -- do you recall if this was a Mercury

15   Milan sedan?

16   A.  Possibly.  Possibly.  Like I said, I would have to look at

17   my notes.

18   Q.  And, I'm sorry, you indicated the weapon that was found in

19   the trunk was a what?

20   A.  It was an assault rifle, an AR-15 style assault rifle.  I

21   believe it was a Bushmaster was the manufacturer.

22   Q.  And did you observe that in the trunk?

23   A.  I did.

24           MS. JARBOU:  May I approach, your Honor?

25           THE COURT:  Yes.

DANIEL WOODS - DIRECT

1   BY MS. JARBOU:

2   Q.  I'm handing you what's been marked as Government's proposed

3   Exhibit Number 4.  Could you identify that?

4   A.  Yes.  This appears to be a picture of the weapon recovered

5   from the trunk of the vehicle.

6   Q.  And you indicated that that vehicle was inventoried?

7   A.  Yes, ma'am.

8   Q.  Why was it inventoried?

9   A.  To make sure that there were -- any personal property in

10  the vehicle could be listed on the impound card so when the

11  vehicle was returned to the proper owner, that there were any

12  personal -- personal property in that vehicle, that it would

13  also be noted on that impound card.

14  Q.  Okay.  So the vehicle was being impounded?

15  A.  Yes, ma'am.

16  Q.  As a result of the arrest that was made?

17  A.  That's correct.

18  Q.  Okay.  And as a result of it being impounded, is it

19  standard policy for DPD to inventory that vehicle?

20  A.  It is.

21  Q.  And there are many reasons to inventory a vehicle, but a

22  lot of that is to determine what's in the vehicle, to note that

23  as well, so that everything is documented?

24  A.  Correct.

25  Q.  Okay.  And you indicated -- I just want to make sure we

DANIEL WOODS - DIRECT

1   know exactly the type of vehicle.  So would your report refresh

2   your recollection --

3   A.  It would.

4   Q.  -- as to the exact vehicle?

5   A.  Yes, ma'am.

6         MS. JARBOU:  May I approach, your Honor?

7         THE COURT:  Yes.

8   BY MS. JARBOU:

9   Q.  If you could just review that and let me know when you're

10  ready.

11  A.  Okay.

12  Q.  And did that refresh your memory as to what type of vehicle

13  exactly?

14  A.  It did.  According to my notes, it was a 2006 Mercury

15  four-door sedan.

16  Q.  Okay.  And you indicated that one of the keys that was

17  found or that Mr. Sutherland had on his -- in his possession

18  opened up that vehicle?

19  A.  That's correct.

20  Q.  Okay.  At some point, was that vehicle towed and impounded?

21  A.  It was.

22  Q.  Did you stay behind, you or your partner, to make sure that

23  that happened?

24  A.  We did.

25  Q.  And were the -- was either the defendant or both conveyed

DANIEL WOODS - DIRECT

1    to a police station?

2    A.  Yes.  Both of the defendants were conveyed to the eastern

3    district.

4    Q.  Okay.

5          MS. JARBOU:  May I have one moment, your Honor?

6    BY MS. JARBOU:

7    Q.  Officer Woods, you indicated some of the statements that

8    were made initially.  But did you speak with, or did either

9    defendant speak with you at any point after that or make any

10   statements to you?

11   A.  I remember talking to Mr. Sutherland, but I don't recall

12   exactly where it was that we were speaking.  I can't recall if

13   it was on the scene while we were waiting for the other

14   officers or if it was at the cell block.

15   Q.  Okay.  And what, what was it that you recall?

16   A.  Just that he was trying to ascertain who was handling the

17   case, if it was going to be us or somebody else.

18   Q.  And this was Mr. Sutherland?

19   A.  Correct.

20   Q.  Did you initiate that questioning?

21   A.  I did not.

22   Q.  Or that conversation?

23   A.  I did not.

24   Q.  Did you question him in any way?

25   A.  No.

1   Q.  All right.  So he was the one asking you?

2   A.  That's correct.

3   Q.  Anything else that you recall that he or Mr. Roberts said?

4   A.  Not that I recall.

5          MS. JARBOU:  Thank you.  Nothing further.

6          THE COURT:  Mr. Hackett, any questions?

7          MR. HACKETT:  Yes.

8                         CROSS-EXAMINATION

9   BY MR. HACKETT:

10  Q.  Good afternoon, Officer Woods.

11  A.  Good afternoon.

12  Q.  How are you today?

13  A.  I'm doing okay.

14  Q.  Good.  Let's see.  Do you still have Exhibit 1, I believe?

15  Is that a front --

16  A.  I do, sir.

17  Q.  -- view of the home?

18  A.  I do, sir.

19  Q.  Now, you had indicated on direct examination that prior to

20  -- you had been to the house twice on the evening of February

21  12th, 2011; is that correct?

22  A.  Yes.

23  Q.  Okay.  The first time was about 20 minutes before you had,

24  you had actually approached the house?

25  A.  That's correct.

DANIEL WOODS - CROSS

1   Q.   Okay.  So at the time that you were there the first time,

2   which would have been approximately what time; if you know?

3   A.   Just after one o'clock in the morning, 1:05, 1:10,

4   somewhere in that time frame.

5   Q.   Okay.  Would it, would it be closer to 12:15 a.m.; if you

6   can recall?

7   A.   I can't recall, sir.

8   Q.   If -- is it that you don't remember or?

9   A.   I don't remember specifically what time we --

10  Q.   If I, if I showed you something, would that possibly

11  refresh your recollection?

12  A.   Possibly, sir.  I can take a look at it.

13          THE COURT:  Just go ahead and show him, Mr. Hackett,

14  if you've got something to show him.

15  BY MR. HACKETT:

16  Q.   Specifically 12:15.

17  A.   Okay.  Is there a specific question about it, sir?  I'm

18  sorry.

19  Q.   Does that refresh your recollection about the time?

20  A.   No, it does not.

21  Q.   Okay.

22  A.   There -- I don't see an address.  I didn't -- I also wasn't

23  the one that did the run sheet that night.

24          THE COURT:  Okay.  That's all on that question.

25          THE WITNESS:  Okay.  Okay.  I'm sorry.

DANIEL WOODS - CROSS

| | |
|---|---|
| 1 | MR. HACKETT:  That's all. |
| 2 | THE WITNESS:  Yes, sir. |
| 3 | THE COURT:  What's the next question? |
| 4 | BY MR. HACKETT: |
| 5 | Q.  Okay.  Now, when you were there the first time and you |
| 6 | encountered Ashley Will, I believe that's her name? |
| 7 | A.  Yes. |
| 8 | Q.  Is that correct?  You got out and spoke with her.  And you |
| 9 | asked her what she was doing there.  And you didn't find any -- |
| 10 | anything illegal going on; is that correct? |
| 11 | A.  No.  She was simply sitting in the front seat of her car, |
| 12 | across the street from an abandoned house. |
| 13 | Q.  Right.  And there's nothing unlawful about doing that, is |
| 14 | there, sir? |
| 15 | A.  No, sir. |
| 16 | Q.  And in fact, you recognize that and you left, right? |
| 17 | A.  No. |
| 18 | Q.  You didn't ticket her? |
| 19 | A.  No. |
| 20 | Q.  You didn't -- did you make her get out of her car? |
| 21 | A.  No, sir. |
| 22 | Q.  Did you search her? |
| 23 | A.  No. |
| 24 | Q.  Okay.  So you didn't believe there was, with her, you |
| 25 | didn't believe there was any kind of criminal activity going |

DANIEL WOODS - CROSS

1    on, right?

2    A.  Not at that time, sir, no.

3    Q.  Okay.  So you left and you came back.  And you were with

4    Lieutenant Quarello; is that correct?

5    A.  That's correct.

6    Q.  Is it normal for lieutenants to be out on the road?

7           THE COURT:  Irrelevant.  Go ahead.  Let's get to the

8    point --

9           MR. HACKETT:  I'll move on.

10          THE COURT:  Let's get to the point of where they are

11   encountering people and so on.

12   BY MR. HACKETT:

13   Q.  So when you came back -- now, you have Exhibit 1, right?

14   The front of the house?

15   A.  Yes, sir.

16   Q.  Okay.  Now, is that -- that's an accurate depiction of what

17   the house looked like on that evening, correct?

18   A.  Yes, sir, other than the fact that it's light in this

19   picture and it was --

20   Q.  Okay.  You noticed the door.  Is the door boarded up?

21   A.  No, sir.

22   Q.  And is there a gate on the door?

23   A.  There is.

24   Q.  Okay.  And there's a, there's a white door behind it,

25   right?

DANIEL WOODS - CROSS

1   A.  Yes, sir.

2   Q.  Does it look relatively new?

3   A.  I can't tell, sir.

4   Q.  Okay.  Fair.  Now, also when you, when you pulled up the

5   first time, did you see the black car in the driveway?

6   A.  I don't recall if the car was there at that time or not,

7   sir.

8   Q.  Okay.  Did you see a white van in the driveway?

9   A.  No, sir.

10  Q.  Okay.  Now, when you came back the second time, you had

11  indicated that you saw a black four-door sedan in the driveway?

12  A.  Yes, sir.

13  Q.  Did you also see the white van that was parked in front of

14  that?

15  A.  Not to my recollection, sir.

16  Q.  Out towards the back door of the house?

17  A.  Not to my recollection.

18  Q.  You don't recall that?  Okay.

19  A.  No, sir.

20  Q.  It's that you don't recall there was a van there or there

21  wasn't a van there?

22  A.  I don't recall there being a van there, sir.

23  Q.  Okay.  Now, you indicated that when you came back, you saw

24  a black vehicle in the driveway, correct?

25  A.  Yes, sir.

1    Q.   Okay.  And it was legally parked in the driveway?

2    A.   It was.

3    Q.   Okay.  And there's nothing unlawful about someone parking a

4    car in a driveway lawfully, correct?

5    A.   No, sir.

6    Q.   Okay.  Now, you indicated that you saw there were boards on

7    the windows?

8    A.   Yes.

9    Q.   The front windows, correct?

10   A.   Yes, sir, and the rear windows.

11   Q.   Could you see the windows around the side at that point,

12   when you first pulled up?

13   A.   When we first pulled up or we came back, sir?

14   Q.   When you came back and you parked down the street.

15   A.   Yes.  As we came back, we approached the house.  We were

16   able to see that -- we came from the north, so we were heading

17   south.

18   Q.   Okay.

19   A.   So we're able to see the northern exposure of the house.

20   We had already seen the front of the house.  We came around the

21   back of the house.  So we saw the back of the house, all the

22   windows were boarded up, and we were standing on the south --

23   the southern exposure of the house where all the windows were

24   boarded up.  So we saw pretty much the entire house.

25   Q.   Okay.  Did you notice that the top window in the front

DANIEL WOODS - CROSS

1   wasn't boarded?

2   A.   The top window in the very front of the house?

3   Q.   Yes.

4   A.   Or in the southern exposure?

5   Q.   In the peak.

6   A.   No, sir, we didn't.  I didn't notice it at the time.

7   Q.   Okay.  And did you notice that the upstairs windows weren't

8   boarded up?

9   A.   I did on the southern face; when we were standing on the

10  south side.  Yes.

11  Q.   Okay.  And that would be the driveway side, right?

12  A.   Correct.

13  Q.   And if there was a white van in that park there on the

14  southern side of the house, you would have seen it, wouldn't

15  you?

16  A.   I would assume so, yeah.  I just don't recall if there was

17  a van there.  The only car that I remember being there was the

18  four-door sedan parked in the front of the driveway.

19  Q.   Okay.  Now, did you also notice that on the north side of

20  the house, the bathroom window was not boarded up?

21  A.   Is that a lower or upper window, sir?

22  Q.   It's a lower window.

23  A.   I did not.

24  Q.   Did you, did you spend any time on the northern side of the

25  house?

DANIEL WOODS - CROSS

1   A.  Not particularly.  We just walked past it as we came from

2   the north, around the back of the house to the south side of

3   the house.

4   Q.  Okay.  So you came in through the back way?

5   A.  Correct.

6   Q.  Okay.  Is there an alley back there?

7   A.  No.  We came down the, down the block and then cut in

8   around the house, at the house.

9   Q.  Okay.  So I just, I just want to be clear because the first

10  time you explained it, you said you came around the back.

11  A.  We came around the back of the house.  Correct.

12  Q.  Okay.  From the back of the house or did you come up the

13  driveway?

14  A.  No.  We came from the north side, around the back side of

15  the house.  From the, from the north side of the house.

16  Q.  Right.

17  A.  We went in between the house and the house next to it on

18  the north side, and around the back of the house.

19  Q.  Okay.  Now, did you hop over a fence?

20  A.  I believe we did, sir.

21  Q.  Okay.  So there was a fence there?

22  A.  If I remember correctly, yes.

23  Q.  And so, just so I'm clear, you came around the north side

24  of the house, hopped the fence into the backyard, and then went

25  around to the south side of the house?

1    A.  Correct.

2    Q.  And you were -- and you noticed that there was debris; is

3    that right?

4    A.  Yes, sir.

5    Q.  Is that what you testified to?  Did you know what kind of

6    debris?

7    A.  No, sir.

8    Q.  Did it look like construction debris?

9    A.  Could have been.

10   Q.  But it was dark, right?

11   A.  Yes, sir.

12   Q.  Okay.  And you also noticed that there was ice that built

13   up on the outside of the house in the back; is that correct?

14   A.  I don't personally recall that, but there may have been.

15   It was wintertime.

16   Q.  Okay.  You saw lights on --

17   A.  Yes, sir.

18   Q.  -- inside the house?

19   A.  Upstairs.

20   Q.  So there was electricity?

21   A.  Yes, sir.

22   Q.  The presence of ice, would that mean that there was, there

23   was heat in the building?

24   A.  I don't know, sir.

25   Q.  Just asking, maybe you'd have some special knowledge about

DANIEL WOODS - CROSS

1   that.

2           So there's lights and you walk around to the south

3   side of the driveway and you're standing under the window

4   listening, right?

5   A.   Standing at the back corner, yes, sir.

6   Q.   Okay.  And it was dark over there, right?

7   A.   Yes, sir, in the back of the house.

8   Q.   And you're in between two houses?

9   A.   Yes, sir.

10  Q.   And you're listening to men's voices, okay?  Right?

11  A.   Yes, sir.

12  Q.   Okay.  Is there anything unlawful about two men talking in

13  a house?

14          THE COURT:  That's really irrelevant, Counsel.

15          MR. HACKETT:  Well --

16          THE COURT:  There are probably 50 things a minute that

17  the witness could observe that are not unlawful going on in his

18  immediate proximity.  The question is not what was unlawful

19  about any of the events that he may have observed.  The

20  question is whether the encounter with these defendants that

21  led to the search uncovering the evidence that's of concern to

22  you was lawfully seized.

23          MR. HACKETT:  That's correct, Judge.

24          THE COURT:  And it is a reasonable officer's, not even

25  this officer, but a reasonable officer's perception of the

 1   events that is, that is at issue here.

 2          MR. HACKETT:  I understand that, Judge.  And he has to

 3   have some articulable suspicion as to some kind of unlawful

 4   activity going on at this residence or with these defendants.

 5          THE COURT:  And as he has --

 6          MR. HACKETT:  In order to --

 7          THE COURT:  And -- yes, that's correct.

 8          MR. HACKETT:  -- effectuate an arrest that he did.

 9          THE COURT:  Correct, sir.  And as he said on direct

10   examination, he was under the impression that entry without

11   permission, squatting, illegal entry into an abandoned house

12   may have been occurring; and it may be well to examine with

13   respect to that stated perception.

14          MR. HACKETT:  I understand.

15          THE COURT:  And facts that are relevant to it.

16          MR. HACKETT:  I understand that.  But I need to

17   understand what facts he relied on in order to make that

18   decision.

19          THE COURT:  Here's one of my points.  I think what

20   we're doing is spinning our wheels and wasting time asking

21   whether two men talking is illegal.  It's just -- there's no

22   jury in the box.  You're not trying to impress anybody in that

23   respect.  It's just that really doesn't have anything to do

24   with whether his stated perception of a possible squatting,

25   illegal entry offense was occurring.  So I would say more hew

DANIEL WOODS - CROSS

1    to the point, please.

2         MR. HACKETT:  Thank you, Judge.  I'll move on.

3         THE COURT:  Okay.

4    BY MR. HACKETT:

5    Q.  Now, at that point, Lieutenant Quarello and yourself are at

6    the side of the house?

7    A.  That's correct.

8    Q.  Okay.  And so far, you hadn't observed anything unlawful

9    going on, right?

10   A.  Not at that point.

11   Q.  Okay.  So you indicated that you saw the young lady that

12   was across the street, walk up into the house, right?

13   A.  That's correct.

14   Q.  Okay.  And about how long after you were at the side of the

15   house did she walk up?

16   A.  Just a couple minutes.  We had been standing there maybe 2,

17   3, 4 minutes.  I don't know.

18   Q.  Okay.  Do you know if she, she saw you walk into the

19   backyard?

20   A.  I have no way of knowing whether or not she saw us, sir.

21   Q.  Okay.  Now, at the point that she walks into the house, how

22   long was it between the time that my client and Mr. Roberts

23   came out of the house?

24   A.  It was almost at the same time.  As she was walking in,

25   they had walked out of the house.  They spoke for maybe a

DANIEL WOODS - CROSS

1   couple of seconds as they were passing, I believe.  And then

2   the two defendants headed towards the driveway, towards the car

3   in the driveway.

4   Q.  Okay.  And is that when you identified yourself?

5   A.  It is.

6   Q.  Okay.  And you came up from the side of the house and you

7   identified yourselves as police?

8   A.  That's correct.

9   Q.  And what did you do then?

10  A.  We asked them who, who belonged to the house, who lived in

11  the house.

12  Q.  Right.

13  A.  Did one of the two of you live here.

14  Q.  And one of them indicated that they were staying there and

15  that they were working on the house?

16  A.  Correct.

17  Q.  Is that correct?  Now, did you have any proof to the

18  contrary that --

19  A.  I'm sorry.

20  Q.  -- he didn't have the permission to be there?

21  A.  He was -- he wasn't able to produce anything for us.  We

22  asked him if he had any paperwork.  He stated he did not.

23  Q.  Okay.  And then you testified that you saw my client, Mr.

24  Sutherland, with a wad of keys in his hand and something else.

25  Could it have been a cell phone or something like that?

1   A.  Something to that effect, sir.  I don't recall exactly.

2   Q.  And you indicated that you told him to walk over to the car

3   and place the -- what he had in his hands on the roof of the

4   car; is that correct?

5   A.  That's correct.

6   Q.  Okay.  And when you say the roof of the car, you mean

7   the --

8   A.  The roof.

9   Q.  -- the roof of the car above the door?

10  A.  Correct.

11  Q.  Not the hood?

12  A.  Yes, sir.

13  Q.  Right?  Okay.

14          Now, if you could look at Exhibit 1, could you tell me

15  exactly where you were standing?

16  A.  Well --

17  Q.  Kind of, if you could point to it?

18  A.  I can't really see it in Exhibit 1.

19          MR. HACKETT:  Your Honor, may I approach the witness?

20          THE COURT:  Yes.

21          MR. HACKETT:  Thank you.

22  BY MR. HACKETT:

23  Q.  I didn't have this marked, but I will ask that it be marked

24  as Defense Exhibit A.

25          Would you tell me what that is?

1    A.   It appears to be a picture of the front of the -- the front

2    of the same house.

3    Q.   Okay.  But it goes a little bit farther, you can see the

4    driveway?

5    A.   A little more perspective, yes, sir.

6    Q.   Right.  There's a car in the driveway; is that right?

7    A.   There is.

8    Q.   And that car wasn't there on the evening of this

9    transaction, right?

10   A.   Not that -- no, sir.

11   Q.   Or this occurrence.  But that's an accurate reflection of

12   what the home on Dresden looks like; is that correct?

13   A.   Yes, sir.

14   Q.   Okay.  Now, if you could tell us exactly where you were

15   standing when you had my client walk over to his car, if you

16   could, if you could do that.

17   A.   We had come out from the side of the house.

18   Q.   Right.

19   A.   And addressed your client and Mr. Roberts somewhere in this

20   area here.

21   Q.   Okay.

22   A.   I don't remember if we had him on this side of the car or

23   the other side of the car.  I can't remember, to be honest with

24   you.  But I believe we were on the passenger side of the car.

25   I asked him to turn and put the stuff on the roof of the car.

DANIEL WOODS - CROSS

```
 1   When he did, that's when his coat came open.  I was able to see
 2   the --
 3   Q.  Okay.
 4   A.  -- pistol in his waistband.
 5   Q.  So you were, what would be on the -- you were south of the
 6   driveway then?
 7   A.  That's --
 8   Q.  Is that what you're saying?
 9   A.  That is correct.
10   Q.  You came out from the back?
11   A.  As I remember, yeah, we were south.
12   Q.  And you were south of the driveway.  You weren't on the
13   front yard of the Dresden house at that point, right?
14   A.  Not at that point, sir.
15   Q.  Okay.  And you indicated that my client had a black trench
16   coat on, right?
17   A.  Yes, sir.
18   Q.  It was a duster, is that -- does this --
19   A.  That could be it, sir.
20   Q.  -- look familiar?
21   A.  Yes.  I don't know if it was leather or -- I just remember
22   it being a long, black overcoat, coat.
23   Q.  And he had -- so you would have been standing by a -- the
24   car, you were on the other side of the vehicle, right?
25   A.  It was on the same side of the vehicle he was on.  Correct.
```

DANIEL WOODS - CROSS

1  Q.  Okay.  You were on the same side of the vehicle that he was

2  on?

3  A.  Yeah.

4  Q.  So he was on the passenger side of the vehicle at that

5  time.  So he had come around the car towards you guys?

6  A.  Yeah.

7  Q.  Towards the two of you?

8  A.  We asked them to come towards us when they exited the

9  house.

10  Q.  Okay.  And you had him -- so the car would have been facing

11  this way then, right?  Towards you, right?

12  A.  The car was facing eastbound.  I don't know.

13  Q.  Okay.  But you said that you had him come out and walk

14  around the side of the car to where you were?

15  A.  Yes.  We asked them to come towards us.

16  Q.  Right.  Okay.  So he came towards you.  And you told him to

17  put the belongings he had on the hood of the car?

18  A.  Correct.

19  Q.  And you said he did this on the passenger side of the

20  vehicle?

21  A.  Yes, sir.

22  Q.  Right?  So he's standing here, right?  You're looking at

23  him just like you are right now, right?

24  A.  No, sir.

25  Q.  No?  Where were you?

1   A.  He's facing me.

2   Q.  He's facing you?

3   A.  Yes, sir.

4   Q.  So the car --

5   A.  And he had his hands like this with the stuff in his hands.

6   Q.  All right.  So the car is -- and he's placing the stuff on

7   the hood, right?

8   A.  Correct.

9   Q.  Okay.  So --

10   A.  I could --

11        MS. JARBOU:  Your Honor?

12   BY MR. HACKETT:

13   Q.  How can you see what's in his waistband?

14   A.  Because it was right in the front of his waistband.  As

15   soon as he turned from me, I could see it sticking right in the

16   front of his waistband.

17   Q.  Okay.

18        MS. JARBOU:  I'm sorry.  Just to interject, I'm going

19   to object to this, what purports to be, I assume, a

20   demonstration.  There's been no foundation laid for this

21   particular coat.  I don't know where this coat comes from, who

22   it belongs to.  So I guess I would object to the demonstration.

23        THE COURT:  I don't think there's a basis to sustain,

24   as the record doesn't even reveal a demonstration as a matter

25   of fact.

DANIEL WOODS - CROSS

1              Go ahead, Mister --

2              MR. HACKETT:  I'm just asking questions, Judge, about

3    where he was at.

4              THE COURT:  I understand.

5              MR. HACKETT:  Where he allegedly saw this weapon in my

6    client's waistband.

7    BY MR. HACKETT:

8    Q.  If, in fact, you asked him to place the belongings that he

9    had on the roof of the car, he would have to turn in order to

10   do that, wouldn't he?

11   A.  Yes, sir.

12   Q.  Okay.  And if, in fact, you were standing in the dark,

13   right?  There wasn't any lights there, were there?

14   A.  Yes, there were.  There were street lights, sir.

15   Q.  There's street lights?

16   A.  Yes, sir.

17   Q.  And is there, do you know if there's a street light in

18   front of the house?

19   A.  I don't recall if there's specifically a street light in

20   front of the house.  But I also had a flashlight I was

21   utilizing at the time as well, sir.

22   Q.  Okay.  And so you told him to put the belongings on the

23   roof of the car and you're saying that so he had to be turned

24   away from you, right?

25   A.  He turned away from me.  He turned back toward me.

DANIEL WOODS - CROSS

1   Q.  Now, do you remember writing a report in this case?

2   A.  I did, sir.

3           MR. HACKETT:  May I approach, Judge?

4           MS. JARBOU:  Is there a question?

5           THE COURT:  Yes.

6           MR. HACKETT:  Yeah.

7   BY MR. HACKETT:

8   Q.  Do you recall -- I'll ask the question.

9           Do you recall in your report indicating that, that he

10  had a large bundle of keys and a cell phone in his hands, and

11  you instructed him to place them on the roof of the vehicle?

12  As Mr. Sutherland placed the items on the roof of the vehicle,

13  his full-length leather coat opened up and writer observed BSA

14  in Mr. Sutherland's right front waistband.

15          That would have been this side, right?

16  A.  Correct.

17  Q.  And he would have been placing the belongings on the roof

18  of the car?

19  A.  That's correct.

20  Q.  When you saw it?

21  A.  When he turned back towards me.

22  Q.  From that point, right?

23  A.  Yes, sir, when he turned back towards me.

24  Q.  And then he turned back towards you.  You don't indicate

25  that in your report, do you?

DANIEL WOODS - CROSS

1   A.  I don't know if it's in there or not, sir.  I'm telling you

2   what I observed.

3           MR. HACKETT:  May I approach, Judge?

4           THE COURT:  Why don't you just aver that it's not in

5   the report, and maybe counsel will agree with you without

6   spending the time.

7   BY MR. HACKETT:

8   Q.  That's not in your report, is it?

9   A.  I would have to check.  I don't recall whether or not it

10  states in there or not.

11          THE COURT:  Mr. Hackett, the procedure you might use

12  is to proffer that it's not in the report and see if counsel

13  will agree with you.

14          MR. HACKETT:  I shall do that.  I apologize, Judge.  I

15  would like to proffer the fact that it's not indicated in his

16  report.

17          MS. JARBOU:  What's not?

18          THE COURT:  Specifically.

19          MR. HACKETT:  That my client specifically turned

20  towards him and he saw the weapon.  What it says is that he

21  placed the belongings on the roof of the car, and that he saw

22  it in his right waistband.  That's what he wrote in his report.

23          MS. JARBOU:  I guess if the question is specifically

24  that you didn't indicate in your report that as he turned his,

25  his, his full-length coat opened up, I disagree with that.  But

DANIEL WOODS - CROSS

1   specifically what isn't in his report?

2          THE COURT:  This all started with a suggestion by Mr.

3   Hackett to the witness that you didn't put in your report that

4   he turned toward you, when the emphasis on the word toward, the

5   witness said he wasn't sure.  He had to read the report.  And I

6   suggested, well, maybe you can just proffer that --

7          MS. JARBOU:  Yes.

8          THE COURT:  -- that is not -- what I meant was that

9   phrase or that word is not in the report and that perhaps

10  counsel will agree with that proffer.

11         MS. JARBOU:  I agree that, that specifically, that he

12  turned toward him is not in the report.

13         THE COURT:  Go ahead, Mr. Hackett.

14         MR. HACKETT:  And that he testified differently than

15  what he wrote in his report.  I think that that's --

16         MS. JARBOU:  That's a mis --

17         THE COURT:  Well, that may or may not be true.  I

18  don't know.  It's not part of your proffer.

19         In any event, we're going to take a -- we're going to

20  recess this briefly to take a default judgment motion, which is

21  only a five-minute affair.  So you can suspend your questioning

22  for the moment.

23         Witness, if you're more comfortable standing down, you

24  can do that.

25         THE WITNESS:  Thank you, your Honor.

DANIEL WOODS - CROSS

1            MS. MOHSIN:  I'm going to retrieve our exhibits.

2            THE COURT:  Defendants should remain in court.

3            (Brief recess, 4:04 p.m. - 4:10 p.m.)

4            THE COURT:  Witness, back to the witness stand, please

5       and we can return to the record here, after the five or six

6       minute recess with the other case.

7            Mr. Hackett, additional questions?

8            MR. HACKETT:  Thank you, Judge.

9       BY MR. HACKETT:

10      Q.  Now, if I remember correctly, you testified on direct exam

11      that you were outside with Lieutenant Quarello when these

12      defendants came outside the house, correct?

13      A.  Correct.

14      Q.  And you -- where was Lieutenant Quarello and Mr. Roberts at

15      the time that you were having Mr. Sutherland put his belongings

16      on the roof of the car?

17      A.  Mr. Roberts was very close to where Mr. Sutherland was.

18      And I think at this time, Lieutenant Quarello had moved over

19      towards the door of the house to keep an eye on the front door

20      of the house.

21      Q.  And at that point, the two of you were alone, correct?

22      A.  For the most part, yeah.  I mean, he was a few yards away

23      from me, my partner was a few yards away from me at that point.

24      Q.  And he was on the other side of the vehicle from where you

25      were, correct?

1   A.   Correct.

2   Q.   And you had indicated that you had asked both my client and

3   Mr. Roberts to walk over towards you; is that correct?

4   A.   To come over towards us, yes.  That's correct.

5   Q.   And at the same time, Lieutenant Quarello went away from

6   you with these two individuals walking towards you, right?

7   A.   I don't recall that he went there at the same time that we

8   initially made contact with Mr. Sutherland and Mr. Roberts.

9   But by the time that I was addressing Mr. Sutherland,

10  Lieutenant Quarello had moved over towards the front door.

11  Q.   Okay.  And Mr. Roberts, he was over by you and Mr.

12  Sutherland?

13  A.   That's correct.

14  Q.   Is that what you indicated?

15  A.   Yes, sir.

16  Q.   Was he between you and Mr. Sutherland?

17  A.   No.  He was standing -- I'm trying to think exactly where

18  everybody was positioned.  Mr. Sutherland would have been to my

19  left and I think Mr. Roberts was to my right.

20  Q.   Okay.  And so Mr. Roberts would have been towards the

21  vehicle at that point?

22  A.   He would have been towards the -- we were on the south side

23  of the vehicle.

24  Q.   Right.

25  A.   Okay.  Mr. Sutherland was to my left.  Mr. Roberts was

1   towards my -- was to my right, if I recall correctly.

2   Q.   Okay.  So if you're looking west, okay?  You're on the

3   south side of the house and you're looking west, you're looking

4   towards the street, right?

5   A.   Actually, I was looking north and I had one on my left and

6   one on my right.

7   Q.   Okay.  And you indicate Lieutenant Quarello had gone to the

8   porch?

9   A.   Correct.

10  Q.   Were there any other officers there at that time?

11  A.   Not at that time, no, sir.

12  Q.   Okay.  And so if Mr. Sutherland was on your left and

13  Mr. Roberts was on your right-hand side, and we're looking at

14  the car, right?

15  A.   We're looking in that direction, yes, sir.

16  Q.   Right, towards the car.  Mr. Sutherland then had to walk to

17  his right in order to get to the car to place his belongings on

18  top of the car, right?

19  A.   I don't recall which direction he came from, sir.  If he

20  came around the car this way, if he came straight at us, I

21  don't recall, sir.  I just remember that us standing there, one

22  on one side, one on the other side.  I don't remember the

23  specifics of how many steps he took or what direction he took

24  them in.

25  Q.   Okay.  Is that normal to have two adult males at one

DANIEL WOODS - CROSS

```
1    o'clock in the morning approach you without your partner
2    standing somewhere close in your proximity?
3    A.  It's as normal as any other department.
4            MS. JARBOU:  I guess relevance if that's normal.
5            MR. HACKETT:  Okay.  I mean, I'm just --
6            MS. JARBOU:  Specifically asked about these two
7    individuals, but.
8            THE COURT:  I agree with the objection.
9            MR. HACKETT:  I'll move on.
10   BY MR. HACKETT:
11   Q.  Now, you had testified on direct examination that the Sable
12   was in the driveway.  And you determined the keys were placed
13   on the roof of the car belonged to that car, right?
14   A.  Correct.
15   Q.  How did you do that?
16   A.  Looked at the keys and there was a Mercury key on there.
17   Q.  Okay.  And at that point, you say that you had already
18   found, allegedly found a pistol in my client's right waistband,
19   right?
20   A.  Correct.
21   Q.  Okay.  And you effectuated an arrest?
22   A.  Correct.
23   Q.  Okay.  So at that point, he was under arrest?
24   A.  That's correct.
25   Q.  All right.  And you had already indicated that this vehicle
```

1   was lawfully parked in the driveway, right?

2   A.   It was.

3   Q.   All right.  And you determined that the keys belonged to

4   Mr. Sutherland, right?

5   A.   He was in possession of them, yes.

6   Q.   Okay.  And you had enough at that point to get a warrant to

7   search the car, didn't you?

8   A.   I don't know, sir.  I don't know if we had enough to get a

9   warrant or not.

10  Q.   You don't --

11  A.   We weren't doing a warrant search of the vehicle.  We were

12  doing an impound and inventory of the vehicle.

13  Q.   Okay.  But at that point, you would have had probable cause

14  to search that vehicle, wouldn't you?

15  A.   Possibly, sir.

16  Q.   And you could have easily gotten a warrant to do so,

17  couldn't you?

18  A.   I don't know about easily, sir.

19  Q.   Okay.  Now, you testified on direct that someone else

20  opened the trunk?

21  A.   That's correct.

22  Q.   Is that right?

23  A.   Yes, sir.

24  Q.   And you didn't recall who it was?

25  A.   At that time there were more than myself and my partner

DANIEL WOODS - CROSS

1    there.  I don't recall which officer actually opened the trunk.
2    Q.  Okay.  About how long after you arrested my client did the
3    other police officer show up?
4    A.  A few minutes.
5    Q.  A few minutes.  Okay.  So in that few minute period of
6    time, what was everybody else doing?
7    A.  I had detained Mr. Roberts at this point, placed him in
8    handcuffs and my partner was still standing by the front door
9    of the residence.  He had the front door open and was talking
10   to, who I imagine at that time, was the female that had gone
11   inside the house.
12   Q.  Okay.  And in your report, you indicate that you were the
13   one that opened the trunk and found the Bushmaster rifle; do
14   you recall that?
15   A.  I didn't open the trunk.  I recovered it from the trunk.
16   Q.  Okay.  It says here, "writer began conducting inventory
17   search of the same pursuant to impound.  And in trunk, writer
18   observed loaded Bushmaster AR-15 type rifle and recovered
19   same."
20          You don't say anything about someone else finding the
21   weapon in your report, do you?
22   A.  Well, I recovered the weapon.  I thought that was the
23   pertinent information to put in the report, not who actually
24   turned the key and opened the trunk.
25   Q.  Okay.  But when you write police reports, it's important to

DANIEL WOODS - CROSS

1   be accurate, isn't it?

2   A.   Sir, it also doesn't state in there the weather conditions,

3   it doesn't state my shoe size.  There's a lot of things that

4   are not stated in that report that were not relevant, that I

5   thought were not relevant at the time I wrote the report.

6   Q.   Okay.  That's fair enough.  But it's true that, you know,

7   you write reports often, right?

8   A.   That's correct.

9   Q.   And it's part of your job to write reports?

10  A.   It is.

11  Q.   And it's part of your job to write accurate and complete

12  reports; isn't is that true?

13  A.   It is true.  And I believe they are accurate.

14          MS. JARBOU:  Your Honor, I believe it's been asked and

15  answered.

16          THE COURT:  It has been asked and answered.  And in

17  addition, it's fairly, it's only marginally, if that, relevant

18  to the matters of concern.

19          Any substantive questions, Mr. Hackett?

20          MR. HACKETT:  No more at this time, Judge.

21          THE COURT:  Mr. Tank, any questions?

22          MR. TANK:  Very briefly, your Honor.

23          THE COURT:  All right.

24                          CROSS-EXAMINATION

25  BY MR. TANK:

DANIEL WOODS - CROSS

1    Q.  Sir, did there come a time where you entered into the

2    address in question on Dresden?

3    A.  Yes, sir.

4    Q.  Okay.  You physically went into the house, correct?

5    A.  I did, sir.

6    Q.  And when you physically went into the house, would you

7    agree that there's, for example, a television set that was

8    inside?

9    A.  There was, sir.

10   Q.  Okay.  And so when you entered into the house itself, based

11   upon what you saw, were you able to conclude that someone, in

12   fact, lived there, sir?

13   A.  No, sir.

14   Q.  Okay.  Was there furniture there?

15   A.  I believe there was a couch and a table pushed up against

16   one of the walls.

17   Q.  All right.  You talk about the kitchen.  Was there

18   things -- were there things in the kitchen like food or things

19   along those lines that you saw?

20   A.  I do recall seeing it, but that doesn't necessarily mean

21   that somebody was there legally, sir, which is what we were

22   investigating.

23   Q.  I see.  Okay.  And so you have a conversation with

24   Mr. Roberts outside, and you ask him for paperwork, correct?

25   A.  Correct.

DANIEL WOODS - CROSS

1    Q.  And you're looking for paperwork from someone showing that

2    he has the legal authority to be there?

3    A.  Correct.

4    Q.  All right.  While you were going through the home, was it

5    pretty clear that some type of renovation was going on or some

6    work had been going on there?

7    A.  I don't recall seeing any construction debris inside the

8    house.  The house, the interior of the house I will say was in

9    good condition.

10   Q.  All right.  It appeared, for example, as if it had recently

11   been painted, correct?

12   A.  Correct.

13   Q.  Did you obtain anything from inside the home in terms of

14   information in reference to a renovation company, for work that

15   had been done there?

16   A.  I did not recover anything from --

17   Q.  Are you aware of -- excuse me.  Strike that.  Are you aware

18   if anyone else did?

19   A.  I'm not aware, sir.

20   Q.  Okay.  After you walk in and you see the couch, you see the

21   TV set and these things, did you in fact go upstairs, sir?

22   A.  We did, sir.

23   Q.  And when you went upstairs, there was a bedroom there, was

24   there not?

25   A.  There was a bedroom set upstairs.

DANIEL WOODS - REDIRECT

1    Q.  And there was -- and with the bed that was there, it was

2    clear it had sheets on it, correct?

3    A.  Correct.

4    Q.  And it was clear that someone was staying there as well,

5    correct?

6    A.  It appeared to be, sir.

7    Q.  And while you were there in this, this room upstairs that

8    contained the bed in it, did you have an opportunity to obtain

9    incidents of ownership:  Letters, documents, things along those

10   lines?

11   A.  No, sir.

12   Q.  You did not?

13   A.  No, sir.

14   Q.  All right.  After this took place, did you have an

15   opportunity -- strike that for a second.

16           MR. TANK:  Your Honor, at this point in time, I have

17   no further questions of the witness.

18           MS. JARBOU:  Very briefly.

19           THE COURT:  Ms. Jarbou?  All right, Ms. Jarbou.

20                        REDIRECT EXAMINATION

21   BY MS. JARBOU:

22   Q.  Officer Woods, just briefly, you indicated that Mr.

23   Sutherland, you had asked him to put the keys on the car, on

24   the vehicle?

25   A.  Correct.

1   Q.  And that he turned, not walked, he turned and put those

2   keys on the vehicle?

3   A.  Correct.

4   Q.  How far away were you from Mr. Sutherland when you observed

5   the handgun?

6   A.  Five, six feet.

7   Q.  And you indicate his coat or jacket opened up?

8   A.  Correct.

9   Q.  Was it zipped in any way or buttoned?

10  A.  It was not zipped; it wasn't buttoned.  It was hanging open

11  in the front.

12  Q.  And so the very act of the turning opened up the jacket

13  where you could observe the, the handgun?

14  A.  Correct.  When he turned and placed the stuff on the car,

15  he put it on the car, he turned back towards me.  I could see

16  the, the gun in the front of his waistband.

17          MS. JARBOU:  Thank you.  Nothing further.

18          THE COURT:  When you say in the front of his

19  waistband, do you mean -- well, just demonstrate where

20  essentially it was.

21          THE WITNESS:  Okay.  Essentially right here.

22          THE COURT:  I'd call that sort of a quarter of the way

23  around the perimeter.

24          THE WITNESS:  Front, that's why I put front right.  It

25  wasn't on the right side like where, you know, where I would

DANIEL WOODS - REDIRECT

1    carry a duty weapon.  It was in the front right -- front part

2    of the waistband right here.

3           THE COURT:  Something of a hollow in front of the

4    pelvis there --

5           THE WITNESS:  Correct.

6           THE COURT:  -- that's naturally receptive to a device

7    of that kind.

8           THE WITNESS:  Yes, sir.

9           THE COURT:  All right.

10          MS. JARBOU:  Nothing further.

11          THE COURT:  Anything else, counsel, based on the

12   Court's brief questioning?

13          MS. JARBOU:  No.  Thank you.

14          THE COURT:  Mr. Hackett?

15          MR. HACKETT:  No.  I have no more for this witness.

16          THE COURT:  Mr. Tank?

17          MR. TANK:  I have no follow up.  Thank you, your

18   Honor.

19          THE COURT:  The witness may step down.

20          THE WITNESS:  Thank you, your Honor.

21          (Witness excused.)

22          THE COURT:  Any other witnesses on this point?

23          MS. JARBOU:  Just briefly -- well, actually your

24   Honor, I'd like to inquire of the Court.  Because when we

25   started, you indicated to Mr. Tank it was his burden, in terms

DANIEL WOODS - REDIRECT

1   of proving some expectation of privacy as to that home.  As to

2   Lieutenant Quarello --

3            THE COURT:  You know, Witness, hang on.  Witness, come

4   back here.  I actually forgot one other line of questioning.

5   Come back into the well of the courtroom, please.  Your oath

6   continues.  You don't need to go back to the witness stand.

7   Just stand here.  I just have another question.

8            All of this question about, about the house, how the

9   house looked, it was freshly painted, food or something on the

10  counters perhaps.  Those observations, if I understand it

11  correctly, you made after the firearm had been seen --

12           THE WITNESS:  That's correct, your Honor.

13           THE COURT:  -- and seized.  After the handcuffing of

14  both defendants.  You didn't see any of that business

15  beforehand?

16           THE WITNESS:  Correct, your Honor.

17           THE COURT:  All right.  Thank you.  I thought that was

18  correct.  I just wanted to be sure.  Thank you, you're excused.

19           THE WITNESS:  Thank you, sir.

20           (Witness excused at 4:24 p.m.)

21           THE COURT:  Back to you, Ms. Jarbou.  You were asking

22  what now, about Mr. Tank?  I said that I'm dubious as to

23  whether he has presented a prima facie case with respect to a

24  recognizable and reasonable expectation of privacy in the home.

25           MS. JARBOU:  And that's why I'm inquiring.  Because if

1   the Court is making a ruling as to that, that if there's no

2   expectation of privacy that Mr. Roberts has in the home, the

3   next witness is going to be the witness who recovered the

4   weapon from the home.  But I don't suppose we need to get into

5   that if there's a determination by the Court.

6           THE COURT:  Well, it seems to me, in a reasonable

7   abundance of caution, it might be well to preserve the

8   testimony and get a ruling.

9           MS. JARBOU:  Thank you, your Honor.  The Government

10  would call Lieutenant Quarello.

11          (Witness is sworn.)

12                  CHRISTOPHER QUARELLO

13      called as a witness at 4:25 p.m. testified as follows:

14                  DIRECT EXAMINATION

15  BY MS. JARBOU:

16  Q.  Good afternoon, sir.  Could you state your name and spell

17  your last name for the record.

18  A.  Christopher Quarello.  Q-U-A-R-E-L-L-O.

19  Q.  How are you employed?

20  A.  I'm a lieutenant with the Detroit Police Department.

21  Q.  How long have you been with the Detroit Police Department?

22  A.  Seventeen years last month.

23  Q.  How long have you been in law enforcement, the same amount

24  of time?

25  A.  The same amount of time.

1    Q.   Lieutenant Quarello, I want to draw your attention to

2    February 12th, 2001 (sic).  Were you working on that date?

3    A.   Yes, I was.

4    Q.   What shift were you working?

5    A.   Seven p.m. to three a.m.

6    Q.   Were you working alone or with a partner?

7    A.   With a partner.

8    Q.   And who was that?

9    A.   Police Officer Daniel Woods.

10   Q.   Did you and -- were you and Officer Woods in full uniform?

11   A.   We were in a modified uniform.

12   Q.   What does that mean?

13   A.   I had like a sweater, or actually a fleece that said police

14   on it, badge, gun belt exposed at the waist, and then some

15   black, like military BTU style pants.

16   Q.   What was your assignment?

17   A.   I was working narcotics street enforcement that evening.

18   Q.   And were you and Officer Woods in a police vehicle?

19   A.   Yes.

20   Q.   And how was it marked?

21   A.   It was fully marked.

22   Q.   Did you at some point, you and Officer Woods, were you in

23   the area of Dresden in the city of Detroit?

24   A.   Yes.

25   Q.   Or on, on that road?

1    A.   Yes.

2    Q.   In the area of Dresden and is it Gietzen?

3    A.   Yes, ma'am.

4    Q.   At some point, were you in front of or near the -- near

5    17378 Dresden in the city of Detroit?

6    A.   Yes.

7    Q.   Approximately one a.m., what occurred?

8    A.   At approximately one a.m.?

9    Q.   That you recall, in relationship to that house?

10   A.   I made some observations regarding the house, the

11   conditions of the exterior.

12   Q.   Okay.  First of all, why were you in that area in

13   particular?

14   A.   We were assigned to that area that evening, just for

15   patrol.

16   Q.   So this was routine patrol that you happened to be going by

17   this house?

18   A.   Yes.

19   Q.   What observations did you make about the house?

20   A.   The house appeared to be -- it didn't appear to be.  It was

21   boarded.  The first floor windows were boarded.  There was a

22   vehicle in the driveway; footprints in the snow, going to the

23   front and side doors, quite a few footprints in the snow.

24   Q.   Anything else that you noticed about the home?

25   A.   No.  Initially, just that.

1   Q.  Did you have any interaction with anyone outside of that

2   home?

3   A.  Yes.

4   Q.  Initially?  Who was that?

5   A.  There was a female in a vehicle parked near the front of

6   the house.

7   Q.  And what interaction did you have with that female?

8   A.  I didn't speak with her.  My partner did.

9   Q.  What was the nature of the interaction?

10  A.  I'll describe it as like a wellbeing check, is everything

11  okay, that sort of thing.

12  Q.  What happened next?

13  A.  We left the area to assist some other officers on a shots

14  fired run.

15  Q.  Did you, at some point around 1:30 in the morning, return

16  to the area of 17378 Dresden?

17  A.  Yes.

18  Q.  And why did you return?

19  A.  To approach the house on foot and make some more

20  observations.

21  Q.  And why, why would you want to do that?  Or why did you do

22  that?

23  A.  I thought it was possibly a vacant or abandoned dwelling

24  that might have persons inside.

25  Q.  For the reasons that you've stated?

1    A.  Yes.

2    Q.  In terms of the description of the home?

3    A.  Yes.

4    Q.  Where -- did you park your vehicle?

5    A.  Yes.

6    Q.  And where did you park your vehicle?

7    A.  On Gietzen, east of Dresden.

8    Q.  And so you approached the home on foot?

9    A.  Yes.

10   Q.  And what else -- what, if anything else did you observe

11   about the home?

12   A.   In approaching the house, walked to the south side and then

13   the back, I observed that all of the first floor windows were

14   boarded over.  There was a large amount of ice frozen to the

15   back of the house.  There was a window open on the second

16   floor, or a second floor window was open partially, a light on

17   inside in the upstairs that was visible.

18   Q.  And did you hear or see anything?

19   A.  Yes.

20   Q.  What did you hear or see?

21   A.  Conversation between two male voices.

22   Q.  Coming from where?

23   A.  The upstairs window.

24   Q.  What happened next?

25   A.  I believe it was myself, I radioed, asked for another car

CHRISTOPHER QUARELLO - DIRECT

1    to come to that location, then waited at the back of the house,

2    along the back corner of the house.

3    Q.  Why did you continue to investigate?  What was your

4    purpose?

5    A.  I felt that it was an abandoned house, the people were

6    inside trespassing or squatting.

7    Q.  What happened next?

8    A.  A woman walked up to the front of the house from the

9    street, approached the front door.

10   Q.  Do you recall if that was the same woman that you and your

11   partner saw earlier?

12   A.  Yes, it was.

13   Q.  Okay.  What happened then?

14   A.  I spoke with Officer Woods.  We decided, or I said that

15   when the front door opened, if people came out, we were going

16   to approach them and speak with them, investigate them.

17   Q.  Okay.  And what happened at that point?

18   A.  Heard the front door open.  Two white males came out of the

19   house and walked towards the black Mercury sedan parked in the

20   driveway.

21   Q.  What happened to the female; do you recall?

22   A.  She, at that point, I didn't know where she had gone to.

23   Q.  What did you and Officer Woods do?

24   A.  We approached the two males.

25   Q.  Do you see the two males in the courtroom today?

1   A.  Yes, I do.

2   Q.  Could you identify them, for the record?

3   A.  Yes.  The two gentlemen, one seated at the table, and the

4   other one is seated to his left at the table, both in the

5   orange jumpsuits.

6   Q.  And just so the record is clear, could you identify

7   anything about their hair that distinguishes the two, other

8   than what they are wearing?

9   A.  Yes.  One has -- one gentleman has reddish-brown hair with

10  a goatee.  The other one is bald.

11  Q.  And did you come to learn either or both of their names?

12  A.  Yes, I did.

13  Q.  Okay.  And could you identify who is who?

14  A.  Mr. Sutherland and Mr. Roberts.

15        MS. JARBOU:  Just for the record, your Honor, the

16  lieutenant pointed to, appropriately, Mr. Sutherland and Mr.

17  Roberts.  Thank you.

18        THE COURT:  Proceed.

19  BY MS. JARBOU:

20  Q.  Lieutenant, what occurred as those two individuals, as the

21  two defendants walked out of that home?

22  A.  We approached them on foot, myself and Officer Woods, asked

23  them not to move.  And I asked them what was going on; why were

24  you in the house.

25  Q.  And did either or both say anything?

1    A.   Mr. Roberts replied.

2    Q.   What did he say?

3    A.   He answered that he was watching the home for a fire

4    restoration company.

5    Q.   What did you indicate to him?

6    A.   I asked if he had any paperwork, if either one of them had any

7    any paperwork to show that they were legitimately at the house.

8    Q.   So you asked for written authorization?

9    A.   Yes, I did.

10   Q.   Did either provide that to you?

11   A.   No, they did not.

12   Q.   What did they indicate?

13   A.   They indicated they did not have any written authorization

14   or paperwork.

15   Q.   Is there a Detroit City Code Ordinance in relationship to

16   having or needing written permission to be in a home?

17   A.   Yes.

18   Q.   What occurred next?

19   A.   I left Officer Woods with the two men by the vehicle, and I

20   approached the front door of the lawn.

21   Q.   And why were you doing that?

22   A.   I wanted to see who else was inside the house.

23   Q.   Okay.  What happened next?

24   A.   The white female that walked towards the front of the house

25   opened the front door when I announced police.

CHRISTOPHER QUARELLO - DIRECT

1    Q.   What occurred at that point?

2    A.   I asked her if there was anyone else in the house.  She

3    answered that she did not know; that she was just visiting.

4    Q.   What was the next thing that occurred?

5    A.   I heard Officer Woods yelling at one of the men by the car.

6    I asked the female to sit on the couch, leave the door open and

7    sit on the couch.

8    Q.   At that point, you hadn't entered the home?

9    A.   No, I had not.

10   Q.   Okay.  What happened next?

11   A.   I went back to near the Mercury.

12   Q.   Where the --

13   A.   In the driveway.

14   Q.   -- Mr. Sutherland and Mr. Roberts were?

15   A.   Yes, and with Officer Woods.

16   Q.   Okay.  What did you learn or what did you observe?

17   A.   Officer Woods advised me he recovered a handgun from Mr.

18   Sutherland.

19   Q.   And did you observe that handgun?

20   A.   Yes.

21   Q.   What happened in relationship to Mr. Sutherland and

22   Mr. Roberts at that point?

23   A.   We handcuffed both of them.

24   Q.   And what happened next?

25   A.   I went back to the front door of the house and entered.

CHRISTOPHER QUARELLO - DIRECT

1   Q.   And what was your purpose in entering at that point?

2   A.   To ascertain if there were anymore persons inside the

3   house, anymore weapons.

4   Q.   Fair to say, a protective sweep?

5   A.   Yes, exactly.

6   Q.   Okay.  And what did you do once inside the home?

7   A.   I went through the house, walked through the house.

8   Q.   Anything of note on the main level of the home?

9   A.   No.

10  Q.   Did you search the upstairs of the home?

11  A.   Yes.

12  Q.   What, if anything, was found upstairs?

13  A.   A pistol grip shotgun.

14  Q.   And where was that found?

15  A.   Against the wall, about 10 feet away from the window, the

16  open window on the south side of the lawn.

17  Q.   The same open window that you could observe when you were

18  outside of the home?

19  A.   Yes.

20        MS. JARBOU:  May I approach the witness, your Honor?

21        THE COURT:  Yes.

22  BY MS. JARBOU:

23  Q.   I'm showing you what's been marked as Government's proposed

24  Exhibit 5.  Could you identify that for the record?

25  A.   Yes.  It appears to be the same shotgun that was recovered

1   from the Dresden house.

2   Q.  And you recovered that from near that window that you were

3   talking about?

4   A.  Yes.

5         MS. JARBOU:  I move for the admission of Government's

6   Exhibit Number 5.

7         MR. HACKETT:  No objection.

8         THE COURT:  Received.

9         MS. JARBOU:  Thank you, your Honor.

10      (GX #5 was received at 4:35 p.m.)

11  BY MS. JARBOU:

12  Q.  Lieutenant Quarello, what did you do next?

13  A.  Went back downstairs.  Other officers arrived at that

14  point, spoke to the female in the house a little bit more,

15  spoke to the other officers that came to back us up.

16        We placed Mr. Sutherland and Mr. Roberts in the back

17  of two other police cars since ours was parked around the

18  corner some distance away.

19  Q.  And what did you do in relationship to the home and/or the

20  vehicle at that point?

21  A.  I went back into the house and got the information,

22  personal information from the woman that was inside the house.

23  Q.  Did you at any point or were you involved in the inventory

24  on the vehicle?

25  A.  No.  That was Officer Woods.

CHRISTOPHER QUARELLO - DIRECT

1    Q.   Okay.   Did you and Officer Woods transport the defendants

2    to the station?

3    A.   No.

4    Q.   What did you and Officer Woods do?

5    A.   We waited at the Dresden location.   We called for a tow

6    truck to impound the Mercury sedan after the inventory search;

7    that took a while for the tow truck to arrive.

8    Q.   At any point -- now, you indicated that the initial

9    statements that Mr. Roberts made regarding not having

10   authorization to not be in the home.   Did Mr. Sutherland, at

11   any point in that initial conversation, say anything that you

12   recall?

13   A.   He stated no when I asked if either one of them had any

14   paperwork to be inside the house or authorization in written

15   form, he just said no.

16   Q.   Did you, at any point after that, have any further

17   conversations, or did either defendant make any statements to

18   you after that initial conversation?

19   A.   At the eastern district cell block area, Mr. Roberts spoke

20   about the house again.

21   Q.   Okay.   Did you -- were you initiating questioning?

22   A.   No, I was not.

23   Q.   Were you questioning him, him in any manner?

24   A.   Just getting some personal information from both of them to

25   fill out, there's an in-processing form, a booking form.

CHRISTOPHER QUARELLO - CROSS

1   Q.  What did he indicate to you?

2   A.  That he really needed to get the paperwork from his boss,

3   could he show it to a detective to clear the whole thing up,

4   asking me questions like that.

5   Q.  All right.  But he didn't, at any point, give you any sort

6   of paperwork that had any authorization for him to be -- for

7   him or Mr. Sutherland to be in that home?

8   A.  No, ma'am.

9        MS. JARBOU:  Thank you.  Oh, one moment.

10  BY MS. JARBOU:

11  Q.  Lieutenant Quarello, did you take the booking information

12  from either defendant?

13  A.  I believe I did.  Yes.

14  Q.  Okay.  And what address, do you recall what address either,

15  either gave?

16  A.  I would have to refer to my report to refresh my

17  recollection.  However, neither of them gave me that address on

18  Dresden.

19        MS. JARBOU:  Okay.  Thank you.  Nothing further.

20        THE COURT:  Any questions, Mr. Hackett or Mr. Tank?

21        MR. HACKETT:  Yes, Judge.

22                    CROSS-EXAMINATION

23  BY MR. HACKETT:

24  Q.  Good afternoon, Lieutenant.  How are you?

25  A.  Afternoon, sir.  Fine.

CHRISTOPHER QUARELLO - CROSS                                    94

1   Q.   Is it Quarello?

2   A.   Quarello, yes, sir.

3   Q.   Quarello is the proper pronunciation?

4   A.   Yes, sir.

5   Q.   Now, on February 12th, 2011, you had indicated on direct

6   that you were working on a street drug task force?

7   A.   I was working narcotics street enforcement.

8   Q.   Narcotics enforcement?

9   A.   That was the unit.

10  Q.   And that unit has since been disbanded, hasn't it?

11  A.   Yes, it has, sir.

12  Q.   And how long ago did that happen?

13  A.   March 7th.

14  Q.   Okay.  So shortly after this, about a month after?

15  A.   Yes, sir.

16  Q.   Okay.  Now, as part of your job in the street enforcement

17  in narcotics, it's to investigate street sales of narcotics,

18  right?

19  A.   Yes, sir.

20  Q.   Okay.  At any time, did you get any information from

21  Federal or Federal authorities about this house on Dresden?

22  A.   No.

23  Q.   No.  Not at all?

24  A.   Not at all.

25  Q.   Okay.  And how about any information from Detroit

1    Narcotics?

2    A.  No.

3    Q.  Okay.  So you had no information about any kind of narcotic

4    sales going on at this, at this address, right?

5    A.  No, sir.

6    Q.  And it's about 1:30 in the morning when you get there; is

7    that right?  The second time?

8    A.  Yes, sir.

9    Q.  The first time you went there, you didn't see or observe

10   any kind of unlawful activity; is that correct?

11   A.  That's correct.

12   Q.  And you left, went on another run?

13   A.  Yes, sir.

14   Q.  And since you didn't see any unlawful activity going on,

15   you decided to come back there a second time that night, right?

16   A.  Yes, sir.

17   Q.  Okay.  And the reason was, is because you believe there was

18   possibly some illegal occupation of the residence, right?

19   A.  Yes, sir.

20   Q.  Squatting?

21   A.  Yes, sir.

22   Q.  Is that something that your unit handles?

23   A.  Yes.

24   Q.  You do?

25   A.  Yes.

1   Q.   And that's related to street enforcement of drug

2   trafficking, right?

3   A.   Well, it's been my experience as a police officer that

4   narcotics are sold out of vacant or improperly illegally

5   occupied dwellings.  It happens --

6   Q.   Okay.

7   A.   -- I don't know how many, maybe a hundred times in my

8   career I've made an arrest for sales from a vacant dwelling or

9   a dwelling that's illegally occupied, temporarily illegally

10  occupied.

11  Q.   Okay.  Now, when you pulled up to the house, you indicated

12  you were -- well, when you were -- you were in a fully marked

13  police vehicle that night, right?

14  A.   Yes, sir.

15  Q.   Okay.  You parked it around the corner from the dwelling,

16  right?

17  A.   On Gietzen Street, yes, sir.

18  Q.   Right.  Which would have been east of Dresden, right?

19  A.   Yes, sir.

20  Q.   So north and east?

21  A.   Yes, sir.

22  Q.   Around the corner.  Okay.  And then you walked through the

23  yards to get there?

24  A.   Yes, sir.

25  Q.   To the, to the back of the house?

CHRISTOPHER QUARELLO - CROSS

1   A.   Yes, sir.

2   Q.   How many yards did you cut through on the way there?

3   A.   Three.

4   Q.   Three yards?

5   A.   It was in the front of the yards, along the front of the

6   houses.

7   Q.   Okay.  And then after you -- you indicated you went across

8   three homes, front lawns, right?

9   A.   Yes, sir.

10  Q.   Okay.  And then when you got to the house, what did you do?

11  A.   Walked to the south side, along the driveway and then to

12  look at the back of the house.

13  Q.   Okay.  So you walked -- you continued in the front of the

14  house and walked to the side of the house, the south side of

15  the house, right?

16  A.   Yes, sir.

17  Q.   Okay.  So as you walked across the, the front of the house

18  and walked into the backyard, your partner was with you, right?

19  A.   Yes, sir.

20  Q.   And did you go into the backyard?

21  A.   Yes.  The backyard wasn't fenced, so as soon as you walk

22  down the driveway, you're in the backyard.

23  Q.   So what you're claiming is that the backyard isn't fenced,

24  right?

25  A.   Not by the driveway, no.  You just walk down the driveway,

2:11-cr-20129-RHC-MAR   Doc # 57   Filed 05/11/12   Pg 98 of 127   Pg ID 411

CHRISTOPHER QUARELLO - CROSS

1    and then the driveway ends, you're at the back corner of the

2    house.

3    Q.   You can just walk right in the back?

4    A.   Yes.

5    Q.   Do you know if there's a fence around the rest of the yard?

6    A.   Yeah.  I believe there was a chain link fence.

7    Q.   Right.  And it goes from the house on the, what would be

8    the north side all the way around the yard and encompasses the

9    whole yard, except for there's no gate across the driveway,

10   right?

11   A.   Yes.

12   Q.   Okay.  So when you walked across the front yard to go up

13   the driveway with your partner, did you notice a white van in

14   the driveway?

15   A.   No.

16   Q.   No.  But you did notice a black four-door sedan in the

17   driveway, right?

18   A.   Yes.

19   Q.   Okay.  And if you -- if that van would have been in the

20   driveway, you would have seen it, right?

21   A.   Yes.

22   Q.   That's good.  Now, how long were you on the south side of

23   the house with your partner sneaking around the backyard?

24        MS. JARBOU:  Your Honor, I guess I would object to the

25   characterization.

US vs. SUTHERLAND, et al. - 11-20129

1   BY MR. HACKETT:

2   Q.   Looking around the backyard.

3   A.   I would say maybe three to five minutes.

4   Q.   Mh-hm.   And in that time period, you saw ice on the back of

5   the house?

6   A.   Yes, sir.

7   Q.   Right?   Saw lights on in the house?

8   A.   From the second story window, yes, sir.

9   Q.   And they were bright lights, right?   Not like flashlights

10   or anything like that?

11   A.   I don't -- I mean, it seemed like a normal room illuminated

12   by light fixtures and light bulbs.

13   Q.   Right.   And in most abandoned houses, in your great, vast

14   experience, there's electrical -- electricity works in them,

15   doesn't it?

16   A.   If it's been tampered with.   I find that 50 percent of the

17   time, 40 percent, 50 percent of the time, the power has been

18   tampered with, to allow the lights to be on.

19   Q.   Okay.   And but you didn't see any evidence of any kind of

20   tampering with the electricity?

21   A.   No, not at this house.

22   Q.   Not lines or anything at that house?

23   A.   Not this house.

24   Q.   Okay.   Now, when you say that three or four minutes elapsed

25   when you were on the south side of the house -- no, the north

CHRISTOPHER QUARELLO - CROSS

1  side of the house -- wait a minute.  The south side of the

2  house, I'm sorry, where the driveway is.

3  A.  About five minutes, yeah, three to five minutes.

4  Q.  And then what did you observe?  Did you observe this, this

5  woman that you talked to earlier?  Did you observe her walk up

6  towards the house?

7  A.  Yes.

8  Q.  Okay.  And when she got up to the front door, it was almost

9  simultaneous that the two males came outside; isn't that true?

10 A.  Yeah, that would be fair to say.  Pretty close.

11 Q.  Did you hear anything that they might have been said to

12 each other or anything like that?

13 A.  There was some, you know, there was something said.  I

14 couldn't make out what it was.

15 Q.  Okay.  Because you were around the corner?

16 A.  Yes.

17 Q.  Okay.  Now, was it almost instantaneous with the two

18 defendants here walking outside the house, that you came around

19 the front of the house and identified yourself as police

20 officers?

21 A.  When they walked to the car, I mean, they made it from the

22 front of the house to the sedan, the side of the sedan, then we

23 approached.  Yes.

24 Q.  Were they on the driver's side of the sedan?

25 A.  No.  Passenger side.

1   Q.  Okay.  So they, they came, they came out of the house and

2   walked around to the passenger side of the vehicle?

3   A.  Across --

4   Q.  Is that what you're saying?

5   A.  -- the front of the vehicle.

6   Q.  They came across the front?

7   A.  To the passenger side, yes.

8   Q.  So, and they didn't see you?

9   A.  I don't know if they did or not.

10  Q.  Okay.  But they didn't, they didn't say hey, what are you

11  doing here?

12  A.  No.

13  Q.  At the side of the house?

14  A.  No, they did not.

15  Q.  So they didn't say anything to you like they saw, they saw

16  you there, right?

17  A.  No.

18  Q.  And you didn't direct them to walk around to the other side

19  of the car, right?

20  A.  No, I did not.

21  Q.  Okay.  And your partner didn't tell them to get out and go

22  to the other side of the car, did he?

23  A.  No, sir.

24  Q.  Okay.  Good.  Now, now, what was my client wearing when he

25  came out of the house; if you know?

CHRISTOPHER QUARELLO - CROSS

1    A.   A black, full-length leather coat.

2    Q.   Did it have any kind of distinguishing marks?  Was it a

3    trench coat like a, like maybe a lawyer would wear or a special

4    agent would wear?  Or was it a, something of a duster, like

5    maybe a biker would wear?

6    A.   I describe it like an Old West duster.  That's what it

7    struck me as.

8    Q.   Okay.  Now, you're saying it's an Old West duster.  Now,

9    when he came out of the house, he was with Mr. Roberts, right?

10   A.   Yes.

11   Q.   And they both walked around to the passenger side of the

12   car?

13   A.   Yes.

14   Q.   The sedan?

15   A.   Yes.

16   Q.   Okay.  And at what point did you identify yourselves to

17   them?

18   A.   When I was probably 10, 15 feet away.

19   Q.   Okay.  And that was after they had already walked around

20   the car?

21   A.   Yeah.  They were walking on the passenger side.  I mean, it

22   took me a few seconds to come from where I was, you know, on

23   the side of the house, down the driveway, towards them.

24   Q.   Were you, were you towards the back of the house?

25   A.   Yes.

1  Q.  And was Officer Woods at the back of the house with you?

2  A.  Yes.

3  Q.  Okay.

4        MR. HACKETT:  Excuse me.  Your Honor, could I get this

5  marked?  This is the same picture I showed the other officer.

6  I'd like to get this marked as Defendant's Exhibit --

7        THE COURT:  You can mark your own.

8        MR. HACKETT:  Oh, okay.  Sorry.  Front or back, does

9  it matter?

10       THE COURT:  You can mark your own, Counsel.

11       MR. HACKETT:  Mark my own?  I believe we're using

12  letters, right?

13       THE COURT:  Typically, I ask that numbers be used, but

14  you may do -- there are not going to be that many in this

15  hearing, I perceive.  So I think you earlier referred to it as

16  Defense A.

17       MR. HACKETT:  Defense A?

18       THE COURT:  That's what you said earlier.

19       MR. HACKETT:  I did.  And I'm sorry.  Some, some

20  judges do A's and some do -- I'm sorry.

21       MS. JARBOU:  So the record is clear, I don't believe

22  this is the same photo that was shown to the previous witness.

23       THE COURT:  No?

24       MR. HACKETT:  It is.  It's the only, it's the only one

25  that I have.

1          MS. JARBOU:  It's the same one that was shown to the

2     previous witness?

3          MR. HACKETT:  Yeah.  It's the only one I have that

4     shows the side of the house.

5          MS. JARBOU:  No.  That's the one that was shown to the

6     previous witness.

7          MR. HACKETT:  No.  The one that was shown to that

8     witness was this one.

9          THE COURT:  Well, it's going to be unclear what was

10    shown to the other witness because you didn't mark it at that

11    time.

12         MS. JARBOU:  Right.

13         THE COURT:  There's a --

14         MR. HACKETT:  At this point --

15         THE COURT:  All we know is this is the one that's

16    being shown to this witness, and it's Defense A.  And you may

17    proceed.

18         MR. HACKETT:  Thank you, Judge.

19         THE COURT:  Do you want to show it to him.

20         MR. HACKETT:  Proposed Exhibit A.  Thank you, Judge.

21         THE COURT:  Go ahead.

22         MR. HACKETT:  May I approach?

23         THE COURT:  Yes.

24         MR. HACKETT:  Thank you.

25    BY MR. HACKETT:

1    Q.  Lieutenant Quarello, could you tell me if that looks like

2    the house on Dresden?

3    A.  Yes, it does, sir.

4    Q.  It's just, it wasn't obviously taken close in proximity to

5    the time, correct?

6    A.  Yes.

7    Q.  Because there's leaves on the trees and so on and so forth.

8            So it's recently taken, but that is an accurate

9    picture of the house on Dresden?

10   A.  Yes.

11   Q.  Is that correct?  Okay.

12           Now, you had indicated that you were towards the back

13   of the house.

14   A.  Yes.

15   Q.  Can you see that area?

16   A.  Yes.

17   Q.  With that photo?

18   A.  Yes.

19   Q.  And was it the, let's see, the southwest corner of the

20   house that you were at?

21   A.  I believe that's the southeast corner, kind of where this

22   security light is in the back corner.

23   Q.  Okay.  But it's towards the back of the house?

24   A.  Yes.

25   Q.  And it took you a few seconds, once Mr. Roberts and my

1  client, Mr. Sutherland, got around to the passenger side of the

2  car, before you notified them that you were police and that you

3  were there?

4  A.  Yes, sir.

5  Q.  Okay.  And at that point, you -- what did you do?

6  A.  I yelled, "police.  Don't move."

7  Q.  Okay.  And they, they froze, right?

8  A.  Pretty much, yeah.  I think they seemed to be a bit

9  surprised.

10 Q.  Okay.  And, you know, neither one of them did any -- they

11 didn't run?

12 A.  No, sir.

13 Q.  Okay.  They didn't, you know, reach for anything?

14 A.  No, sir.

15 Q.  Okay.  They didn't threaten you in any way?

16 A.  No, sir.

17 Q.  Okay.  So what you know is you've got two people that come

18 out of a house, right?

19 A.  Yes, sir.

20 Q.  And it's got boards on some of the windows, right?

21 A.  Yes, sir.

22 Q.  Because the windows on the top weren't boarded?

23 A.  Correct.

24 Q.  The side door wasn't boarded, was it?

25 A.  No, sir.

CHRISTOPHER QUARELLO - CROSS

1  Q.  Okay.  The front door wasn't boarded?

2  A.  No, sir.

3  Q.  And in fact, there was a, there was a safety grate over the

4  front door, wasn't there?

5  A.  A security door?

6  Q.  Yeah.

7  A.  Yes, there was.

8  Q.  Okay.  So, and the window in the front of the house didn't

9  have a, at the peak, didn't have boards on it, right?

10  A.  No, sir.

11  Q.  Okay.  Now, and there was electricity?

12  A.  Yes.

13  Q.  Okay.  So at that point, all you knew was what I just

14  described to you, right?

15  A.  Well, with the, with the earlier observations I made, yeah,

16  that's basically it.  That's fair to say.

17  Q.  So at that point, you had absolutely no knowledge of any

18  unlawful activity going on at that house, right?

19  A.  No knowledge?  That's correct.

20  Q.  Right.  So after you identified yourself as police

21  officers, what did you do next?

22  A.  I don't know if it was myself or Officer Woods, but one of

23  us asked them just to face the car.  And then I asked them

24  what's going on with the house or, you know, why are you in the

25  house.  Is it -- do you have any permission to be there.

1  Q.  Okay.  And what did my client indicate to you?

2  A.  He just said no.

3  Q.  He said he didn't have permission to be there.  He just

4  said no?

5  A.  Yeah.

6  Q.  He didn't have any written permission.

7  A.  He didn't have any written permission, yes.

8  Q.  And I'll let co-counsel, brother counsel ask you about his

9  client.

10        Now, so at that point, both the defendants are

11 standing next to the car, the sedan, right?

12 A.  Yes, sir.

13 Q.  And do they have their, their hands on the, on the roof?

14 A.  I don't remember if we asked them to put their hands on the

15 roof or not.

16 Q.  Okay.  Do you recall anyone having anything in their hands?

17 A.  Keys, yes, I do.

18 Q.  Okay.  And who had the keys?

19 A.  Your client did.

20 Q.  And my client is this gentleman right here, Mr. Sutherland?

21 A.  Yes, sir.

22 Q.  Now, when -- so at that point, you don't know if they've

23 got their hands on the roof of the car, both of them are

24 standing next to the car, right?

25 A.  They are standing next to the car.  I think their hands

1   were visible.  I don't know if we actually ordered them to put

2   their hands on the car, but their hands were visible.

3   Q.  Okay.  All right.  And you didn't feel threatened or

4   anything at that point?

5   A.  No.  No.

6   Q.  Okay.  And at that point, you know, what point did it come

7   when Mr. Sutherland was told to put his keys on the roof of the

8   car?

9   A.  I don't know.  I don't think I told him.

10  Q.  Okay.  Were you, were you outside when, when he was told to

11  put his keys on the car?

12  A.  I don't remember.

13  Q.  Okay.  Now, if you were, say you're looking.  So at this

14  point, you're on the -- you're standing what is on the, the

15  driveway, which would be, if you're facing the house, you're to

16  the right of the sedan that's parked in the driveway; is that

17  correct?

18  A.  Yes.

19  Q.  Okay.  And that's, that's, you know, using Defendant's

20  Exhibit A, there's a car in that picture, right?

21  A.  Yes, sir.

22  Q.  It's not the car that was there that night, right?

23  A.  Yes, sir.

24  Q.  But it's, it's in a similar position; is that right?

25  A.  Yes, sir.

1   Q.  Okay.  Now, according to your testimonies, Mr. Sutherland

2   and Mr. Roberts were standing next to the car, right?

3   A.  Yes, sir.

4   Q.  Who was closer to you?

5   A.  I was closer to your client, Mr. Sutherland.

6   Q.  Okay.  So Mr. Sutherland was standing here, and then

7   Mr. Roberts would have been here?

8   A.  Mister -- well, using your exhibits, sir.

9   Q.  Yes.

10  A.  Mr. Sutherland was closer to the back bumper of the car on

11  the passenger side or the side where the door's opened.

12  Q.  Okay.

13  A.  And Mr. Roberts was closer to the front of the car on the

14  same side.

15  Q.  Okay.  So Mr. Roberts would have been closer to you?

16  A.  No.  Mr. Sutherland was closer to me because I had come

17  around, around the car.  I was at the back bumper of the car,

18  more that, that side.

19  Q.  So it was backed in?  Was the car backed in?

20  A.  No.  No, no.  I ran around.  When I came in the driveway.

21  Q.  Okay.

22  A.  Officer Woods went directly to the two gentlemen, and I

23  kind of looped around and came to the other side.

24  Q.  So you -- okay.  They are walking across the, the, towards

25  the car, and they would have been walking in this direction,

1    right?

2    A.   Yes.

3    Q.   Okay.  Which would have been south?

4    A.   Yes, sir.

5    Q.   Right?  And the car is parked here?

6    A.   Yes, sir.

7    Q.   And what you said that they walked around the front of the

8    car?

9    A.   Yes, sir.

10   Q.   And they got on the passenger side of the vehicle?

11   A.   Yes, sir.

12   Q.   And that's when you identified yourself as a police

13   officer, right?

14   A.   Yes.

15   Q.   Okay.  And then you came out from the back of the house?

16   A.   Well, when I identified myself, I was already --

17   approaching them, I was coming from the back of the house.

18   Q.   But they didn't see you, they didn't --

19   A.   I don't believe so, no.

20   Q.   Okay.  And at that point --

21           THE COURT:  Just for your information, Counsel, I have

22   a very clear picture of what he said.  There's, there's no

23   confusion in my mind at all, and the repetition is unnecessary.

24           MR. HACKETT:  Okay, Judge.  I'll move on.

25   BY MR. HACKETT:

1   Q.  Okay.  After, after you identified yourself as a police

2   officer and went around the car, okay?  What did you do, what

3   did you do next?

4   A.  I asked them about the house, and then the follow-up

5   question of did anyone have any written permission on their

6   person or in the house to show that they were legitimately at

7   that house.  That's what I asked next.

8   Q.  All right.

9   A.  Because I felt, you know, that that was the appropriate

10  question to ask based upon the reasonable suspicion I had about

11  the dwelling.

12  Q.  Right.  But you just testified that you had seen nothing

13  illegal or unlawful transpire prior to that at all.

14  A.  Nothing unlawful.  But based upon my experience as a law

15  enforcement officer, I did have an opinion of reasonable

16  suspicion, something perhaps.  That was the reason to approach

17  and --

18  Q.  So you had a hunch?

19  A.  No.  A reasonable suspicion, I believe, is a little more

20  than a hunch, sir.

21  Q.  All right.  But you had testified that you had seen nothing

22  unlawful transpire?

23          MS. JARBOU:  Your Honor?

24          THE WITNESS:  Nothing --

25          MS. JARBOU:  He's asked this a number of different

CHRISTOPHER QUARELLO - CROSS

1   ways.

2           MR. HACKETT:  I'll move on, Judge.

3           THE COURT:  Thank you.

4   BY MR. HACKETT:

5   Q.  Now, Mr. Roberts and Sutherland --

6           THE COURT:  For counsel's information, we're going to

7   terminate at 5:15 and begin again on the 25th of July at nine

8   a.m.  Go ahead.

9   BY MR. HACKETT:

10  Q.  Now, at what point did you -- when officer -- when Officer

11  Woods indicated at some point that Mr. Sutherland should put

12  his keys and so forth on the hood of the car, you were saying

13  at first he was by the bumper of the car, right?  And he had to

14  move?  Or were you there when that was -- directive was given.

15  A.  No.  They really didn't, they didn't move, sir.

16  Q.  Okay.

17  A.  Mr. Sutherland was towards the rear of the car but not

18  directly at the bumper.

19  Q.  Okay.  And when -- and he was holding these things in his

20  hand, right?

21  A.  Keys.

22  Q.  Okay.  Did you see anything else in his other hand or?

23  A.  No.

24  Q.  Okay.  And at what point did he put the keys on the roof of

25  the car; if you know?

CHRISTOPHER QUARELLO - CROSS

1   A.   I think I had already left and gone to the front of the

2   house by that point.

3   Q.   Okay.

4   A.   The front door.

5   Q.   So -- I didn't mean to cut you off.

6   A.   I'm sorry.

7   Q.   No.

8   A.   The front door.

9   Q.   Okay.  So the two defendants are standing at the back of

10  the car or at the car, and you walk back up towards the house?

11  A.   Yes.

12  Q.   To check and see if there was any other occupants in the

13  house?

14  A.   Yes.

15  Q.   You knew there was one in there, right?

16  A.   Yeah.  I did.  I believe she had gone inside, the female

17  had gone inside.

18  Q.   Okay.  You actually didn't see her go inside because you

19  were in the back of the house?

20  A.   That's correct, sir.

21  Q.   But you presume that she was?

22  A.   Right.

23  Q.   Now, so at that point, you went inside.  And what did you

24  see inside the house?

25  A.   No.  I didn't go inside the house.  I was at the front

1  door.

2  Q.  Okay.

3  A.  I announced police.  The woman opened the door.

4  Q.  Okay.

5  A.  And I didn't go inside at that point, because I heard the,

6  the yelling of Officer Woods back by the car.

7  Q.  Okay.  Officer Woods began yelling.  What, what did he

8  yell?

9  A.  I, I don't really -- I couldn't understand clearly what he

10  was saying, but I believe he was trying to alert me to the fact

11  that one of the two men had a weapon.

12  Q.  Did he say, you know, a gun or, you know, something like

13  that or?

14  A.  I was engaged in a conversation with the woman.  It's one

15  of those things where --

16  Q.  On the porch?

17  A.  On the porch.  Kind of caught, half caught what he said.

18  Q.  And about how far away is Officer Woods away from you at

19  that point?

20  A.  Oh, not very far.  Not very far.

21  Q.  Maybe 10 feet?  15 feet?

22  A.  Fifteen, yeah, 15, 20 feet I would say, at the most.

23  Q.  And that got your attention?

24  A.  Yes.

25  Q.  Okay.  And then what did you do?

1   A.   I told the woman just to sit on the couch and leave the

2   door open for the moment, and I ran back to the car.

3   Q.   Okay.  The, the sedan that was in the driveway, right?

4   A.   Yes, sir.

5   Q.   Okay.  Now, when you got to the sedan, what happened?

6   A.   Officer Woods advised me he had recovered a handgun from

7   Mr. Sutherland.

8   Q.   Okay.

9   A.   And then we handcuffed both of them.

10  Q.   And, and you testified earlier that Mr. Sutherland was

11  wearing a black duster jacket, right?

12  A.   Yes, sir.

13  Q.   Okay.  Is this the type of jacket that he was wearing; if

14  you recall?

15  A.   In general, I'd you say yes.  I don't know about the

16  lining, the fur lining, but.

17  Q.   Okay.  It was winter and it wouldn't be unusual for someone

18  to wear lining in their coat, right?  Okay.

19  A.   Yeah, I don't -- I guess.

20  Q.   But can't identify for it for certain, right?

21  A.   No, not for certain, sir.

22        MR. HACKETT:  I have no further questions at this

23  time, Judge.

24        THE COURT:  Mr. Tank, do you have any questions?

25        MR. TANK:  Yes, your Honor.  I will be very brief.

1                        CROSS-EXAMINATION

2     BY MR. TANK:

3     Q.   Sir, if I'm not mistaken, you're the officer-in-charge of

4     the case, correct?

5     A.   No.  No, I'm not, sir.

6     Q.   Who would that be?

7     A.   I believe it would be Special Agent Herrera.

8     Q.   Okay.

9     A.   From the FBI.

10    Q.   All Right.  And I apologize for complicating that.  As you

11    arrive out there, there's no Federal involvement when you

12    arrive out there the first time, correct?  I mean you're not

13    working with them; you just show up?

14    A.   No, sir.  It's just myself and Officer Woods.

15    Q.   Just the Detroit Police Department, correct?

16    A.   Yes, sir.

17    Q.   That typically works with the Wayne County Prosecutor's

18    Office, right?

19    A.   Yes, sir.

20    Q.   Okay.  After Mr. Roberts was arrested and you get this

21    explanation, or at least he's detained and you get this

22    explanation that he, he's working for some type of restoration

23    company, did you get any information in the form of a company?

24    A.   No, I did not.

25    Q.   Did you ever call a person by the name of Dan Pappert from

1    National Fire Restoration?

2    A.  No, I did not.

3    Q.  So is it your testimony here today, sir, that you never, on

4    February the 12th, the morning of February the 12th, called Mr.

5    Pappert on his telephone to verify that Mr. Roberts worked for

6    him?

7    A.  No.  I didn't call.

8    Q.  And, all right.  Are you aware if anyone else from the

9    police department or who was there made a telephone call along

10   those lines?

11   A.  Maybe one of the detectives that day in the -- we took them

12   to the eastern district and they, I believe, handled the

13   initial investigation before the Federal involvement.

14   Q.  All right.  And when they were taken to the eastern

15   district, there's a person that's there, his name, and I may

16   butcher this, and I apologize, in doing so.  Did you have

17   contact with a person named Jeffrey Wenterin (phonetic).

18   A.  Wentering?

19   Q.  Yes.

20   A.  Yes.  He's a detective at the eastern district.

21   Q.  Okay.  And as a detective in the eastern district, the

22   reason I ask this question is you indicated, did you do the

23   booking as it related to these people or was it him?

24   A.  No.  I fill out the booking information.  I waited several

25   hours with both of the gentlemen until they could be

1  fingerprinted.  There was a line of prisoners waiting to be

2  processed.

3  Q.  So it's your testimony as you stand here that you

4  interviewed these men and got necessary information from them

5  at that point, correct?

6  A.  Well, it's just informational questions about, you know,

7  age, date of birth, just general information questions for the

8  booking forms.

9  Q.  Okay.

10  A.  Yes.

11  Q.  Is it a fair statement that when you take someone to a

12  place, like for example, the eastern district, they have a

13  booking officer who works there?

14  A.  They have three prisoners' officers that work there.  Yes,

15  sir.

16  Q.  And they are responsible for booking, correct?

17  A.  Well, they fingerprint and feed the prisoners, and you

18  know, monitor the prisoners.  The way the department system is,

19  the arresting officer usually fills all the initial information

20  and then passes it off to the officer that does the actual

21  physical fingerprinting and taking the mugshots and --

22  Q.  All right.  Sir, while you got into the house that we're

23  talking about on Dresden, you were inside, correct?

24  A.  Yes, sir.

25  Q.  And while you were inside, did you obtain any information

CHRISTOPHER QUARELLO - REDIRECT

1   in the form of paperwork that you saw there from a National

2   Fire Restoration?

3   A.  No, sir.

4       MR. TANK:  Your Honor, with that I have no further

5   questions of the witness.

6       MS. JARBOU:  Very brief.

7       THE COURT:  Go ahead.

8                   REDIRECT EXAMINATION

9   BY MS. JARBOU:

10  Q.  Lieutenant Quarello, the female, did you ascertain her

11  name?

12  A.  I believe it's Ashley, perhaps, Will.  I have to refer to

13  my report to refresh my recollection about her last name.

14  Q.  But Ashley Will?

15  A.  I believe so.

16  Q.  And then Mr. Sutherland, at the time he was arrested, was

17  he wearing a Highwayman T-shirt; do you recall?

18  A.  Yes, underneath the, like the duster, the leather duster.

19      MS. JARBOU:  Thank you.  Nothing further.

20      THE COURT:  Can you describe, at least generally, what

21  the weather was like in this February encounter?

22      THE WITNESS:  Cold and clear, from what I remember

23  sir, very cold and clear.

24      THE COURT:  You mentioned ice at the back of the

25  house.  It conjures in my mind an image of a valve left open or

1    a flooding event perhaps, that a pipe is broken inside?

2              THE WITNESS:  The ice --

3              THE COURT:  Actually, I have horrific memories of my

4    own house.

5              THE WITNESS:  The ice, your Honor --

6              THE COURT:  Similar situations.  What, how did it

7    appear to you?

8              THE WITNESS:  It appeared to me like on the, like an

9    ice damn or something along the back of the house.  It was a

10   large amount of ice from the roof line from the gutter, down

11   the back of the house, over the window.  One window was boarded

12   up; a large part of the brickwork.  I mean it was, it was a

13   substantial amount of ice.

14             THE COURT:  Did it -- okay.  Did it appear to be more

15   than what would be accounted for by just snow melting off the

16   roof, in a normal --

17             THE WITNESS:  Yes, it did.

18             THE COURT:  So would you say that it would have, at

19   least could have had the appearance of an open valve or a

20   broken pipe leading to that sort of accumulation?

21             THE WITNESS:  Yes, sir.

22             MR. HACKETT:  Your Honor, I would object to his, his

23   being able to give any kind of opinion as it relates to some

24   kind of malfunction in the plumbing or, and any kind of --

25             THE COURT:  The question didn't deal with that.  It

1   had to deal with just the outward appearance.  It didn't have

2   to do with anything -- anything having to do with, with the

3   actual state of affairs in the plumbing, just appearance.  I

4   wanted to get a sense, and I still want to get a sense of how

5   things appeared on the outside of the house as they were

6   observing it on that evening.

7           You said also that there were footprints in the snow

8   appearing to proceed to and from the side door and front door,

9   right?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  What do you recollect, if anything, about

12  the state of affairs regarding whether the front walk of the

13  driveway was shoveled, maintained, tended to, or any phrase

14  similar to that?

15          THE WITNESS:  It was not.  The footprints were created

16  like almost a couple paths or trails where you could see that

17  multiple people had used this to approach, and just the snow

18  was matted down over those areas.

19          THE COURT:  In this neighborhood, there were other

20  homes that were more apparently occupied, I would take it?

21          THE WITNESS:  Oh, yes, sir.

22          THE COURT:  And as it -- do you have any recollection

23  that would allow you to say whether, in this neighborhood, as a

24  general matter, sidewalks or driveways tended to be shoveled as

25  of February 2011?

 1          THE WITNESS:  It's, it's actually a nicer block for

 2   that area, your Honor.  There are brick homes, single-family

 3   homes.  And it's Dresden, north of Six Mile, and most of the

 4   homes were, properties were maintained and snow was shoveled,

 5   driveways clear.

 6          THE COURT:  Does counsel have any additional questions

 7   based on the Court's brief questioning for the Government?

 8          MS. JARBOU:  No.  Thank you.

 9          THE COURT:  For the defendant, Mr. Sutherland?

10          MR. HACKETT:  Your Honor, one, one thing I would like

11   to do, and I forgot to do it.  And I would like to move for

12   admission of Defense Exhibit A.

13          THE COURT:  I don't think there's any objection to

14   that, is there?

15          MS. JARBOU:  No.

16          THE COURT:  When, would you just proffer roughly when

17   that was taken?

18          MR. HACKETT:  I believe it was taken about --

19          THE COURT:  Roughly.

20          MR. HACKETT:  -- today?  Today.  It was taken today.

21          THE COURT:  Well, that's a pretty good approximation.

22   All right.  So July 2011?

23          MR. HACKETT:  That's correct, sir.

24          THE COURT:  That's received.

25       (DX A was received at 5:13 p.m.)

1            THE COURT:  Anything else?

2            MR. HACKETT:  Not at this point.

3            THE COURT:  Mr. Tank, anything else based on what the

4   Court has asked?

5            MR. TANK:  I have, I have one question.

6            THE COURT:  Go ahead.

7                          FURTHER EXAMINATION

8   BY MR. TANK:

9   Q.  Sir, do you recall when Mr. Roberts was arrested, him

10  wearing a Fire Restoration shirt?

11  A.  No, I don't.  I do have a general description of his

12  clothing in my report.  I could refer to that if it would

13  refresh my recollection.

14  Q.  Would you?

15  A.  I have indicated on the report he had a gray T-shirt on,

16  underneath a black jacket, black leather jacket but nothing

17  about the -- if there was any words on the front or.

18           MR. TANK:  Thank you, very much, your Honor.

19           THE COURT:  All right.  That's all then?

20           MS. JARBOU:  Yes, your Honor.  Thank you.

21           THE COURT:  The witness may step down.

22           You will want to take the photographs back to the

23  attorneys.

24           (Witness excused.)

25           THE COURT:  We will recess this hearing at 5:15,

1    subject to recommencement, 25th of July, nine a.m. or such

2    other date that counsel might negotiate with my case manager,

3    if that one is not particularly suitable for some important

4    reason.

5             MS. JARBOU:  Your Honor, just that we're clear,

6    Lieutenant Quarello and Officer Woods are excused?

7             THE COURT:  They are, they are finished as far as I'm

8    concerned.

9             MS. JARBOU:  Thank you.

10            THE COURT:  Do you have any other need for them?

11            MR. HACKETT:  Your Honor, depending on what transpires

12   in the testimony of the other witnesses, we may want them

13   subject to recross.

14            MS. JARBOU:  I would ask that counsel let us know.

15            MR. HACKETT:  I certainly will.

16            THE COURT:  Let's be diligent about staying in touch

17   with each other and what you think you might need or not need,

18   as time goes on here.  I would hope to conclude the testimony

19   portion of the hearing at the next session of court.  We're

20   clear the entire day of the 25th, by the way.  The Court is

21   clear the entire day.

22            MS. MOHSIN:  We would also ask that counsel let us

23   know if they are any additional witnesses so we can adequately

24   prepare and not waste any time.

25            THE COURT:  Yes.  Would you do that, Mr. Tank?

 1            MR. TANK:  Absolutely.  Just for the record, I will

 2    have Mr. Daniel Pappert.  I know the Government is already

 3    familiar with him.  He's represented by Mr. Jeffrey Burns, who

 4    is an attorney.  And I've spoken with him earlier today.  We

 5    couldn't have him here because of Mr. Burns' schedule.  But I

 6    would make certain the date we agree on Mr. Pappert will be

 7    present.

 8            MS. MOHSIN:  Thank you.

 9            THE COURT:  And Mr. Hackett, will --

10            MR. HACKETT:  At this point, there are no additional

11    witnesses that we have.

12            THE COURT:  We stand in recess.

13            THE CLERK:  All rise.  Court is now in recess.

14

15            (Proceedings adjourned at 5:15 p.m.)

16                          *       *       *

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2              As an official court reporter for the United States

3    District Court, appointed pursuant to provisions of Title 28,

4    United States Code, Section 753, I do hereby certify that the

5    foregoing is a correct transcript of the proceedings in the

6    above-entitled cause on the date hereinbefore set forth.

7

8

9                    ___s/ Christin E. Russell___

10              CHRISTIN E. RUSSELL, CSR, RPR, FCRR, CRR

11                   Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25