1    **UNITED STATES DISTRICT COURT**
      **EASTERN DISTRICT OF MICHIGAN**
2          **SOUTHERN DIVISION**

3    **UNITED STATES OF AMERICA,**

4                  Plaintiff,         **Case No. 11-20129**
      **-v-**
5
      **RONALD ROBERTS, D-1, and SCOTT**
6    **SUTHERLAND, D-2,**

7                  Defendants.
      _____/
8
                **EVIDENTIARY HEARING, VOLUME II**
9
          BEFORE THE HONORABLE **ROBERT H. CLELAND**
10             United States District Judge
        Theodore Levin United States Courthouse
11           231 West Lafayette Boulevard
                  Detroit, Michigan
12                **July 25, 2011**

13   **APPEARANCES:**

14   FOR THE PLAINTIFF:   SAIMA MOHSIN
                         HALA JARBOU
15

16   FOR THE DEFENDANT:   WILLIAM HACKETT
                         (Sutherland)
17
                         CRAIG TANK
18                       (Roberts)

19

20

21

22

23
            **To Obtain a Certified Transcript Contact:**
24   Christin E. Russell, CSR, RPR, FCRR, CRR - (248) 420-2720
          Proceedings produced by mechanical stenography.
25     Transcript produced by computer-aided Transcription.

TABLE OF CONTENTS
_____

E X A M I N A T I O N S

**WITNESSES FOR THE DEFENDANT:**                        PAGE

**ASHLEY WILL**
Direct Examination by Mr. Hackett                        4
Direct Examination by Mr. Tank                          14
Cross-Examination by Ms. Mohsin                         20

**DANIEL PAPPERT**
Direct Examination by Mr. Tank                          35
Voir Dire by Ms. Mohsin                                 47
Direct Examination by Mr. Tank (cont'd)                 50
Cross-Examination by Ms. Mohsin                         53
Redirect Examination by Mr. Tank                        60
Further Examination by Mr. Tank                         65
Recross-Examination by Ms. Mohsin                       66


Argument by Mr. Hackett                                 81
Argument by Mr. Tank                                    85
Argument by Ms. Mohsin                                  92
Ruling of the Court                                     96

E X H I B I T S

EXHIBIT                                                 PAGE

Exhibit #3 (receipt)                                    49

Exhibit #4-30 (receipts)                                49

EVIDENTIARY HEARING - 7/25/2011                    3

1    Detroit, Michigan

2    July 25, 2011

3    9:33 a.m.

4                          *      *      *

5         (Call to Order of the Court; all parties present.)

6              THE CLERK:  Calling case number 11-20129.  The United

7    States of America vs. Scott William Sutherland and Ronald

8    Raymond Roberts.

9              Please state your name for the record, counsel.

10             MS. MOHSIN:  Good morning, your Honor.  Saima Mohsin

11   and Hala Jarbou appearing on behalf of the United States.

12             MS. JARBOU:  Good morning.

13             MR. HACKETT:  Good morning, your Honor.  William

14   Hackett on behalf of Scott Sutherland.

15             MR. TANK:  Good morning, your Honor.  My name is Craig

16   Tank, and I appear on behalf of Mr. Roberts.

17             THE COURT:  Both defendants are personally present, I

18   note.  And, Mr. Hackett, it continues I think to be your

19   hearing, doesn't it?

20             MR. HACKETT:  I believe, Judge.

21             Your Honor, just, just briefly.  I have some witnesses

22   that were subpoenaed that are Detroit police officers.  And

23   other than Christopher Quarello and Daniel Woods, I don't

24   believe they are present.

25             They were served.  I did get a call prior to the last

ASHLEY WILL - DIRECT                                    4

1   hearing from two of them that indicated that they were sick and

2   that they weren't planning on being here.  And that wasn't for

3   this date.  However, the attempts that I made to get in contact

4   with them through their commanding officers and their sergeants

5   were in vain.  The numbers that I have, ring twice and go to

6   busy signals.  So I have several witnesses that were subpoenaed

7   that would be either -- that have not shown up.  And those are

8   all Detroit police officers.

9            I do have one witness that is on the way.  She had a

10  flat tire.  She's getting another ride.  And I do have one

11  witness that's ready to go.  I believe that Mr. Tank has a

12  witness as well, that's ready to go.

13           With that, Ashley Will, or no -- yeah.  Ashley Will is

14  the name of the witness.

15           (Witness is sworn.)

16                            ASHLEY WILL

17     called as a witness at 9:35 a.m. testified as follows:

18                         DIRECT EXAMINATION

19  BY MR. HACKETT:

20  Q.  Good morning.

21  A.  Morning.

22  Q.  You'll have to speak up --

23  A.  Good morning.

24  Q.  -- so we can hear you.

25           Okay.  Would you state your name, please, for the

ASHLEY WILL - DIRECT

1   record?

2   A.   Ashley Lynn Will.

3   Q.   Okay.   Ashley, how old are you?

4   A.   Twenty.

5   Q.   Okay.   Do you recall the date of February 12th, 2011?

6   A.   Yes.

7   Q.   Okay.   And what happened on that date that you would

8   remember it?

9   A.   I came over to the house.   And I was outside in my car.

10  And I was waiting for Brandy.

11  Q.   Where was the house at?

12  A.   Dresden.

13  Q.   Do you remember the address?

14  A.   No.

15  Q.   Okay.   Do you remember why you were there?   Were you

16  visiting somebody?

17  A.   Yeah.

18  Q.   Who were you visiting?

19  A.   Brandy.

20  Q.   Who is Brandy?

21  A.   My friend.

22  Q.   Who is Brandy?

23  A.   My friend.

24  Q.   What's her last name?

25  A.   Irwin.

ASHLEY WILL - DIRECT

1    Q.  Okay.  And why were you at this house on Dresden to visit
2    her?
3    A.  Because that's where she was living.
4    Q.  Okay.  She was living there on Dresden?
5    A.  Yes.
6    Q.  Okay.  And about what time -- what time was this that you
7    were at the house on Dresden?
8    A.  Like between twelve and one o'clock.
9    Q.  Twelve and one o'clock?  Is that in the afternoon?
10   A.  At night.
11   Q.  Or is that in the morning?
12   A.  Midnight.
13   Q.  Okay.  Twelve midnight, one o'clock.  And you had indicated
14   that you were sitting out in front?
15   A.  Yes.
16   Q.  How were you sitting out in front?
17   A.  In the car.
18   Q.  In your car?
19   A.  Two houses away from the house.
20   Q.  Okay.  When you say two houses away from the house?
21   A.  Well, it was like this one and I was across, but on this
22   side, on the opposite side.
23   Q.  You were on the opposite side of the street?
24   A.  Yes.
25   Q.  And you were one house or two houses down?  Is that what

1   you're saying?

2   A.  Diagonal.

3   Q.  On a diagonal?

4   A.  Yeah.

5   Q.  Okay.  Was it one house over or two houses over?

6   A.  One.

7   Q.  One house over.  Could you see the house from where you

8   were at?

9   A.  Yes.

10  Q.  Okay.  And did you have a good view of the front of the

11  house?

12  A.  Yes.

13  Q.  Okay.  And when you looked, when -- you can remember what

14  the house looked like?

15  A.  Yes.

16  Q.  Okay.  While you were sitting there, what did the house

17  look like?  I mean, was it, was it completely boarded up?

18  A.  Just the windows.

19  Q.  Just the windows?  Was the door boarded?

20  A.  No.

21  Q.  The front door?

22  A.  No.

23  Q.  Okay.  Was there a porch light on?

24          MS. MOHSIN:  Objection as to leading, your Honor.

25  That's the third leading question.

ASHLEY WILL - DIRECT

1          THE COURT:  Actually, that one I think was not.  And

2    overruled.

3          MR. HACKETT:  Thank you.

4    BY MR. HACKETT:

5    Q.  Was there a porch light on; if you recall?

6    A.  Yes, there was.

7    Q.  Okay.  Was there any vehicles in the driveway?

8    A.  Two.

9    Q.  Which two?

10   A.  A van and car.

11   Q.  Okay.  You say a van.  What, what color was the van?

12   A.  It was like a minivan.  A smaller -- it was like a minivan.

13   It was white.

14   Q.  A white minivan?

15   A.  I don't know the, what kind of van it was, but I know it

16   was a van.

17   Q.  Okay.  And you said that that was in the driveway?

18   A.  Yes.

19   Q.  Whereabouts in relation to the house was that, that van?

20   A.  Like up by the side, but not far up, but like so that a car

21   can fit behind it.  That's how far up.

22   Q.  And was -- and you indicated there were two cars --

23   A.  Yes.

24   Q.  -- in the driveway?  And what was the other car?

25   A.  I don't know.  I think it was like Focus or something.

ASHLEY WILL - DIRECT

1   Q.  Okay.

2   A.  I don't know the name of it.

3   Q.  Do you remember the color?

4   A.  Black.

5   Q.  It was black?  Was it four door, two door?

6   A.  Four.

7   Q.  Okay.  Now, at some point, did you have some contact with

8   some police officers that night?

9   A.  Yes.  When they came up to my car.

10  Q.  Okay.  And you say "they" or was there one?

11  A.  Well, there was two in one car.

12  Q.  Okay.

13  A.  A passenger and a driver.

14  Q.  What kind of car were they driving?

15  A.  It was like a Jeep or Escalade car, police car.

16  Q.  It was an SUV?

17  A.  Yeah, SUV.

18  Q.  Did it have lights on it?

19  A.  Yeah.

20  Q.  And it said "police" on it?

21  A.  Yeah.

22  Q.  Okay.  And they spoke to you?

23  A.  Yes.

24  Q.  What did they -- as a result of them talking to you, what

25  did you do next?

1    A.   I called Brandy when I was outside when they were next to

2    me.  And she told me that to go up to the door and Ronnie would

3    let me in and wait for her.

4    Q.   Okay.  And is that what you did?

5    A.   Yes.

6    Q.   Okay.  And so you got out of your car and you walked across

7    the street?

8    A.   Yes.

9    Q.   Okay.  And then what happened?

10   A.   Then I went up to the door and they were, Ronnie and Scott

11   were leaving as I was going in.

12   Q.   Okay.  Had you ever seen Mr. Sutherland before that night?

13   A.   No.

14   Q.   Okay.  Have you seen Ronnie before that night?

15   A.   Yes.

16   Q.   Okay.  Now, you had indicated Brandy wasn't there?

17   A.   Yes.

18   Q.   Okay.  And she tells you to go up to the house?

19   A.   Yes.

20   Q.   So what happened when you got to the door?

21   A.   I walked in and then I stood by the couch, set my purse

22   down, and then I heard fighting outside.

23   Q.   You say you heard fighting outside?

24   A.   Yeah.  I heard yelling.

25   Q.   And, you know, how would you know that you heard fighting?

1  A.  Well, I heard yelling, but I don't know what exactly

2  happened because I wasn't -- I couldn't see.  But I heard

3  yelling, and then everyone ran in the house.

4  Q.  When you say everyone ran in the house --

5  A.  Like --

6  Q.  -- who?

7  A.  -- five cops.

8  Q.  There were five police officers that ran in the house

9  right --

10  A.  Yeah.

11  Q.  -- afterwards?

12  A.  Yes.

13  Q.  Okay.  I mean, within how long?

14  A.  I was standing by the couch, and then I just put my purse

15  down.  And two seconds after I heard screaming is when they ran

16  in and asked me who is all in there.

17  Q.  And you say there were five police officers?

18  A.  There was, yeah.

19  Q.  At least?

20  A.  Yeah.

21  Q.  Okay.  And what, what did you do as a result of that?

22  A.  Freaked out.  I sat on the couch.

23  Q.  Did you do that because you were told to sit on the couch?

24  A.  I didn't know what else to do, so I just sat there.

25  Q.  Okay.  Now, at some point, did someone come in the house

```
 1   with a weapon?
 2   A.  Yes.
 3   Q.  Okay.  And you could hear them talking about this weapon,
 4   right?
 5           MS. MOHSIN:  Objection, your Honor, as to the leading
 6   nature of these questions.
 7           THE COURT:  That was leading, I agree.  Go ahead.
 8           MR. HACKETT:  I'll rephrase.  I'll rephrase.
 9   BY MR. HACKETT:
10   Q.  Did you hear anyone talking about anything they may have
11   found?
12   A.  No.  Only when he came in with it, one cop came in with it.
13   Q.  Came in with -- what did he come in with?
14   A.  He said it was a rifle.
15   Q.  Okay.  And you say he came in?
16   A.  He came in from outside.
17   Q.  Okay.  And did anything he say lead you to believe where he
18   got it from?
19   A.  No.
20   Q.  Okay.  Is there anything, you know -- how long did you sit
21   on the couch?
22   A.  Until they let me go.
23   Q.  Okay.  And how long was that; do you know?
24   A.  At least a good half hour.
25   Q.  Another half hour?  Okay.
```

```
 1              MR. HACKETT:  And I have no further questions.  Thank
 2   you.
 3              THE COURT:  All right.
 4              MS. MOHSIN:  May I have a moment, please, your Honor?
 5              THE COURT:  Yes, ma'am.
 6              MS. MOHSIN:  No questions for this witness, your
 7   Honor.
 8              THE COURT:  I need a little clarification.  You said
 9   that your friend was Brandy; is that right?
10              THE WITNESS:  Yes.
11              THE COURT:  And you said you were there to see Brandy?
12              THE WITNESS:  Yes.
13              THE COURT:  Waiting for her?
14              THE WITNESS:  Yes.
15              THE COURT:  And you said that when you called her, I
16   presume that means on a telephone, right?
17              THE WITNESS:  Yes.
18              THE COURT:  And she wasn't there?
19              THE WITNESS:  No.  She went to McDonald's and she told
20   me she'll be right back.  And she took a little longer.
21              THE COURT:  I'm sorry?
22              THE WITNESS:  And she took a little longer than what I
23   thought.
24              THE COURT:  Okay.  So you walked in the house?
25              THE WITNESS:  Yeah.
```

1            THE COURT:  Okay.  This was a house that had

2    boarded-up windows, right?

3            THE WITNESS:  Yes.

4            THE COURT:  You've been there before?

5            THE WITNESS:  I picked her up from there a few times.

6            THE COURT:  And that's it?

7            THE WITNESS:  I sat on the couch and watched a movie

8    with her like twice.

9            THE COURT:  In this house.  And were the windows

10   boarded up when you were there before?

11           THE WITNESS:  Yes.

12           THE COURT:  Yes?

13           THE WITNESS:  (Nodding head.)

14           THE COURT:  Okay.  Anything else?  Mr. Tank, do you

15   have questions?

16           MR. TANK:  I do, your Honor.

17           THE COURT:  All right.  Go ahead.

18                         DIRECT EXAMINATION

19   MR. TANK:

20   Q.  Ma'am, if you could describe the inside of this, this home.

21   Were the walls painted?

22   A.  Yes.

23   Q.  All right.  Could you tell, I mean, how long ago that they

24   had been painted?

25   A.  They looked -- everything looked fresh.

1    Q.  Okay.  Was there carpets?

2    A.  Yes.

3    Q.  And did the carpet appear to be new, old or you couldn't

4    tell?

5    A.  I couldn't tell.

6    Q.  Okay.  Now, with respect to these windows being boarded

7    out, outside of -- or if you were to look at where the windows

8    are, was there an actual window there?

9    A.  Behind the board?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Okay.  And if you know, how long had those windows been

13   there?

14   A.  I don't know.

15   Q.  Okay.  As you're sitting inside this home, do the

16   furnishings or the -- strike that.

17           As you're sitting inside the home and you look at, for

18   example, the carpet and the painting, does it appear to be new

19   or old?

20   A.  New.

21   Q.  Okay.  When you say new, how new do you mean?

22   A.  Like there were no stains on the carpet.

23   Q.  Okay.

24   A.  And walls, I see no, like, dirty walls or nothing.

25   Q.  All right.  Now, as you enter into the home, there's a

1    couch downstairs, correct?

2    A.   Yes.

3    Q.   Are there any other -- are there radios or televisions or

4    anything like that?

5    A.   TV.

6    Q.   Okay.  Where is the TV located, ma'am?

7    A.   Above the fireplace.

8    Q.   And this TV that's above the fireplace, could you describe

9    it or what kind of television that is?

10   A.   It was a big flat screen.  I don't know what, what kind,

11   like what 42-inch or something.

12   Q.   Okay.  Was it evident to you when you were there, for

13   example, watching this movie, that people in fact lived there?

14   A.   Yes.

15   Q.   Outside of this area where the fireplace is and this flat

16   screen TV and couch was, did you go to any other areas of the

17   home?

18   A.   Brandy's room.

19   Q.   Okay.  In Brandy's room, was there a place where she slept?

20   A.   Yes, air mattress.

21   Q.   In addition to an air mattress, was there a place where her

22   clothing was kept?

23   A.   In a basket.

24   Q.   Okay.  And in addition to that, did, did your friend, whose

25   name is Brandy, did she have anything else that was there, that

1   you knew of?

2   A.   Besides her baby's toys and her son.

3   Q.   Now, let's turn to the issue of Mr. Roberts.  Do you know

4   who Ron Roberts is?

5   A.   No.

6   Q.   Okay.  And if you can see the man, I'm pointing to him

7   right now.  He's wearing orange and he's facing me.  Have you

8   ever seen that man before?

9   A.   Yeah.

10  Q.   Okay.  When?

11  A.   When I go see her.

12  Q.   Okay.

13  A.   And pick her up.

14  Q.   When you went to see her and pick her up, how was it that

15  you came to see Mr. Roberts, ma'am?

16  A.   Huh?

17  Q.   Well, I mean, you saw Mr. Roberts when you went to pick

18  up --

19  A.   Yeah.

20  Q.   -- your friend.  And I presume that's Brandy, correct?

21  A.   Yeah.

22  Q.   Is that right?

23  A.   Yes.

24  Q.   Okay.  And, and how was it on the occasions that you went

25  there that you physically saw Mr. Roberts, if you, in fact,

ASHLEY WILL - CROSS

1    did?

2    A.  When he came downstairs to say hi to us, or me.

3    Q.  Okay.  So, approximately, let's talk about the first

4    occasion that you went to pick up Brandy where you saw Mr.

5    Roberts.  Do you know when that was, ma'am?

6    A.  When I first came there?

7    Q.  Yes.

8    A.  No.

9    Q.  Okay.  Was it in 2010 or was it in 2011?

10   A.  20 -- it was February.

11   Q.  Okay.

12   A.  That was 2011.

13   Q.  So in February of this year?

14   A.  Yes.

15   Q.  You went to pick up your friend Brandy and you saw Mr.

16   Roberts?

17   A.  Yes.

18   Q.  And when you saw him on that occasion, you said he came

19   from upstairs?

20   A.  Yeah.

21   Q.  Okay.  Based upon that conversation and what you saw on

22   that day in February, did you understand Mr. Roberts to live

23   any place?

24   A.  Huh?

25   Q.  Okay.  I'll rephrase the question, ma'am.

1          Was there anything that you saw on the times that you

2     went to pick up your friend Brandy that made you conclude that

3     anyone else lived there?

4     A.   Oh, no.

5     Q.   Okay.  Were there other occasions that you saw Mr. Roberts

6     beyond this one occasion that you described in February, ma'am?

7     A.   Just when I went and picked her up.

8     Q.   Okay.  Were there other occasions beyond that?

9     A.   And when we watched a movie at her house.

10    Q.   Okay.  The time that you watched a movie at her home, did

11    you have occasion to see Mr. Roberts then?

12    A.   Yes.

13    Q.   Okay.  And how did you come about seeing Mr. Roberts on

14    that occasion?

15    A.   He was just walking around the kitchen.

16    Q.   Okay.

17    A.   Just like living normal.

18    Q.   When you say living normal, did you understand that he had

19    access to the premises?  I mean, he didn't --

20    A.   Yes.  Brandy told me that.

21    Q.   I'm sorry?

22    A.   Yes.

23    Q.   Okay.  What month was it that you watched this movie; if

24    you can recall?

25    A.   Like, back in February and January.

1          MR. TANK:  Okay.  Your Honor, with that, I have no

2     further questions of the witness.

3          THE COURT:  Okay.  Some cross?

4          MS. MOHSIN:  Thank you, your Honor.

5                         CROSS-EXAMINATION

6     BY MS. MOHSIN:

7     Q.  Good morning, Ms. Will.

8     A.  Good morning.

9     Q.  Ms. Will, how long have you known Brandy Irwin?

10    A.  Three years.

11    Q.  And you knew her to live at this house that we've been

12    discussing here today?

13    A.  Yes.

14    Q.  How long did she live at that house?

15    A.  At least three months.

16    Q.  For at least three months?  Did you help her move in?

17    A.  No.

18    Q.  Do you remember when she lived -- so three months from the

19    time that, that --

20    A.  Yeah.

21    Q.  -- this incident occurred, right?

22          So at least in November of 2010?  How do you know she

23    lived there in at least November of 2010?

24    A.  Because she told me.  She called me and told me to come

25    over and see her new house.

ASHLEY WILL - CROSS

1    Q.  And did you believe that she lived there alone?

2    A.  No.

3    Q.  Okay.  You believed that she lived --

4    A.  Yes.

5    Q.  -- lived there with another person, right?

6            Did you know who that other person was?

7    A.  No.

8    Q.  Did she tell you anything about her -- what she was allowed

9    to do in the house?  In other words, did she have any

10   restrictions on where she could go or not go?

11   A.  All she said was she couldn't go upstairs.  That's it.

12   Q.  She was not allowed on the second floor of the house; is

13   that right?

14   A.  Yes.

15   Q.  She had the run of the first floor of the house, but she

16   was not permitted to go to the second floor, right?

17   A.  Yes.

18   Q.  And Ronald Roberts told her that she couldn't go up there,

19   right?

20   A.  That's what she said.

21   Q.  Okay.  Did she tell you Ronald Roberts lived at that house

22   with her?

23   A.  Yes.

24   Q.  On the day you were there, that's the third time you were

25   there?

ASHLEY WILL - CROSS

1   A.  Yes.

2   Q.  Could it have been more than three times that you had

3   visited her there?

4   A.  She -- when I -- I picked her up, she came outside in my

5   car and then she stayed in my house for at least a good month

6   or two.

7   Q.  Okay.  Let's back up.  She moved into this house in

8   November of --

9   A.  Yeah.

10  Q.  -- 2010?

11  A.  She wasn't hardly there.

12  Q.  And she spent time living at your house?

13  A.  Yes.

14  Q.  Did she tell you why she came to your house?

15  A.  No.

16  Q.  And you said she spent a month living with you at your

17  house?

18  A.  Yes.

19  Q.  After she got the house in November 2010?

20  A.  Yes.

21  Q.  When was that?  In December?  November?  January?  When?

22  A.  I really don't remember.  I really don't remember, but I

23  know it was a while ago, like a long time ago.

24  Q.  Okay.  Just so we're clear, when she lived with you, was it

25  during the time that she was also living with Ronald Roberts at

1   this house?

2   A.  She was pregnant with her son.

3   Q.  Okay.  So she did not live with you after she moved in --

4   A.  No.

5   Q.  -- with Ronald Roberts?

6   A.  No.

7   Q.  She lived with you previously?

8   A.  Yes.

9   Q.  All right.  But she had -- and she lived there from about

10  November of 2010 until she was arrested, correct?

11  A.  Yes.

12          MS. MOHSIN:  Nothing further.  Thank you.

13          THE COURT:  I have another clarification that I

14  just -- it just occurred to me.  This woman is living there

15  with an infant son, right?

16          THE WITNESS:  Yes.

17          THE COURT:  So why are you there at one o'clock in the

18  morning?

19          THE WITNESS:  I was really supposed to pick her up.

20  She --

21          THE COURT:  Why?  For what reason would you pick

22  somebody up in the middle of the night who is living in a

23  boarded up house with an infant son?  Were you getting her out

24  of there or rescuing her or what?

25          THE WITNESS:  She just wanted to hang out.

```
1              THE COURT:  She wanted to hang out.

2              THE WITNESS:  At my house.

3              THE COURT:  Sorry?

4              THE WITNESS:  She wanted to go spend the night at my

5   house.

6              THE COURT:  She wanted to spend the night at your

7   house.

8              THE WITNESS:  Yes.

9              THE COURT:  Starting at one in the morning?

10             THE WITNESS:  Well, it was, it was a Friday, so.

11             THE COURT:  What?

12             THE WITNESS:  It was Friday.  And she didn't get back

13  home until late.  So she told me just come get her at midnight.

14             THE COURT:  Okay.

15             THE WITNESS:  I don't even know why I went.

16             THE COURT:  I couldn't hear the last --

17             THE WITNESS:  I said I don't even know why I went.

18             THE COURT:  You don't know why you went?

19             THE WITNESS:  (Shaking head.)

20             THE COURT:  Okay.  Any other questions?

21             MS. MOHSIN:  May I, your Honor?

22             THE COURT:  Well, you're on cross.  Are there any

23  other direct questions on any of this, Mr. Tank or Mr. Hackett?

24             MR. TANK:  I have none, your Honor.

25             THE COURT:  No?
```

ASHLEY WILL - RECROSS                    25

```
 1              MR. HACKETT:  I have none, your Honor.
 2              THE COURT:  Go ahead.
 3              MS. MOHSIN:  I have a few related to the question
 4    raised by the Court.
 5              THE COURT:  Go ahead.
 6                        CROSS-EXAMINATION
 7    BY MS. MOHSIN:
 8    Q.  Ms. Will, on the other occasions you picked up Brandy Irwin
 9    at this house, was it also at midnight or one in the morning?
10    A.  No.
11    Q.  What time would you pick her up?
12    A.  Like early in the afternoon, like two, three.
13    Q.  Two or three in the afternoon?
14    A.  Yeah.
15    Q.  So this was, in fact, the only occasion that you picked her
16    up at midnight?
17    A.  Yes.
18    Q.  Okay.  And she did not give you any reason why she wanted
19    to do it other than to hang out?
20    A.  No.
21    Q.  She was not -- she didn't tell you she was concerned about
22    something or had some fears?
23    A.  Nope.
24    Q.  On other occasions as well?
25    A.  No.
```

1              MS. MOHSIN:  Thank you.

2              THE COURT:  You can step down.  Thank you.

3              (Witness excused at 9:55 a.m.)

4              THE COURT:  Mr. Hackett, what else?

5              MR. HACKETT:  Your Honor, let me check the hallway and

6    see if any of the other witnesses have showed up.

7              (Brief pause.)

8              MR. HACKETT:  Your Honor, as I had indicated, and I

9    have just spoken with the U.S. attorneys on this case, I have

10   some witnesses that were subpoenaed that are Detroit police

11   officers who apparently have not shown up and they haven't

12   contacted me at all.  And I have no contact numbers for these

13   people other than the, the lines at the precinct that they work

14   on, that seem to be not working very well.

15             I did speak with Lieutenant Quarello out in the

16   hallway.  And he did indicate that if he had a phone, he could

17   contact these people and have them down here.  They were

18   subpoenaed and, you know, they know about this hearing and they

19   are not here.

20             I believe that Mr. Tank has another witness that will

21   be here to testify.  If we can try to get a hold of these

22   officers in some way, to get them down here.

23             THE COURT:  So you've got Lieutenant Quarello back

24   here again, do you?

25             MR. HACKETT:  Yeah.  Lieutenant Quarello was

 1   subpoenaed, and he wasn't released from his subpoena when he

 2   was here.

 3            THE COURT:  So you're going to put him on again?

 4            MR. HACKETT:  We very well may.  We wanted to see how

 5   the testimony went today.

 6            THE COURT:  Well, what's your proffer with respect to

 7   what else you would produce?

 8            MR. HACKETT:  With these other officers?

 9            THE COURT:  Right.

10            MR. HACKETT:  These other officers have been out to

11   that house on Dresden and have reports that I provided to the

12   prosecutor.  And I believe they have relevant information.  And

13   there's no way for me --

14            THE COURT:  What would that relevant information

15   consist of?

16            MR. HACKETT:  Well, from their reports -- if I may,

17   your Honor?

18            THE COURT:  No.  Just tell me.  Just, I don't -- just

19   tell me what your proffer is.  What, what relevant information

20   would any other witnesses beside those people who were there on

21   the scene provide?

22            MR. HACKETT:  Well, in January, there were officers

23   that went out to this house on Dresden and investigated the

24   caller who said that there was someone squatting in the home.

25   And they did an investigation on that and talked to the people

1    that were at the home and didn't make a determination that

2    there was any squatting going on.

3            THE COURT:  Okay.  And that would not -- would that

4    have consisted of Lieutenant Quarello or Sergeant Woods?

5            MR. HACKETT:  No.  But it would have, it would have

6    been individuals that reported back to the Eastern District

7    regarding what they found when they were there.

8            There's also --

9            THE COURT:  And that would be relevant to what Woods

10   and Quarello did in what way?

11           MR. HACKETT:  Well, it may be relevant in the sense

12   that Woods and Quarello may, in fact, have been privy to the

13   information that these individuals took back to their precinct.

14           THE COURT:  They said they were not.

15           MR. HACKETT:  That may be true, but --

16           THE COURT:  At least I think they did.  Did you ask

17   them that?

18           MR. HACKETT:  I did ask them if they'd had any other

19   contact with any other officers or Federal agents involving

20   this house.

21           THE COURT:  Okay.

22           MR. HACKETT:  And they indicated they had not.

23           THE COURT:  Okay.  So do you have some other officer

24   that says that that's not, not correct?

25           MR. HACKETT:  Well, I haven't had a chance to question

1    these officers because, one, when I went to the police station,

2    they wouldn't talk to me.  And, two, we subpoenaed them to be

3    here at your hearing.

4            THE COURT:  So your proffer is that if you were able

5    to call a number of other witnesses, maybe you would find

6    something that's relevant?

7            MR. HACKETT:  Well, we do, we do know --

8            THE COURT:  And the relevance would be to call into

9    question, again, with an "if" associated in the premise, call

10   into question the recollection or the statement of Quarello and

11   West (sic) that we were just talking about; that they were not

12   privy to such earlier information about the house having been

13   investigated a month earlier, things of that sort?

14           MR. HACKETT:  Well, they may have, in fact,

15   communicated to someone who could communicate to the detective

16   and Lieutenant Quarello.

17           THE COURT:  It sounds attenuated to me.  Do you have

18   any other information that you'd seek from anybody else?

19           MR. HACKETT:  Judge, this is what my purpose was for

20   subpoenaing these officers.

21           THE COURT:  Okay.

22           MR. HACKETT:  They have written reports regarding the

23   house on Dresden.

24           THE COURT:  Okay.

25           MR. HACKETT:  They'd been out to the house and

1   investigated on prior occasions the claims that the house was

2   abandoned and that it was a, you know, there was a squatter or

3   that there was drug activity involved there.

4          THE COURT:  Okay.

5          MR. HACKETT:  And I'd like to follow up with some

6   questions on their, on their reports that they wrote.

7          THE COURT:  Anything else?

8          MR. HACKETT:  Judge, we have one other witness,

9   Brandy --

10         THE COURT:  Irwin?

11         MR. HACKETT:  Yeah, Brandy Irwin.

12         THE COURT:  You've already called her.

13         MR. HACKETT:  She's en route to the court.  I

14  understand she had a flat tire and she's on her way.

15         THE COURT:  So you want to recall her?

16         MR. HACKETT:  Yeah.  I -- she wasn't -- if you -- if I

17  recall properly, she was, she was called for the purpose of

18  dealing with standing of --

19         THE COURT:  Well, the point is she's been a witness.

20  Do you want to recall her?  That's all I asked.

21         MR. HACKETT:  Yes.  I intended on recalling her

22  because there's some information that she has, I think, is

23  relevant, Judge.

24         THE COURT:  All right.  And Mr. Tank has a witness?

25         MR. HACKETT:  Yes, he does.

1          MR. TANK:  I do, your Honor.

2          THE COURT:  Why don't you go ahead.

3          (Witness is sworn.)

4          THE COURT:  Have a seat.

5          MR. TANK:  Your Honor, before I begin the direct

6     examination as it relates to Mr. Pappert, one of the things

7     that I wanted to disclose to the Court was that Mr. Pappert was

8     in the past represented by an individual whose name is Jeff

9     Burns, that I informed the Court of when the last hearing

10    concluded.

11         Since that point in time, or I guess before that point

12    in time, that relationship no longer exists and he's not

13    represented by counsel any longer.  And so I wanted to bring to

14    the Court's attention that he was, at one point in time,

15    represented by counsel, and that he's not now.

16         It's my understanding, your Honor, that he has spoken

17    with the Government's -- some of the agents associated with the

18    Government, and that he spoke with them at some point in time

19    in the past.  I have no idea when that was.  And it was at that

20    point in time that he was represented by counsel.

21         THE COURT:  I hear all of that.  And, therefore, what?

22         MR. TANK:  I was just concerned about letting the

23    Court know that.  I didn't know -- I was concerned about -- and

24    Ms. Mohsin and I have just spoken about it.  I don't believe

25    there will be any issues related to Fifth Amendment privilege

EVIDENTIARY HEARING - 7/25/12

 1   that will come up.  But I wanted the Court to be aware of what

 2   had transpired in the past in terms of --

 3           THE COURT:  I see.

 4           MR. TANK:  Yeah.

 5           THE COURT:  All right.

 6           MS. MOHSIN:  May I have a moment to confer with Mr.

 7   Tank, briefly?

 8           THE COURT:  Yes.

 9           (Brief pause.)

10           MR. TANK:  In addition to that, your Honor, one of the

11   other things I wanted to place on the record was is that Mr.

12   Pappert, I guess there was some time in the neighborhood of

13   March of this past year, called me and set an appointment with

14   me.  When he set an appointment with me, I had an initial

15   meeting with him.

16           About five to ten minutes in the meeting, I made the

17   determination that this case, or what he was coming to see me

18   about, that being that the FBI had contacted him in reference

19   to this house on Dresden, was related to a case that I had.  I

20   indicated to him that there was a conflict and that I could not

21   represent him.  And at that point in time, the meeting

22   discontinued and I helped him find another attorney, which was

23   Mr. Burns.  In total, I probably met with him for a period of

24   somewhere between five and ten minutes, your Honor.

25           THE COURT:  Okay.  I understand what you've said.

1    Apparently you wish to --

2            MR. TANK:  I do.

3            THE COURT:  -- have the witness testify.

4            MR. TANK:  I do.

5            THE COURT:  Right?

6            MR. TANK:  Right.  And I don't wish to waste any of

7    the Court's time.  I apologize if I've done so.

8            THE COURT:  Is there anything that the Government

9    needs on the record or any cautions or anything of that sort

10   that you think are due, based upon everything that you know?

11           MS. MOHSIN:  Judge, I think --

12           THE COURT:  And about which, I might add, I know

13   absolutely nothing other than what Mr. Tank has just stated on

14   the record.  So fill me in, to the extent that anything is

15   missing, as far as you're concerned.

16           MS. MOHSIN:  Judge, I don't know that anything is

17   missing.  We did meet with Mr. Pappert, and he initially

18   indicated that he had contacted Mr. Tank to represent him.

19           THE COURT:  The gentleman sitting here apparently is

20   Mr. Pappert?

21           MS. MOHSIN:  That is correct, your Honor.

22           THE COURT:  Okay.

23           MS. MOHSIN:  The Government did have a meeting with

24   him in which he indicated that he initially contacted Mr. Tank

25   to represent him and that he later was referred to another

1     attorney, Jeff Burns, who I believe is known to Mr. Tank, as

2     well, to represent Mr. Pappert.  I don't know if there's a

3     conflict here.  But I think it is appropriately raised from the

4     point of view of that prior contact, since he was already

5     representing Mr. Roberts at the time.

6              THE COURT:  Okay.

7              MS. MOHSIN:  And so perhaps it would be appropriate,

8     in light of the fact that Mr. Pappert is no longer represented

9     by any attorney; that he has had meetings with, or a meeting

10    with the Government regarding these matters.  And so to the

11    extent that perhaps Mr. Pappert may be under the impression

12    that there's some relationship or not, I don't know.  Perhaps

13    the Court could inquire to make sure that there's no conflict

14    here.

15             THE COURT:  I think maybe Mr. Tank will be in a better

16    position than someone who doesn't really know about the

17    background.

18             But why don't you go ahead with that, Mr. Tank.

19             MR. TANK:  I will do that.

20             THE COURT:  And do whatever you think is

21    appropriate --

22             MR. TANK:  I will.

23             THE COURT:  -- to amplify the record.  Go ahead.

24                         DANIEL PAPPERT

25       called as a witness at 10:03 a.m. testified as follows:

```
 1                        DIRECT EXAMINATION
 2    BY MR. TANK:
 3    Q.  Sir, can you state and spell your full name for the record,
 4    please.
 5    A.  Daniel Lynn Pappert.
 6    Q.  Okay.
 7             COURT REPORTER:  Can you spell your last name, please?
 8             THE WITNESS:  P-A-P-P-E-R-T.
 9    BY MR. TANK:
10    Q.  Mr. Pappert, as we sit here right now, you were in the past
11    represented by an individual, if I'm not mistaken, named Jeff
12    Burns, correct?
13    A.  Yes.
14    Q.  And how was it that you came to find Mr. Burns?
15    A.  Through your office.
16    Q.  Okay.  And so if I'm not mistaken, some time in, perhaps
17    was it March or, or April, or at some point in time in the
18    spring, you found yourself, or came to my office, correct?
19    A.  Correct.
20    Q.  In that meeting that took place in our office, if I'm not
21    mistaken, you came in and explained some things to me, correct?
22    A.  Yes, I did.
23    Q.  All right.  And after you had explained why it was that you
24    were there, did I, in turn, send you someplace else?  Or what
25    was stated at that point in time?
```

1   A.  You gave me Jeff Burns' phone number.

2   Q.  And did I indicate to you what the reason was for that,

3   sir?

4   A.  A conflict of interest.

5   Q.  Okay.  All right.  As we sit here right now, you understand

6   that I am not your attorney, correct?

7   A.  Yup.

8   Q.  And do you understand that I've never been your attorney?

9   A.  Yes, I do.

10  Q.  And do you understand that I've not now, nor have I ever

11  given you any legal advice except to say there was a conflict,

12  correct?

13  A.  Correct.

14          MR. TANK:  With that, your Honor, I'd like to proceed

15  forward with the direct exam.  I think I've covered what I want

16  to.

17          THE COURT:  Go ahead.

18          MR. TANK:  Okay.

19  BY MR. TANK:

20  Q.  Mr. Pappert, what, what is it that you do for a living,

21  sir?

22  A.  Fire restoration.

23  Q.  Okay.  And what does a fire restoration person like

24  yourself do?  What does that mean?

25  A.  We rebuild burned-out houses.

1   Q.  Okay.  And how long have you been in this business for,

2   sir?

3   A.  Since my early 20's.

4   Q.  All right.  And are you self-employed or do you work for

5   someone else?

6   A.  I'm self-employed and I subcontract.

7   Q.  All right.  Is there a name or another entity, a d/b/a or

8   corporation that you also work under?

9   A.  Yes.

10  Q.  What is that, sir?

11  A.  Dynamic Fire Restoration and Miles Building Company.

12  Q.  Okay.  So Dynamic Fire Restoration and Miles Building.

13        All right.  Now, as a result of you, you doing this,

14  or having these companies, both Dynamic and Miles, do you have

15  employees?

16  A.  Yes, I do.

17  Q.  Was Mr. Roberts one of those employees?

18  A.  Yes, he was.

19  Q.  And for how long, sir, was Mr. Roberts one of your

20  employees?

21  A.  Since probably beginning late '09, I believe.

22  Q.  Okay.  And so what was it that Mr. Roberts did from, until

23  late '09 until when he ceased working for you?

24  A.  General labor, painting, cabinetry, tile work.

25  Q.  Okay.  And so what you're saying is, is that if you have a

DANIEL PAPPERT - DIRECT

1    fire at a home in Detroit, for example, or any place else for

2    that matter, you would come in and restore the inside of the

3    home; is that what happens?

4    A.   Yes.

5    Q.   What about the exterior of the home, do you do that as

6    well?

7    A.   Yes, we do.

8    Q.   Did there come a point in time in the latter part of the

9    year, in 2010, where you began to work at a home on Dresden?

10   A.   Yes.

11   Q.   In Detroit?

12   A.   Yes, there was.

13   Q.   Do you recall off the top of your head what the address was

14   at Dresden?

15   A.   17368, I believe.

16   Q.   Okay.  All right.  Now, you were working on any other homes

17   in Dresden --

18   A.   No.

19   Q.   -- in addition?

20        Okay.  Have you ever heard the address 17378?

21   A.   Yes.

22   Q.   Okay.  What do you understand that address to be?

23   A.   That's the house on Dresden, I believe.

24   Q.   Okay.  Now, when you get to this home, approximately what

25   month and what year is it, sir, when you commence work on this

1    home?

2    A.   You have my receipts, so.

3    Q.   Now, I'm going to stop you there.  Do you have something

4    with you that would refresh your recollection if you looked at

5    it, in terms of knowing what the date was?

6    A.   Yup.

7    Q.   Okay.  And just for the record, sir, what is it that you

8    have in your hand right now?

9    A.   My check registry.

10   Q.   Okay.

11   A.   I would have to say the first dumpster we had over there

12   was September, beginning of September.

13   Q.   All right.  Of what year, sir?

14   A.   2010.

15   Q.   All right.  So in September of 2010, you have a first

16   dumpster arrive.  What would that be for?

17   A.   When we have to tear out all the materials on the inside.

18   Q.   What does it mean, to tear out all the materials on the

19   inside?  What specifically are you doing?

20   A.   We tear out the insulation, drywall, carpeting, whatever is

21   on the inside of the house burned out, you know, tear the roof

22   off.

23   Q.   The roof as well?

24   A.   Yup.

25   Q.   All right.  What do you wind up with?  In what condition is

40

1    the house after you removed all these things?  What's left?

2    A.  Basically it's a shell.

3    Q.  Okay.  And the shell would consist of what, sir?

4    A.  The exterior 2 by 4's and the brick.

5    Q.  And what do you do from that point in time once you got the

6    shell there?  What did you do in this instance, I guess is my

7    question.

8    A.  We had to pull a permit.

9    Q.  All right.

10   A.  Then we did the structure in the back, fix the roof.

11   Q.  All right.  When you say that you had to pull a permit, who

12   did you pull permits with?

13   A.  City of Detroit.

14   Q.  All right.  And so you got permits to do what?

15   A.  A rough structure.

16   Q.  All right.  Once this house is down to the shell, if you

17   will, what kind of work do you do internal to it?

18   A.  You have to spray it, fix everything, insulate, drywall,

19   paint, get it back to liveable.

20   Q.  All right.  Did you do that in this instance?

21   A.  Yes, we did.

22   Q.  When you say get it back to liveable, what do you mean by

23   that?

24   A.  You have to -- people got to be able to move back into it.

25   Q.  So it has to be inhabitable?

1   A.   Yes.

2   Q.   All right.  As you're doing these things, is Ronald Roberts

3   assisting you?

4   A.   Yes, he is.

5   Q.   All right.  And so when you say that you put up drywall,

6   this is new drywall that's put up, correct?

7   A.   Correct.

8   Q.   The carpeting?

9   A.   It's all new.

10  Q.   All new.  How about plumbing for the house?

11  A.   Yeah.  We re-PEX it.

12  Q.   What does that mean?

13       MS. MOHSIN:  Your Honor, we're going to object as to

14  the relevancy of all this testimony that's been going on for

15  some time.

16       MR. TANK:  Okay.  I'll --

17       MS. MOHSIN:  I don't think it addresses the issue of

18  the issue here in this case.

19       MR. TANK:  All right.  I will move along faster, your

20  Honor.

21       THE COURT:  All right, Mr. Tank.

22  BY MR. TANK:

23  Q.   As it relates to this house, this house, did there come a

24  point in time where you allowed someone to stay or live in it?

25  A.   Two, yes.

DANIEL PAPPERT - DIRECT

1  Q.  Okay.  Who was that, that you allowed to live inside this
2  home?
3  A.  Darryl Stringer, who occupied the house on occasion.
4  Q.  Okay.
5  A.  And Ron had occupied it on occasion.
6  Q.  When you say Ron, what do you mean by that?
7  A.  Ron Roberts.
8  Q.  All right.  And so why is it or how is it, sir, that your
9  employees have come to live inside this home?
10  A.  Well, I wouldn't call it living, but we have permission to
11  enter the home.
12  Q.  Okay.
13  A.  To protect it, insurance, main contractor's interest.
14  Q.  What do you mean by that?
15  A.  Well, because the house was broken into before, and we were
16  waiting for the bank to repossess the property.
17  Q.  All right.  So you're employed by who when you're doing
18  this work, sir?
19  A.  National Fire Restoration.
20  Q.  Now, as you're -- strike that.  I apologize.
21          How is it -- could you describe the nature of the
22  permission or what it is that you tell the other man you
23  described and Mr. Roberts, in relationship to what they are
24  allowed to do and not do in the home?
25  A.  We go in, do weekly checks and make sure everything is

 1   okay, and the neighborhood is not breaking in and stealing

 2   everything.

 3   Q.  All right.  So as you complete these things and things are

 4   done, for example, like you have electrical in or new, new

 5   things that have been placed in, does that become an increasing

 6   problem on a place like Dresden?

 7   A.  Yes, it does.

 8   Q.  Did you give Mr. Roberts permission to stay the night at

 9   the home?

10   A.  If he had to.

11   Q.  Okay.  And what kind of situations would he have to, sir?

12   A.  I mean, I -- what do you mean, what kind of situation?

13   Q.  All right.  I'll withdraw the question.

14           Now, as it relates to, to the home itself, if we were

15   to go, for example, to the years or to the month of, for

16   example, say February of the year 2010, what kind of condition

17   is this home in, in February of 2010?

18   A.  February 2010?

19   Q.  Excuse me.  Strike that.  February of 2011.

20   A.  It's in a liveable, habitable situation.

21   Q.  All right.  Would it have been up to code, for example, for

22   the --

23   A.  Yes.

24   Q.  -- city?

25   A.  We passed all our inspections.

DANIEL PAPPERT - DIRECT

1    Q.  All right.  So there were inspectors that had come through

2    with the City of Detroit?

3    A.  Yes.

4    Q.  And you passed those?

5    A.  Yes.

6    Q.  And as it relates to, for example, March of say 2011, had

7    that changed at all?

8    A.  I don't think I was there in March.

9    Q.  Okay.  The last that you saw the house, for example, in say

10   in February of 2011, it was livable then, correct?

11   A.  Yes.

12   Q.  All right.  Now, one of the things that you brought with

13   you was a series of records as it relates to your business.

14   And you handed those to me today, correct?

15   A.  Mh-hm.

16   Q.  Okay.

17          MR. TANK:  If I may, your Honor, is it permissible I

18   hand him more than one exhibit at a time?

19          THE COURT:  It's desirable, as a matter of fact.

20          MR. TANK:  I'll hand him all of them, your Honor.  I'm

21   going to hand him, the witness, Exhibits 3 through 30.

22          MS. MOHSIN:  I did have a chance to look at them.

23          MR. TANK:  Okay.

24          THE COURT:  Okay.

25          MR. TANK:  If I may approach, your Honor?

DANIEL PAPPERT - DIRECT

```
 1              THE COURT:  Yes, sir.
 2   BY MR. TANK:
 3   Q.  I'd like you to take a look at Exhibit 3.  Can you describe
 4   for me what that is, sir?
 5   A.  That's the order for the cabinets.
 6   Q.  I'm sorry?
 7   A.  The order for cabinets.
 8   Q.  The cabinets for where, sir?
 9   A.  Kitchen.
10   Q.  Where?
11   A.  On Dresden.
12   Q.  Okay.  And these receipts that you have brought and which
13   are now marked as Exhibits 3 through 30, these are receipts to
14   the home as relates to Dresden, correct?
15   A.  Correct.
16   Q.  And so that's the receipt as we relate to Exhibit Number 3
17   for cabinets that you put in the home, correct?
18   A.  Yes, sir.
19   Q.  Okay.  And those were new cabinets?
20   A.  Mh-hm.
21   Q.  Is that -- you have to say -- answer audibly, yes or no.
22   A.  Yes.
23   Q.  I want to move on, if I could, to Exhibit Number 4.  Could
24   you identify what Exhibit Number 4 is?
25   A.  Exhibit Number 4 is shingles for Dresden.
```

DANIEL PAPPERT - DIRECT

1   Q.  Okay.

2   A.  Roof repair.

3   Q.  In what month does that indicate that receipt is for, sir?

4   A.  October.

5   Q.  Okay.

6          MR. TANK:  Your Honor, just as a point of direction,

7   would you prefer that I go through and admit each exhibit one

8   by one, or just go through and lay the foundation and admit

9   them at the end?

10          THE COURT:  You would like to have 3 through 30

11   admitted?

12          MR. TANK:  Yes.

13          THE COURT:  Is there any objection to admitting 3

14   through 30 from the Government, Ms. Mohsin, other than

15   tangential relevance?

16          MS. MOHSIN:  Judge, I do have an objection to it.

17          THE COURT:  All right.  Do you want them to go one by

18   one then or?

19          MS. MOHSIN:  I don't think that they are relevant.

20   And I also have some issues related to whether or not these

21   records came from Mr. Pappert himself.  I know he's testified

22   that he gave them to him, but I want to voir dire this witness

23   more specifically about these records.

24          THE COURT:  Do you want to move to admit 3, for

25   example?

| | |
|---|---|
| 1 | MR. TANK:  Yes. |
| 2 | THE COURT:  Mr. Tank? |
| 3 | MR. TANK:  That will be fine.  I'll move to admit 3. |
| 4 | THE COURT:  The Government wants voir dire on that. |
| 5 | So I will turn the lectern over to Ms. Mohsin. |
| 6 | Go ahead. |
| 7 | VOIR DIRE |
| 8 | BY MS. MOHSIN: |
| 9 | Q.  Mr. Pappert, you appear to have a file in front of you. |
| 10 | And then you just indicated that you provided a series of |
| 11 | records to Mr. Tank.  Is that correct? |
| 12 | A.  Yes, ma'am. |
| 13 | Q.  Are the records in your file different from the records |
| 14 | that you provided to Mr. Tank this morning? |
| 15 | A.  These are my check registers. |
| 16 | Q.  So they are different from the records you provided to Mr. |
| 17 | Tank this morning? |
| 18 | A.  I didn't give these to him. |
| 19 | Q.  Are the records you provided to Mr. Tank different from |
| 20 | what's contained in that envelope? |
| 21 | A.  Yes. |
| 22 | Q.  Are the records that you provided to Mr. Tank a complete |
| 23 | record of all of the documents you have in connection with this |
| 24 | case? |
| 25 | A.  All of them that I could find, yes, they are. |

DANIEL PAPPERT - DIRECT

48

1    Q.   And not including the check registers?

2    A.   No, not including those.

3    Q.   So other than the check registers, are there any other

4    documents in that file?

5    A.   In this?  Just a subpoena that you guys served me, a copy

6    of a check that I got written for Dresden Street, a draw sheet,

7    and a couple things with hourly.

8    Q.   So there are other records in there that are not contained

9    in that file?

10   A.   In this file?  No.  I mean, yes.

11   Q.   I'm sorry.  I'll be more specific.  The file that you

12   provided to Mr. Tank, I'm trying to determine if the file that

13   you provided to Mr. Tank is a complete record of the documents

14   connected to your work on 17378 Dresden.

15   A.   These are the things that are missing that I did not put

16   into that file.

17   Q.   Okay.  And in addition to that, in the file, are there any

18   other documents that you have or that exist related to that

19   file?

20   A.   To Dresden Street, at my office I have a list of a

21   specification sheet that I was not able to get this morning

22   yet.

23   Q.   And the file that you gave to Mr. Tank, that came from you?

24   A.   Yes.

25   Q.   From your files of both your companies, as well as you

1   personally?

2   A.   Correct.

3            MS. MOHSIN:  Okay.  Thank you, your Honor.

4            THE COURT:  Is there an objection to the receipt of

5   Number 3, as an exemplar?

6            MS. MOHSIN:  Only the relevance issue.  Beyond that,

7   we're satisfied as to the authenticity of the records.

8            THE COURT:  I'm uncertain about the relevance as well.

9   But authenticity being reasonably satisfied, 3 will be

10  admitted.

11           And why don't you identify 4 through 30, Mr. Tank, and

12  see if those are subject to the same ruling.

13           MR. TANK:  Okay.

14       (Exhibit #3 was received at 10:22 a.m.)

15           THE COURT:  I would suggest that you have the -- Ms.

16  Mohsin?

17           MS. MOHSIN:  To be helpful to the Court, we're

18  prepared to agree, having reviewed these records with counsel,

19  that 3 through 30 came from the file that he just testified

20  about.  Other than relevance, we don't have an objection to

21  authenticity.

22           THE COURT:  You move to admit 4 through 30?

23           MR. TANK:  I do, your Honor.

24           THE COURT:  Received.

25       (Exhibits #4-30 were received at 10:22 a.m.)

DANIEL PAPPERT - DIRECT

```
 1              THE COURT:  Go ahead.  Next question.
 2                        DIRECT EXAMINATION
 3   BY MR. TANK (continued):
 4   Q.  Now, sir, you have in your hand there, and I believe that
 5   they are in order, Exhibit No. 15.  Could you go to that for
 6   me, please?
 7   A.  Mh-hmm.  Sorry, yes.
 8   Q.  Could you pull the microphone a little closer to yourself?
 9   Thank you, sir.
10              There's an indication as it relates to an organization
11   or a company called Pleasant View Windows.  Can you tell me
12   what that is, sir?
13   A.  That's my window manufacturer.
14   Q.  All right.  This window manufacturer, did you, in fact,
15   have windows placed into this home on Dresden?
16   A.  Yes, I did.
17   Q.  What was the reason, sir, if you can recall, they were
18   boarded up?
19   A.  We do a mortgage company board-up because they kept trying
20   to break in the back windows.
21   Q.  All right.  And so the boards prevent what?
22   A.  People to get in the house.
23   Q.  All right.  So is that why, for example, all of the windows
24   are boarded on the first level but they are not on the second?
25   A.  Correct.
```

1   Q.  All right.  And so underneath those boards are brand new

2   windows, if I'm not mistaken?

3   A.  Correct.

4   Q.  All right.  So as we have Dresden, for example, in February

5   of 2010, the total interior of this home is brand new, correct?

6   A.  Yes, sir.

7   Q.  All right.  Now, as it relates to the outside of the

8   exterior, was there water that was frozen or built up on the

9   outside of the home on the back of it that you ever saw?

10  A.  Not to my knowledge.

11  Q.  Okay.  Had you seen it, that would have been a concern to

12  you?

13  A.  If I would have seen it, it might have been a concern, but

14  I don't remember seeing that.

15  Q.  All right.  Now, was there a point in time as it relates to

16  Mr. Roberts or anyone else where you provided written

17  permission for someone to stay inside the home?

18  A.  I had written permission from people to surveillance the

19  premises.

20  Q.  All right.  And who would those people have been that you

21  provided the written permission for?

22  A.  Darryl Stringer and Ron Roberts.

23  Q.  All right.  And when you say to surveil the premises, what

24  do you mean by that?

25  A.  Enter the property, check it out, walk around, make sure

```
 1   everything is still there.
 2   Q.  Okay.  Is it a fair statement, as we sit here, that one of
 3   the things that you wanted done because of the investment that
 4   you had in this, is to provide at least some degree of security
 5   to the inside of the home?
 6   A.  Correct.
 7            MS. MOHSIN:  Objection leading.
 8            THE COURT:  Agreed.
 9   BY MR. TANK:
10   Q.  Sir, what was the purpose, if you will, of giving Mr.
11   Roberts and this other individual that you've identified the,
12   the -- this record?
13   A.  Because I, in case somebody asked them what they were doing
14   at the property, so they'd have proof that they work for my
15   company.
16   Q.  Okay.  Not only proof to work for your company, but
17   anything else beyond that?
18   A.  Proof to surveillance the property, protect the interests.
19   Q.  Okay.  When you put together this document, who was this
20   document intended for?  Was it for anybody else beyond Mr.
21   Roberts and this other individual?
22   A.  No.
23   Q.  Now, when you say to surveil the property, did you have any
24   understanding or idea how much time or how long they would be
25   inside the property, if at all?
```

1   A.  No, I did not.

2         MR. TANK:  All right.  If I could just have a moment,

3   your Honor.

4         (Brief pause.)

5         MR. TANK:  Your Honor, I have no further questions of

6   the witness.

7         THE COURT:  Anything for you, Mr. Hackett, from the

8   defense?

9         MR. HACKETT:  I have no questions at this time.

10        THE COURT:  Ms. Mohsin?

11        MS. MOHSIN:  Thank you, your Honor.

12                        CROSS-EXAMINATION

13  BY MS. MOHSIN:

14  Q.  Mr. Pappert, we've met, correct?

15  A.  Yes.

16  Q.  In fact, we met on approximately April 13th of this year;

17  is that right?

18  A.  Correct.

19  Q.  You were represented by an attorney?

20  A.  Yes.

21  Q.  You came to the FBI's office?

22  A.  Yes, I did.

23  Q.  In Macomb County?

24  A.  Yes.

25  Q.  And you were presented with a document that was three pages

DANIEL PAPPERT - CROSS

54

1   in length, and you signed that document.  Do you remember that?

2   A.  Yes, I do.

3   Q.  And in that agreement, between -- wasn't that an agreement

4   between you and the Government?

5   A.  Yes, ma'am.

6   Q.  And you agreed to provide truthful information to the

7   Government; isn't that correct?

8   A.  Yes, I did.

9   Q.  And you agreed that so long as you provide truthful

10   information, those statements would not be held against you?

11   A.  Correct.

12   Q.  Now, during the meeting that we had with you in April of

13   this year, we asked you a series of questions about your work

14   as it was performed at the Dresden address?

15   A.  Correct.

16   Q.  And you made certain statements at that time?

17   A.  Yes, I did.

18   Q.  And you indicated to us that you had documents that were

19   relevant to the work that was performed?

20   A.  Correct.

21   Q.  And you agreed to provide those documents to us?

22   A.  Yes, I did.

23   Q.  And to date, those documents have not been provided to us,

24   despite repeated requests; isn't that correct?

25   A.  Well, can I --

DANIEL PAPPERT - CROSS

1  Q.  It's a yes or no question, sir.

2  A.  They should have been.

3  Q.  When you say they should have been, you don't know that

4  they were or were not provided; is that correct?

5  A.  I am not sure.  I dropped them off.

6  Q.  You gave them to Mr. Tank this morning; isn't that correct?

7  A.  Correct.  But I also dropped them to Mr. Burns at his

8  office within a week of then.

9  Q.  Okay.  But you provided the documents that were requested

10  by the Government in April of 2011, which you agreed to

11  provide, to Mr. Tank this morning?

12  A.  Correct.

13  Q.  And you indicated in your meeting with us, in April of

14  2011, that you didn't know if you had given any written

15  permission to Mr. Roberts to stay at the residence; isn't that

16  correct?

17  A.  I gave a letter, written permission, stating that if

18  someone was outside the property, they would work for my

19  company.  And we were doing -- protecting the bank's interests.

20  Q.  But you didn't provide any letter to the Government,

21  despite repeated requests for any letter or written permission

22  to the Government, did you?

23  A.  I cannot find that letter.

24  Q.  In fact, you couldn't recall if you had ever even drafted

25  one; isn't that correct?

DANIEL PAPPERT - CROSS

1   A.   No.   I --

2   Q.   So you --

3   A.   I don't think so.

4   Q.   No, it's not correct that you couldn't recall?

5   A.   I know I wrote a letter for Ron and Darryl to get the --

6   for the property.

7   Q.   You know that today.  But in April of 2011, did you or did

8   you not tell the Government that you could not recall whether

9   such a letter was ever drafted or even existed?

10  A.   I'm almost positive, almost positive.  I'm almost positive.

11  But there was another letter that --

12  Q.   You're almost positive what, sir?

13  A.   -- about, too.

14  Q.   I'm sorry.  You're almost positive about what?  I'm not

15  sure I understood your answer.

16  A.   I'm almost positive there was a letter written.  I could

17  not find the copy I'd written, but there was a letter written

18  stating that people could get into Dresden to remove personal

19  effects, somewhere along that line.

20  Q.   You're almost positive today; is that correct?

21  A.   Yes.

22  Q.   But at the time, you were not sure.  Are you saying that

23  that statement to us, to the FBI, was not correct?

24  A.   That's not what I'm saying.

25  Q.   You know Ronald Roberts; is that correct?

DANIEL PAPPERT - CROSS

1   A.   Correct.

2   Q.   You know him to be a member of the Devil's Disciples

3   motorcycle gang?

4   A.   Correct.

5   Q.   You've had opportunities to party with Ronald Roberts as a

6   member of the Devil's Disciples motorcycle gang?

7   A.   We've hung out.

8   Q.   You've been to club events, "club" meaning members of

9   Devil's Disciples who have parties and events on behalf of the

10  motorcycle club, you've been to those events?

11  A.   Yes, I have.

12  Q.   You've met the national president, right?

13  A.   Who is it?

14  Q.   You've been to their clubhouses?

15  A.   I've been to one, yes.

16  Q.   Okay.  And now you're, you're stating that there was

17  permission for Mr. Roberts to surveil the property.  Is that

18  your testimony here today, sir?

19  A.   I had written a letter for a reason, because there has been

20  an opportunity before this that when people were walking out of

21  the address, the police had pulled up and asked them what we

22  were doing there.

23  Q.   So you wrote a letter after police had already been to the

24  Dresden address seeking a determination whether Mr. Roberts has

25  a right to be there?  In other words, you wrote a letter after

DANIEL PAPPERT - CROSS

1   police had already been to the property.  Is that your

2   testimony here today?

3   A.  Yes.

4   Q.  And you provided that letter to Ronald Roberts; is that

5   your testimony here today, sir?

6   A.  I had given a letter to someone.  Yes, I have.

7   Q.  You don't recall who you gave this letter to?

8   A.  I could have swore I gave it to Ron.

9   Q.  So your testimony is that you gave Ronald Roberts a letter

10  giving him permission to be at the premises after the police

11  had already been there?

12  A.  One, yeah, one prior event, yes.

13  Q.  Okay.  But you do not have a copy of that letter, correct?

14  A.  No, I don't.  And I asked the office for it and they can't

15  find it either.

16  Q.  Now, Chuck Norris of National Fire Restoration, the company

17  that you were subcontracting for, that's your uncle, sir?

18  A.  Yes.

19  Q.  Okay.  And that's who you subcontract for, correct?

20  A.  Correct.

21  Q.  And the property in this case on Dresden, all work was

22  completed by November 10th of 2010; isn't that correct?

23  A.  Not November 10th.

24  Q.  What was the date that the work was completed on that

25  property?

DANIEL PAPPERT - CROSS

1   A.   Some time in December, because I couldn't get my last pay

2   until December 31st.

3   Q.   So as far as you were concerned, as of December 31st, you

4   were not owed any further money by anyone in connection with

5   your work being performed at this property?

6   A.   No, I was not.

7   Q.   So you had no further interest in this property after

8   December 31st; is that correct?

9   A.   Financially, no.  But the contractor asked me to make sure

10  that the house stays in its condition until either Mr. Burrage

11  or the mortgage company came up and took repossession of the

12  home.

13  Q.   So Mr. Burrage, meaning Tony Burrage, the actual owner of

14  the property?

15  A.   Correct.  He lost that in foreclosure.

16  Q.   And you know that for a fact?

17  A.   That's what I was told in the office.

18  Q.   Okay.  And the person who asked you was your uncle, Chuck

19  Norris?

20  A.   Yes.

21           MS. MOHSIN:  Nothing further, your Honor.

22           THE COURT:  Any redirect, Mr. Tank?

23           MR. HACKETT:  Yeah, I --

24           THE COURT:  No.  It would be Mr. Tank for redirect.

25  You didn't have any direct, Mr. Hackett.

1                    REDIRECT EXAMINATION

2    BY MR. TANK:

3    Q.  Sir, this, this prior occasion that you talked about on

4    cross-examination of the police arriving out on the property

5    that precipitated you writing this letter, do you recall when

6    that had taken place, what month or year?

7    A.  It had to be in January some time.

8    Q.  Okay.  January of what year, sir?

9    A.  2011.

10   Q.  2011.

11   A.  Mh-hm.

12   Q.  All right.  You have to say yes and you have to answer

13   audibly.

14   A.  Yes.

15   Q.  Now, you also, on cross-examination, you made reference to

16   not only the first letter but a secondary letter.  What was

17   that secondary letter that you referred to?

18   A.  The secondary letter was so people could get into the house

19   and gain their personal effects.  Darryl had a blowup mattress

20   or something there, and a radio that he wanted.

21   Q.  Okay.  When was that, sir?

22   A.  I can't even recall.

23   Q.  Okay.  All right.  Was it -- can you recall if it was

24   before or after March of the year 2011?

25   A.  I believe it was after March, after everybody got arrested

 1   outside of there.

 2   Q.  All right.  And so the secondary letter you provided so

 3   that people could go in and obtain the household items that

 4   were theirs?

 5   A.  Correct.

 6   Q.  The other question that I had, is that all of the work that

 7   you had done on this home was complete by when, sir?

 8   A.  The end of December.

 9   Q.  All right.  And so it's complete in the end of December,

10   you're done with all the work, right?

11   A.  Correct.

12   Q.  Why do you stay?

13   A.  The contractor had asked us, could I make sure, do checks

14   on the property so the stuff would stay in there, because

15   they've already broken into it twice before that.

16   Q.  Were you being paid to do that?

17   A.  No.

18   Q.  If you weren't being paid to do it, why would you do

19   something like that, sir?

20   A.  Well, when your boss asks to you do something, and you tell

21   him no - I'd like to continue to work.

22   Q.  When you say you would like to continue to work, so you

23   were concerned about receiving future business from these

24   people that had sent it to you?

25   A.  Correct.

DANIEL PAPPERT - REDIRECT

1   Q.  And so because you were concerned about the future

2   business, you continued to provide security, your people to

3   watch the house from prevent it from being broken into?

4            MS. MOHSIN:  Objection.  Leading.

5            THE COURT:  Overruled.

6   BY MR. TANK:

7   Q.  Did you do that?

8   A.  Yes.

9            MR. TANK:  With that, I have nothing further, your

10  Honor.  Thank you.

11           THE COURT:  So, Mr. Pappert, the permission that you

12  wrote, whether it was before or after this February event, was

13  apparently intended to permit mister -- these two individuals,

14  Mr. Roberts and Mr. Stringer to do what you called surveilling

15  the property, which would be observing the property in order to

16  apparently periodically make sure the doors were locked and

17  things were secure.  Is that, is that the substance of it?

18           THE WITNESS:  Correct.

19           THE COURT:  I do not understand you to be saying that

20  whatever permission you wrote would have been permission to

21  allow Mr. Roberts to set up housekeeping and to actually use

22  the house as though it was his and to live in it.  Am I correct

23  about that?  Or did you intend to take this order from your

24  boss, to grant permission for Mr. Roberts, to actually set up a

25  household in this, in this house?

DANIEL PAPPERT - REDIRECT

1          THE WITNESS:  I'm confused on that question.  Can you

2    repeat that?

3          THE COURT:  Did your surveillance permission --

4          THE WITNESS:  Mh-hm.

5          THE COURT:  -- as far as you are concerned, include

6    permission for Roberts and Stringer to set up housekeeping in

7    the building?

8          THE WITNESS:  Well, Darryl had a blowup mattress and a

9    radio over there, so.

10         THE COURT:  And the answer to my question is what?

11         THE WITNESS:  Yes.

12         THE COURT:  You intended to permit, to permit Mr.

13   Roberts to set up housekeeping in the house and to actually

14   live there; that was your intention?

15         THE WITNESS:  No, not to actually live there.  But --

16         THE COURT:  So the answer to the question would be no?

17         THE WITNESS:  It would have been no.  But you're kind

18   of confusing me by saying household items.  And I just said

19   Darryl had a blowup mattress and stuff over there.

20         THE COURT:  Yeah.  When you said that, you were not --

21   my, as the saying goes, my question may have been not been

22   responsive to your answer.

23         But let me ask this.  Would your permission to Mr.

24   Roberts, whatever it encompassed, would it have been intended

25   by you to permit Mr. Roberts to extend an invitation to other

DANIEL PAPPERT - REDIRECT

1    people to live there, such as a woman and an infant child?

2              THE WITNESS:  Yes.

3              THE COURT:  And personal possessions?

4              THE WITNESS:  Yes.

5              THE COURT:  Yes?  You intended to permit him to permit

6    others.  Would you have permitted him -- intended to permit him

7    to collect rent from these other individuals?

8              THE WITNESS:  Not that I know of.  I mean --

9              THE COURT:  Well, you're the one that would know.  I'm

10   asking what your intention was.

11             Was it your intention, your idea, your concept to

12   permit him to, for example, collect rent from individuals?

13             THE WITNESS:  No.  I wouldn't have gave permission to

14   collect rent.

15             THE COURT:  But you would have -- so you would have

16   intended to allow him to grant entry to other people to live

17   there rent-free, right?

18             THE WITNESS:  If need be, yes.

19             THE COURT:  So yes?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.  And was all of that done with the

22   knowledge and the permission of your uncle, who you referred to

23   as your boss?

24             THE WITNESS:  Chuck.

25             THE COURT:  The general contractor?

```
 1              THE WITNESS:  Well, he's the one that asked us to do
 2    it.
 3              THE COURT:  To do it.  And would the "it" be giving
 4    people permission to live there?
 5              THE WITNESS:  Gosh, I don't know if he knew anybody
 6    was there or not.  He just asked us to go through and check it
 7    out.
 8              THE COURT:  Okay.  Mr. Tank, any other questions along
 9    the lines of what the Court has asked?
10              MR. TANK:  Briefly.
11                        FURTHER EXAMINATION
12    BY MR. TANK:
13    Q.  Sir, this area that Dresden is on, is it a nice
14    neighborhood or is it a tough neighborhood?  What kind of area
15    is it?
16    A.  It's a pretty tough neighborhood.
17    Q.  Okay.  And so if you were to have people surveil the house,
18    as you put it, was it your expectation that they would be there
19    frequently or infrequently?
20    A.  Frequently.
21    Q.  Why frequently?
22    A.  Because the neighborhood is pretty tough.
23    Q.  Okay.  As it relates to the conversations that you had with
24    your uncle, did you understand that, that you have people there
25    surveilling the property, as you put it, frequently or
```

DANIEL PAPPERT - REDIRECT

1   infrequently based upon the kind of area it is?

2   A.  Frequently.

3   Q.  Okay.  Frequently, for example, as we talk about these air

4   mattresses, in an overnight capacity, correct?

5   A.  Correct.

6           MR. TANK:  With that, I have nothing further.

7           THE COURT:  Ms. Mohsin, any additional questions?

8           MS. MOHSIN:  May I have a moment, please, your Honor?

9           THE COURT:  Yes.

10                        RECROSS-EXAMINATION

11  BY MS. MOHSIN:

12  Q.  Mr. Pappert, would it be fair to say that you knew Ronald

13  Roberts was living in the property, but you knew he didn't have

14  the right to do so and you certainly didn't give him the right

15  to live there?

16          MR. TANK:  Your Honor, I'm going to object to the

17  question as compound.

18          THE COURT:  Well, perhaps.

19  BY MS. MOHSIN:

20  Q.  You knew Ronald Roberts was living there; isn't that right?

21  A.  That's not his residence.  Like I said, people were coming

22  there surveilling the property.

23  Q.  Sir, here's my question.  Did you know -- withdrawn.

24          You knew that Mr. Roberts was living at 17378 Dresden,

25  didn't you?

1   A.   No.

2   Q.   You did not know that?

3   A.   No.  I know he was there frequent.  Darryl was there

4   frequent.

5   Q.   You've been inside that property, sir, haven't you?

6   A.   Yes, I have.

7   Q.   You were inside that property in January of 2011, weren't

8   you?

9   A.   Yes, I was.

10  Q.   After work had been completed?

11  A.   Yes.

12  Q.   And February, as well?

13  A.   Yes.

14  Q.   And you, you've seen the sofa that was in there, correct?

15  A.   Correct.

16  Q.   The TV that was in there, correct?

17  A.   Correct.

18  Q.   And the other personal effects, correct?

19  A.   Kitchen table, correct.

20  Q.   You didn't put those things in that house, did you?

21  A.   No, I did not.

22  Q.   You knew that Ronald Roberts was at the house living and

23  using those things during that period of time; isn't that

24  correct?

25  A.   I can say somebody was living in there using those things,

 1    yes.

 2    Q.   Okay.  You knew Brandy Irwin, a female with an infant

 3    child, was living at that address; isn't that correct?

 4    A.   I don't know what her name is, but there was a girl in

 5    there with a child.  Yes.

 6    Q.   But you don't know who she was?

 7    A.   I've never got her name, no.

 8    Q.   And when you told the FBI in March -- in April of 2011,

 9    that you knew Ronald Roberts was living at that house, but you

10    didn't give him permission to do that, was that a lie?

11    A.   No.  I knew the girl was living at the house because she

12    was homeless with a baby.

13    Q.   When you told the FBI in February of 2011 that you knew

14    Ronald Roberts was living in that house, was that a lie?

15    A.   I knew he stayed there a couple nights, yes.

16    Q.   But you didn't have the authority to allow him to do so;

17    isn't that correct?

18    A.   I got the authority from the office to have someone in the

19    house.

20    Q.   You did not have the authority to allow someone to live

21    inside the property, sir, did you?

22    A.   I got the authority from the office.

23    Q.   For someone to live inside of this house?

24    A.   Chuck wanted people to stay in the house so it didn't get

25    ripped off.

1    Q.  You just testified on direct examination that you don't

2    know that Chuck wanted that; he just wanted it surveilled.

3    A.  I did not -- you're trying to tell me I didn't have

4    permission, but I was doing what I was asked by Chuck.

5    Q.  You, you know who Tony Burrage is, correct?

6    A.  Burrage, I met him.  I think I met him once or twice.

7    Q.  The owner of the property?

8    A.  Correct.  But he was lost in the foreclosure.

9    Q.  Well, his name is still on the deed, correct?

10   A.  I couldn't tell you.

11   Q.  When you pulled an electrical permit on December, I think

12   it was 18th of 2010, it was in his name, correct?

13   A.  He was still the owner at the time, yes.

14   Q.  So as far as you knew, Tony Burrage didn't give anyone

15   permission to live in that property?

16   A.  I was doing what I was asked to do by the contractor.

17             MS. MOHSIN:  Nothing further, your Honor.

18             THE COURT:  The witness may step down.

19             THE WITNESS:  What do I do with these?

20             THE COURT:  You ask Mr. Tank.

21             (Witness excused at 10:43 a.m.)

22             THE COURT:  And?  Well, you deal with the witness here

23   and your various exhibits.

24             And, Mr. Tank, any other witnesses?

25             MR. TANK:  Your Honor, I have no further witness.

EVIDENTIARY HEARING - 7/25/11

```
 1              THE COURT:  Okay.  Mr. Hackett, any further witnesses?

 2              MR. HACKETT:  As far as I know, Judge, none of the

 3   other witnesses have shown up yet.

 4              THE COURT:  You said that Lieutenant Quarello was out

 5   in the hallway.  You said you wanted to call him.  I'm not

 6   directing you to, but I want to know why you wanted him back

 7   today if you're not going to call him, for example.

 8              MR. HACKETT:  Well, I expected other -- excuse me,

 9   Judge.  Let me see if there's someone out here, shown up.

10              (Brief pause.)

11              MR. HACKETT:  As I indicated, Judge, none of the other

12   witnesses that were subpoenaed have shown up this morning.

13              THE COURT:  So what is your desire?

14              MR. HACKETT:  Pardon?

15              THE COURT:  What is your desire?

16              MR. HACKETT:  Judge, I would, I would like to have

17   these witnesses brought here to testify.  That's why I

18   subpoenaed them in the first place.  Most of these are police

19   officers who knew of this hearing and simply didn't show up.  I

20   would ask for a continuance, Judge.

21              THE COURT:  And the names that you're focusing on are

22   what, so the record is clear, please?

23              MR. HACKETT:  Well, I have Sergeant David Meadows,

24   Police Officer Shawnee Robbins, Police Officer Vanessa Burke.

25   Police Officer Sean Smelter, Police Officer Charles Howard.
```

```
 1              For the record, Lieutenant Quarello and Danny Woods
 2    are both in the hallway.  And Brandon Shortbridge, Police
 3    Officer Brandon Shortbridge as well.
 4              THE COURT:  And your proffer as to Meadows, Robbins,
 5    Burke, Smelter, Howard and Shortbridge is that they would
 6    testify that, on one occasion or another, they had been at the
 7    property in earlier months?
 8              MR. HACKETT:  That is correct.  And regarding the
 9    allegations that the house was abandoned.
10              Also, two of the officers, I believe, assisted the
11    Officer Woods and Detective Quarello in the arrest.  And they
12    were subpoenaed as well.
13              THE COURT:  And what would your proffer be about any
14    relevant testimony those individuals would offer?
15              MR. HACKETT:  Well, for one of the, I believe it was
16    Officer Woods testified that he didn't -- he indicated that it
17    was another officer that found the alleged weapon in the trunk
18    of the car that has allegedly been attributed to my client.  He
19    did indicate that he didn't know who found the weapon.  And
20    there is no report in any of the discovery that I've received
21    to indicate who that person was.  I was hoping that, that some
22    of the other officers that were on the scene at that time could
23    shed some light as to that, and how it came to be.
24              THE COURT:  Why would that be relevant to a motion to
25    suppress, based upon the issues you've raised?
```

EVIDENTIARY HEARING - 7/25/11

1      MR. HACKETT:  Well, if I, if I recall, Officer Woods's

2   testimony is that, you know, he didn't actually see the weapon

3   be recovered from the trunk of the, allegedly, from the trunk

4   of the vehicle.

5      THE COURT:  Actually, I think he did.  I think he said

6   that some -- that an officer lifted the trunk and called out to

7   him saying come over here, you need to see this.  And he went

8   over there and he saw it.

9      MR. HACKETT:  Well, I, I understand that that's what

10  Officer Woods testified to.  He also testified to some other

11  things that --

12     THE COURT:  Well, that's different from what you just

13  proffered he said.

14     MR. HACKETT:  I understand, Judge.  These other

15  officers, I believe, have relevant information.  And unless I

16  can talk to --

17     THE COURT:  Relevant -- what point would you seek to

18  prove that would be relevant to the issues raised in the motion

19  to suppress by the testimony of additional officers that were

20  on the scene?  Either who were on the scene at the time of the

21  February 12th encounter or had been there earlier?  How would

22  it inform the Court with respect to making a determination as

23  to the legitimacy of the things that Woods and Quarello did?

24     MR. HACKETT:  Your Honor, at this point, since their

25  reports are kind of vague, I can't indicate from the reports,

 1   and the lack of reports that are not here, what they will

 2   testify to.  Okay.  They haven't chose to talk to me about

 3   these incidents, as well.

 4        THE COURT:  Okay.  All right.  Ms. Mohsin, what's the

 5   Government's position on this discussion and suggestion for a

 6   continuance and --

 7        MS. MOHSIN:  Judge, I don't think a continuance --

 8        THE COURT:  -- time for six additional police officer

 9   witnesses to be brought in for testimony about things that are

10   similar to what Mr. Hackett was just speaking of?  Go ahead.

11        MS. MOHSIN:  First and foremost, your Honor, my

12   understanding is that on the last date, witnesses were

13   sequestered.  To the extent that there were officers in the

14   hallway, I don't know that they are aware of this date.  I just

15   put that on the record so the Court is aware of that.  I know

16   counsel has indicated he has been unable to contact them.  I

17   didn't see him speaking to them in the hallway, and I was out

18   there with them after the hearing.

19        Secondly, your Honor, these witnesses, to the extent

20   that there is any relevance to some event that transpired in

21   weeks prior to the arrest in this case, we submit is not

22   relevant to the issues here as it relates to the two officers

23   who observed the, the abandoned house and the individuals, and

24   the events that unfolded.

25        And this defendant, Mr. Sutherland, doesn't have any

1    expectation of privacy in the home, has not alleged any.  And

2    to the extent there may be some collateral issue of whether

3    officers provided any permission to Mr. Roberts, and we

4    certainly don't concede or, or agree that that occurred.  But

5    to the extent that that's the issue that's being raised, I

6    don't see what relevance that would have to this defendant at

7    all.

8          So I think, your Honor, that those witnesses are not

9    necessary; that the issues have been fully presented to the

10   Court; and that we are prepared to argue our position at the

11   conclusion of this hearing.

12         Thank you.

13         THE COURT:  I agree.  A request for continuance and

14   these additional witnesses, opportunity to bring these

15   additional witnesses in, to perhaps discover that something may

16   be of some significance, there's been no case made sufficiently

17   to delay the hearing any further.

18         So you said you do have Quarello here.  Earlier you

19   told Mr. Hackett that perhaps you would want to call him back

20   at that time.  If there's anything more that he hasn't said

21   that you think needs to be said, do you want him back on the

22   stand or shall -- or not?

23         MR. HACKETT:  No.  At this time, I don't, I don't have

24   any additional questions.

25         THE COURT:  Well, this is the time.

```
 1              MR. HACKETT:  I understand.  I don't have any
 2    additional questions for Lieutenant Quarello.
 3              THE COURT:  Okay.  What about Woods?
 4              MR. HACKETT:  And, and Officer Woods, none.
 5              THE COURT:  Mr. Tank, likewise?
 6              MR. TANK:  Likewise, your Honor.
 7              THE COURT:  All right.  Those individuals can be free
 8    to go.
 9              Is there anything else to be presented?  Any
10    documents?  Any other testimony, witnesses?  No statements from
11    the defendants, I presume.  Nothing else to be presented for
12    you, Mr. Hackett?
13              MR. HACKETT:  Judge, at this time, no other witnesses
14    have appeared.
15              THE COURT:  And it is at this time that we are focused
16    upon.  Is there anything else to be presented?
17              MR. HACKETT:  No, there is not, Judge.
18              THE COURT:  All right.  And, Mr. Tank, anything else
19    to be presented for your client?
20              MR. TANK:  Your Honor, I have nothing further.
21              THE COURT:  Nothing further for the Government?
22              MS. MOHSIN:  Nothing further for the Government.
23              THE COURT:  All right.  I'll consider the evidence
24    concluded.
25              I also want to alert counsel that I can take judicial
```

1    notice of the Detroit City Ordinance, Section 38-4-1, which is

2    entitled Trespassing in Vacant Buildings, and which says that

3    it shall be unlawful for any person, except an officer,

4    employee or contractual agent of a government agency in the

5    performance of a public duty to enter a vacant building or the

6    property it is on without the express written authorization of

7    the property owner, lessee, agent or trustee thereof.  That's

8    the ordinance that has been referred to throughout the

9    proceedings here.

10          I also take notice of the Code of Ordinances, Part 3,

11   City Code Building Regulations, property maintenance

12   requirements, and specifically part IV, lighting and

13   ventilation requirements, which sets forth minimum conditions

14   and standards for light, ventilation and space for occupying a

15   building or structure.

16          Among other, among other things, Section 9-1-374 says

17   that all habitable spaces shall have at least one window of

18   approved size that faces directly to the outdoors or to a

19   court.  The minimum total glazed area for every habitable space

20   shall be 8 percent of the floor area of such room.  It says

21   other things as well, but that's salient.

22          Also, Section 9-1-377 says all habitable spaces shall

23   have at least one openable window.  The total openable area of

24   the window in every room shall be equal to at least 45 percent

25   of the minimum glazed area required in section 9-1-374.  And it

1    says other things as well, but that's the salient portion.

2            Finally, Section 9-1-405 of the Code entitled

3    Emergency Escape Openings, it says this:

4            In sleeping areas, at least one window shall be

5    operational and accessible from inside the room without the use

6    of keys or tools to provide for emergency escape and rescue.

7    And again, it goes on with other information as well.  But

8    that's the salient portion of those code provisions, some of

9    which were talked about, or were implicated in earlier

10   testimony when the police officers were on the stand.

11           So your motion then, with respect to the search of

12   your client, Mr. Hackett, do you want to argue or sum up in

13   terms of the evidence presented and the implications with

14   respect to the matters that are before the Court?

15           MR. HACKETT:  Your Honor, if I could suggest that -- I

16   know we've ordered a transcript of the hearing that took place

17   last week.  It was quite lengthy -- lenghty.  Excuse me.  It

18   was rather long.  And we would like -- I would ask the Court to

19   allow me to get a copy of the transcript and to brief the

20   issues as I believe they arose in the, in the hearing prior to

21   the Court making a ruling on this issue.

22           THE COURT:  I'd rather just have it discussed,

23   frankly.  I mean, you've already briefed it.  You've set forth

24   the motion.  The law is clear.  It seems to me the law is clear

25   in this area certainly with respect to street-side encounters.

1    The officers testified plainly with photographic evidence

2    submitted as to what they saw regarding the house and its

3    condition, its apparent condition.  You can't just sum it up

4    based on what you've heard here?

5            MR. HACKETT:  Well, Judge, I heard quite a bit of

6    different testimony coming from both police officers.  And I

7    would like the opportunity to review their testimony as it

8    relates to the issues that have been raised in this case.  I

9    would like to be able to brief the issue as it relates to this,

10   these -- as it relates to the search of my client.

11           THE COURT:  The brief is going to consist of *Terry vs.*

12   *Ohio* I think, the citation to that case and other cases that

13   followed and interpreted it in the Sixth Circuit.  The question

14   is whether the officers had a -- it boils down to it whether

15   they had a reasonable basis to do what they did, to be in a

16   position to see what they saw.

17           MR. HACKETT:  That's correct.

18           THE COURT:  It's not that complicated.

19           MR. HACKETT:  I understand the issue, Judge.  I just

20   would like to have an opportunity to review the transcripts and

21   the testimony.

22           THE COURT:  Okay.

23           MR. HACKETT:  Because I believe they were inconsistent

24   with each other.

25           THE COURT:  I have your position.

 1          Mr. Tank, do you have any other thoughts or are you

 2   ready to talk about --

 3          MR. TANK:  Yeah, I would as well.  And the reason that

 4   I would like to do so, especially as it relates to Mr.

 5   Pappert's testimony and some of the testimony we've had from

 6   others, is the Court has taken judicial notice of a series of

 7   local ordinances passed by the City of Detroit.  And I think

 8   that a lot of the issues that the Court has described have been

 9   dealt with as it relates to the witnesses that have testified.

10   And I know that has an implication as it relates to the motions

11   we've filed.

12          So I would like an opportunity to look at the

13   transcript and to compare it to the relevant ordinances that

14   the Court has talked about as it relates to those arguments.  I

15   don't anticipate as, your Honor, as we sit here I would submit

16   anything lengthy or that would take an extended amount of time.

17          THE COURT:  Here's the implication.  Let me just be

18   plain about these ordinances.  They were implicated in the

19   first round of testimony.  The officers said they encountered a

20   house that looked like it was unoccupied and boarded up.  And

21   indeed, the photographs show a house that the first floor of

22   which is boarded up and could be interpreted as unoccupied.  In

23   fact, the Detroit City Ordinance makes it illegal or at least

24   out of compliance with code for a space to be occupied without

25   an opening window, without an operable window that can be

1    operated from the inside.  The point is it's not legitimate to

2    live in a house with boarded-up windows under the code.  That's

3    just a general statement that I glean from the ordinance that I

4    -- ordinances that I cited.

5         That's not a surprising proposition.  It's entirely

6    consistent with one's intuition.  And, it is entirely

7    consistent with a conclusion that a reasonable officer upon

8    encountering a building that is largely boarded up, but from

9    which there are -- there is heard the sound of a voice or

10   voices and a light in an upstairs window, as the officers said

11   they observed, it has the appearance of somebody being in a

12   house that ought not be occupied.  And the officers then, as

13   they said, proceeded from there.  That's the only point.

14   Again, it's not a complicated proposition.

15        So, in any event, what do you think about an adjourned

16   date, Ms. Mohsin, for argument on these, on these motions?

17        MS. MOHSIN:  Your Honor, I don't think it's necessary.

18   We took testimony from two police officers over ten days ago,

19   if I'm not mistaken, or close to ten days ago.  I think we

20   provided them with police reports, with FBI reports of

21   interviews of these officers.

22        My recollection is that they were entirely consistent,

23   both with the reports and with each other.  I know that's a

24   matter for argument.  But certainly with the testimony of just

25   a handful of witnesses, any further delay in this case, I

 1    think, is really unnecessary and unwarranted.

 2          Perhaps if the Court was inclined to indulge the

 3    defense maybe a short recess so they could collect their

 4    thoughts may be in order.  But short of that, your Honor, I

 5    don't think it's necessary.

 6          THE COURT:  Let's come back at 11:45.  That will be 45

 7    minutes to assemble your thoughts, Counsel.  And I'll take

 8    whatever comments you have on the motions at that time.

 9    Defendants will be brought back at or near 11:35, please.

10    We'll recess.

11          THE CLERK:  All rise.  Court is now in recess.

12       (Recess taken at 11:00 a.m. until 11:50 a.m.)

13          THE CLERK:  All rise.  Court is back in session.  You

14    may be seated.

15          THE COURT:  All right.  Counsel, your motion and your

16    argument, Mr. Hackett.  Proceed.

17          MR. HACKETT:  Thank you, Judge.

18          It's undisputed that the searches in this, in this

19    case were done without a warrant.  And as it relates to my

20    client, *Terry vs. Ohio* is the applicable standard.

21          And in looking at the totality of the circumstances

22    and the reasonableness of the search as it relates to Mr.

23    Sutherland, we would submit that all that was known to the

24    officers at the time prior to encountering my client was that

25    they had seen a house with boards on some of the windows.  They

EVIDENTIARY HEARING - 7/25/11

1   had spoken to a young lady prior to stopping at that house.

2   And the young lady indicated that she was waiting for a friend

3   and that they had apparently told her that it probably wasn't a

4   good idea to sit on the street and they left.

5          Officers -- or Lieutenant Quarello and Officer Woods

6   then returned to the area of the home on Dresden Street.  They

7   indicated that what they observed was footprints in the snow

8   leading up to the house; that they saw one vehicle parked in

9   the driveway, which was lawfully parked; and that prior to that

10  observation, they had absolutely no indication that there was

11  any sort of illegal or unlawful activity taking place at the

12  house.

13         Upon making these observations, Officer Woods and

14  Lieutenant Quarello made a decision to investigate further,

15  apparently.  Officer Woods indicated that they walked up to the

16  house, and both of them hopped the fence in the back along the

17  north side of the street or towards the north side of the

18  property and went into the backyard and looked around.

19         Lieutenant Quarello indicated that they walked across

20  the front of the house and took up a position towards the

21  backyard towards the southeast corner of the home.  They

22  observed ice that had formed on the back of the house and

23  observed lights on inside the home, not flashlights, but

24  regular lights.  And once again, no unlawful activity.

25         They remained in the backyard for a period of time,

1    it's kind of unclear, and they saw a young lady walk up to the

2    front of the home, which is the young lady whom they had

3    previously talked to.  After that, after seeing her walk up to

4    the home, they didn't see her walk into the home, but

5    individuals, they heard individuals come out of the home.  And

6    this is when they had contact with my client, Mr. Sutherland

7    and Mr. Roberts.

8            According to Officer Woods, when the two defendants

9    came out of the home, they were confronted by Officer Woods and

10   Detective Quarello and were ordered to come around the car and

11   place their hands on the roof of the vehicle.  Lieutenant

12   Quarello had a different take on things.  He indicated that

13   they waited in the darkness towards the back of the home for a

14   few minutes and then made their presence known.

15           Both of these officers had one thing in common:

16   Neither one of them could articulate any sort of unlawful

17   activity or a reasonable suspicion that my client, Mr.

18   Sutherland, was involved in any unlawful activity.  They

19   continued to question my client, and in fact, ordered him to

20   place his keys on the roof of his vehicle that was lawfully

21   parked in the driveway.  And at that point, my client, not

22   feeling he was free to leave, complied with the officers.  And

23   the officer indicates he allegedly saw a handgun in my client's

24   belt.

25           The actions of the officers in this situation, being

1    that it was one o'clock in the morning, it was dark, their

2    actions were, in my eyes, a bit unreasonable.  Either jumping

3    through yards or staying in the shadows in the backs of -- in

4    the backyards of homes in the middle of the night, without

5    backup, without announcing their presence, seems to me to be a

6    bit unreasonable.

7            And we believe that based on what the officers knew at

8    the time, they had no reason or no justification for stopping

9    and seizing my client as he exited the home.  They had no

10   indication that there was any unlawful activity.  In fact,

11   when, when Mr. Sutherland and Mr. Roberts exited the home and

12   they were asked what they were doing there, Mr. Roberts

13   indicated that, you know, he had permission from the building

14   company that he worked for to be on the premises.

15           And the police officers indicated, they testified that

16   they, in fact, had nothing or no evidence or no facts known to

17   them that would contradict the fact that Mr. Roberts lived in

18   the home and that they were lawfully on the premises.

19           And finally, as it relates to the officer's indication

20   that he saw the gun in plain view on my client's person, one of

21   the prerequisites to that is that the police officers must be

22   lawfully on the premises in which they make that observation.

23           From the facts that were adduced at this hearing, I

24   don't believe that the officers were lawfully on the premises.

25   And that is *U.S. vs. Berenguer, 562 F2d 206*.  And for all those

EVIDENTIARY HEARING - 7/25/11

1    reasons, Judge, we believe that the weapon should be

2    suppressed.

3         The vehicle, the four-door sedan that was attributed

4    to my client was lawfully parked in the driveway.  And as such,

5    the officers could have, if they would have gotten a warrant at

6    the time that they searched it, they could have easily gotten a

7    warrant and it didn't need to be towed.  And for all those

8    reasons, Judge, we would like you to suppress the evidence.

9         THE COURT:  Okay, Mr. Hackett.

10        MR. HACKETT:  Thank you.

11        THE COURT:  Mr. Tank, with respect to your client?

12        MR. TANK:  Yes, your Honor.  Your Honor, I'll be

13   brief.  Obviously, as it relates to the search and the seizures

14   that took place, my client's position differently.

15        What I would simply point out, your Honor, I think

16   that one of most compelling issues when we begin to talk about

17   these things is that I understand that the officers have

18   articulated what they believed the house looked like on the

19   night in question.  And I don't think there can be any issue,

20   by virtue of what everyone has testified to, we can all agree

21   that the windows were, in fact, boarded up on the outside for

22   on at least the lower level.

23        And from that, there was -- it was nighttime.  And we

24   know a little bit about the lighting in terms of what was

25   there.  And there were -- I guess we can argue about what the

1   conclusions are and what the facts are.  But thereafter, at

2   least at some point in time after the *Terry* stops that

3   transpire outside, we run into a situation where police

4   officers make entry into the home itself.  And there doesn't

5   seem to be much from a contravention with respect to the

6   testimony that's there.

7         We've heard about a building that's relatively new,

8   that's been originally drywall, that has carpeting, but also

9   has household fixtures in the form of flat screen televisions,

10  and the like.

11        When the Government makes the seizure as it relates to

12  my client, it's not on the first level of that home in terms of

13  them coming in from a plain view standpoint.  They continue on

14  upstairs.  It's at that point in time that the weapon is, in

15  turn, seized.

16        And I think that what really turns on it, what the

17  real issue becomes as it relates to, to that is how reasonable

18  the search is with respect to its continuance at that point in

19  time.  And that an officer, I suppose, we could argue and I

20  suppose that any reasonable person could conclude that perhaps

21  the house was vacant, or perhaps that it was not.  But

22  regardless of where you come down on that issue, I don't think

23  there's much in conflict about what it is they discover once it

24  is that they are inside.  And the exhibits point to that, that

25  we've seen in terms of the amount of work that was done, and

1    the fact that this home was ready.

2          On the other issue, as it relates to the issue of

3    standing and what we began with, I don't think there's any

4    question from the testimony that's been deduced from what we've

5    heard from Mr. Pappert himself, that at least a subjective

6    belief as it relates to Mr. Roberts existed in terms of his

7    ability to be there and to be a guest in the place as he was,

8    was staying there or working security.

9          In addition to that --

10         THE COURT:  Does -- on that question of standing, Mr.

11   Tank, isn't it the case that any reasonable expectation of

12   privacy attributed to your -- to Mr. Roberts would have, would

13   have had to have come from some form of permission from Mr. --

14         MR. TANK:  Pappert?

15         THE COURT:  -- Pappert?

16         MR. TANK:  Yes.

17         THE COURT:  Right?

18         MR. TANK:  That is correct.

19         THE COURT:  Are you satisfied with Mr. Pappert's level

20   of authority, in turn, to be able to say anything authoritative

21   in the way of permission?

22         MR. TANK:  Your Honor, I think --

23         THE COURT:  Doesn't there have to be some showing of

24   agency or authority --

25         MR. TANK:  I agree.

1        THE COURT:  -- to satisfy the, for example, the city

2   ordinance or just to satisfy a common sense --

3        MR. TANK:  Right.

4        THE COURT:  -- interpretation of a line of authority,

5   granting permission and so forth?

6        MR. TANK:  Right.

7        THE COURT:  So what does the evidence tell us about

8   the authority of Mr. Pappert, backing up the purported

9   authority of Mr. Roberts, or at least his subjective belief, as

10  you've described it?  And then we have it -- and then another

11  step down the line is the encounter with the officers and what

12  they perceived based upon observations that early morning.  Go

13  ahead.

14       MR. TANK:  Well, we have from Mr. Pappert's testimony

15  himself, we have a situation where he describes that he was

16  contracted by his uncle that was employed by an insurance

17  company, that's tied back to the mortgage company as it relates

18  to the home itself.  We have his testimony where he speaks with

19  this person, and that I believe it's Mr. Norris, that he speaks

20  with Mr. Norris.  And that Mr. Norris, who is the person

21  associated with the insurance company, that he is to go out and

22  to do these things as it relates to a home repair standpoint.

23  And then it also extends to the standpoint that Mr. Norris

24  indicates to Mr. Pappert that he is concerned about the safety

25  of what's going on inside of the property itself.

1        So we have a situation where people that are obviously

2   tied to the ownership of the home as it relates to the mortgage

3   company itself, and whatever situation this home finds itself

4   in.

5        THE COURT:  Well, the mortgage company is not the

6   owner, based on all the evidence that I've heard.

7        MR. TANK:  Right.

8        THE COURT:  The owner was identified.  We have his

9   name.  I didn't write it down, but it's some -- an individual

10  who was named.  Mr. Pappert said that the permitting, for

11  example, was taken out in the name of the owner.  What do we

12  know about the owner and any agency or even apparent agency

13  that may have been granted by the owner down the line?  The

14  work was apparently finished.

15       MR. TANK:  Correct.  We know the owner wasn't present

16  there.  And we know from the testimony that obviously he wasn't

17  residing there at this point in time.  But there's been no

18  indication from the testimony so far what the level of

19  authority that the owner, as is listed on the Register of Deeds

20  in Wayne County would indicate, that is correct.

21       THE COURT:  Doesn't it -- wouldn't it, doesn't it make

22  sense that there would have to be some, some authority granted

23  by the owner of the property to an agent in order to examine

24  the scope of that agency to determine whether that agent had

25  appropriate latitude, sensible latitude, to deputize an agent

```
 1   of his, or its, to then in turn deputize another agent.  Now
 2   we're down to the level of Mr. Roberts, who, according to
 3   Pappert's testimony, had authority to deputize anybody he
 4   wanted to come in and basically live there rent-free.  That is
 5   the substance of the Pappert testimony.
 6              MR. TANK:  Your Honor, I would --
 7              THE COURT:  It seems a little attenuated --
 8              MR. TANK:  Right.
 9              THE COURT:  -- to me.  Does it to you?
10              MR. TANK:  It does, but to a certain level.  But I
11   think if we applied reason and common sense when we look at the
12   circumstantial proofs, it would make a lot of sense.  It would
13   make sense, for example, once a house was burned down, for an
14   insurance company to want to replace what's there.  It would
15   make sense the insurance company and the owner there to provide
16   authority to the people to make sure the home doesn't return to
17   the condition it was once in, where people make off with their
18   belongings.
19              And I'd submit to you, your Honor, I don't have -- we
20   don't have the direct people that can come forward and testify
21   to those things.  We have an owner that's in Mississippi, as
22   we've heard from the testimony, we have an insurance company,
23   and then we have the uncle here.
24              THE COURT:  I actually missed it, if there was
25   something about Mississippi.  I didn't --
```

1          MR. TANK:  Yes.  The owner, where there was discussion

2     in the beginning the owner, it may appear on the exhibit

3     itself, the original owner of the home is in Mississippi.  And

4     I don't think there was necessarily direct testimony, but there

5     was some reference to it early on in terms of what had taken

6     place.

7          I would submit to you, yes, you're correct, your

8     Honor.  There has not been someone that's taken that witness

9     stand that says, yes, I have the authority to do this and that

10    from that, we can establish standing.  But what we have is

11    obviously Mr. Pappert who believed people who told him these

12    things had the authority, and then in turn passed that onto Mr.

13    Roberts.

14         And the attenuation, as you point out, is an issue,

15    and it's problematic from the standpoint that by the time we

16    get to Mr. Pappert, or at least three, possibly four levels

17    removed in terms of what one's authority is and onward from

18    there.  But I would just indicate that it's my position, the

19    circumstantial proof, the actions of the parties certainly

20    provide at some level for this.

21         THE COURT:  Okay.

22         MR. TANK:  Your Honor, with that, I have nothing

23    further.

24         THE COURT:  Thank you, Mr. Tank.

25         MR. TANK:  Thank you.

1          THE COURT:  Ms. Mohsin?

2          MS. MOHSIN:  Good morning, your Honor.

3          Your Honor, I would like to address the issue of the

4    officers' reasonable suspicion to investigate here.  I think

5    that the testimony that was adduced by the Government's

6    witnesses here has been corroborated.  Both witnesses that

7    testified on behalf of the Government were Detroit police

8    officers who provided very detailed and thorough testimony

9    about their interactions with the defendants in this case.  And

10   though there may have been some inconsistencies in their

11   perceptions of certain events, certainly those inconsistencies

12   don't rise to the level of creating any sort of confusion about

13   what they observed, when they observed it, and the events that

14   transpired.

15         In addition, I would point out that the defendant's

16   witness, Ashley Will, corroborates nearly all the information

17   that was provided by the two law enforcement witnesses, Woods

18   and Quarello here.  And that is that, that these two officers,

19   on routine patrol, in a marked police officer wearing what was

20   marked law enforcement uniform were driving in the area of

21   17378 Dresden in the city of Detroit at roughly midnight or so,

22   observed Ashley Will parked across the street from what

23   appeared to be an abandoned home.

24         The windows, all along the first floor of the home

25   were boarded up.  The Court has seen those photographers and

1  has heard that testimony.  After a brief interaction with this

2  woman, who they knew intended to -- was waiting for someone,

3  they returned later that property to investigate whether or not

4  it was an abandoned home and whether there were individuals

5  inside.

6      And only after observing debris in the yard, snow that

7  had been not shoveled from various walks, but matted down with

8  footprints, ice at the back of the house, a window on the

9  second story opened with a light emanating from it and adult

10  voices emanating from that window, did they begin to suspect

11  that perhaps they ought to investigate some sort of trespassing

12  slash, you know, other activity, illegal activity taking place

13  inside that house.

14      They did that in a brief investigatory stop.  The

15  communications that they had with the two defendants in this

16  case I think fall well within *Terry vs. Ohio*.  They were trying

17  to ascertain whether the two individuals coming out of what was

18  patently an abandoned house to them had written permission as

19  required by the Detroit City Code to be inside that house.

20      When the defendants indicated that they did not have

21  that permission, the officers then observed the firearm inside

22  of Defendant Sutherland's waistband.  Whether he observed it in

23  plain view, or as I submit that was what their testimony was,

24  you know, or if, if he had -- even if he had observed it later

25  on, he was certainly within his right to pat-down this

EVIDENTIARY HEARING - 7/25/11

1   defendant.  He testified that he saw the gun and then he seized
2   it.  So the events that took place after that, I think, fall
3   well within the case law.
4        There was a protective sweep conducted of the home.
5   Again, they believed it to be abandoned.  They had no reason to
6   think otherwise.  Once they were inside, they observed the
7   firearm in plain view on the second story of the building.
8   And, and after they realized that these two individuals were
9   going to be taken into custody, an impound of the vehicle was
10  conducted because that vehicle was parked, you know, in the
11  driveway of that house.
12       That impound was not a search under the existing case
13  law, but it was an impounding pursuant to Detroit Police
14  Department impound policy, which requires them to, for the
15  protection of the police department, as well as the possessions
16  of the defendant, to conduct a routine inventory of the vehicle
17  before impounding it.  And that vehicle was, in fact, later
18  impounded.
19       So I submit to you, your Honor, that officers acted
20  very reasonable -- very reasonably here.  They clearly had a
21  reasonable suspicion to conduct an investigatory stop in
22  connection with *Terry vs. Ohio*.  And then all of the evidence
23  that was seized flowed, you know, accordingly.
24       With respect to the issue of reasonable expectation of
25  privacy, your Honor, we don't believe the defendant has made

1    out his burden of establishing a reasonable expectation of

2    privacy, certainly not any interest that society would be

3    prepared to recognize as legitimate.

4          Even if this defendant had a subjective expectation of

5    privacy, I doubt that society would consider a questionable

6    worker, who is employed by a subcontractor, who is further

7    employed by a contractor, who has been retained to repair a

8    house, I doubt society would be willing to accord that

9    individual an expectation of privacy in a home.

10         Mr. Pappert's testimony, I submit to you, your Honor,

11   was very incredible on many different levels, both for his

12   failure to articulate exactly what sort of permission he had

13   given to Mr. Sutherland.  At first, he maintained that he gave

14   Mr. Sutherland some sort of surveilling permission that did not

15   include the ability to remain overnight.  And then later, he

16   suggested that perhaps he had done that.

17         I think what is clear is that Mr. Sutherland was

18   residing at the property, but he didn't have the lawful

19   authority to do that, and in fact, could not produce any

20   written permission because none existed.

21         For those reasons, we submit that a reasonable

22   expectation of privacy has not been established by Mr. -- and

23   if I said Sutherland, I meant Mr. Roberts -- by Mr. Roberts.

24   But even if it had, the seizure of the firearm that was the

25   subject of this hearing was done during the course of a

1    protective sweep necessitated by the fact that officers, when

2    they encountered these two defendants walking out of the

3    building, they observed another individual walking in the

4    building.  And from their point of view, when someone is inside

5    of a building they believe to be abandoned and they are

6    investigating activities in and outside of a house, they are

7    required for their own safety to conduct a protective sweep of

8    the house.

9           And so I submit to you, your Honor, that that firearm

10   was seized in connection with that protective sweep.

11   Therefore, even if there was a reasonable expectation of

12   privacy in this case, the firearm was lawfully seized.  And we

13   would rely upon the remainder of the cases and arguments that

14   we have in our brief in support of any other residual

15   arguments.

16          THE COURT:  Thank you.

17          MS. MOHSIN:  Thank you, your Honor.

18          THE COURT:  Well, first, because there are a variety

19   of issues raised here by two defendants coming at this from a

20   slightly different perspective, I intend to write my decision,

21   to make sure the case citations are appropriately recorded, and

22   the significant facts, the salient facts, adequately expressed.

23   But I can tell you the motion on behalf of Mr. Sutherland and

24   the motion on behalf of Mr. Roberts is going to be denied for,

25   for the following essential reasons:

1          Number one, the officers encountered a situation

2   which, from its appearance, a reasonably confident police

3   officer could have interpreted as people inside a vacant

4   building.  I don't, I don't know about the use of the term

5   "abandoned" as such.  I'm not so sure that this house looked

6   like something that I would call an abandoned building, but it

7   was absolutely boarded up on the first floor.  And accordingly,

8   both evaluated by intuition and evaluated under the standards

9   of the Detroit City Ordinances that I referred to earlier, it

10  was not legally habitable, I should say neither legally nor

11  sensibly habitable.

12          You can't live in a house that is windowless from

13  which there was no means of egress in the event of an emergency

14  and so forth.  These things are captured in not just Detroit's,

15  but I'm sure virtually every municipality's ordinances

16  concerning habitability and egress and things of that nature.

17          No one should have been in that house at all.  That is

18  what a reasonable officer could have concluded from the

19  observations made by Woods and Quarello that early morning.

20  Though, it was obvious that there were individuals there on the

21  second floor, voices were heard, more than one -- it was not

22  specified how many, but more than one from the second floor.  A

23  window to which not having been boarded up was open and a light

24  was seen in that room from I believe the backyard, not visible

25  from the street.

1          Further, the house had the appearance of not being

2    cared for in a way that an owner would, specifically shovelling

3    walks and driveways and so forth.  I wondered about that and

4    asked the officer his impression.  And the photographs are not

5    unambiguous in that regard.  The porch deck and the two steps

6    leading to it are fairly free of snow.  But the walk leading to

7    the steps is simply iced over or accumulated with snow and it's

8    been walked on.  No effort, no apparent effort made to shovel

9    or to clear it down to the hard surface.

10         As I say, that's not unambiguous, but it could be

11   consistent with a home which is not currently occupied, the

12   home, in other words, that is vacant.  And people ought not be

13   in vacant buildings without appropriate permission.

14         There has been no permission proven in the facts

15   presented here.  Mr. Roberts has an obligation show at least,

16   if not prove, to a reasonable level that he had permission from

17   a person capable of granting permission to be in that house,

18   let alone to be living there, sporadically perhaps, but living

19   there nonetheless.

20         And it makes no sense from the perspective of

21   law-abiding society that an insurance company could be engaged

22   by a homeowner to undertake repairs whereby the insurance

23   company could hire an agent and the agent could hire a

24   subcontractor, and the subcontractor could grant permission to

25   a friend of his to live in the house, and not only that, but to

1    grant additional permission to other people to live in one of

2    the windowless rooms down the stairs.

3           I do not see any way in which society could be held to

4    evaluate that very attenuated series of permissions as being

5    something that could be recognized as legitimate and give rise

6    to a reasonable and legitimate expectation of privacy on the

7    part of someone such as Mr. Roberts, who was simply camping out

8    in what was an otherwise abandoned building.

9           Even more fundamentally, we haven't heard from the

10   owner.  We haven't heard from the principal contractor, that

11   would be the uncle of the gentleman who testified here today,

12   and who testified not particularly convincingly, I might add,

13   nor who appeared to be interested in answering questions that

14   were fairly direct and reasonably understood.

15          I am quite convinced that the officers acted, acted

16   upon a reasonable and -- not only articulable, but articulated

17   suspicion of wrongdoing, that is, squatting in a vacant

18   building without permission.  And they approached the situation

19   cautiously, I think, with that belief.  They stated they had

20   that belief.  It is certainly the case that a reasonable

21   officer could have gleaned that impression from the

22   circumstances.

23          And that would be true, by the way, even if other

24   officers a month earlier had been to the house and had

25   investigated and had, for their own purposes, determined that

1    there was not an untoward situation, not drug dealing going on,

2    not improper squatting and so forth.  And even if that were the

3    case that impression was communicated in a way that Woods

4    and/or Quarello may have learned about it, as was suggested by

5    Mr. Hackett's argument for a continuance, perhaps he would

6    learn something like if these other officers were called into

7    testify, he said.  I don't even think if that testimony were

8    presented it would make a difference, because as the saying

9    goes, that was then and this is now, from the perspective of

10   officers on the 11th or 12th of February.  Who knows what the

11   situation other officers a month earlier may have encountered,

12   what facts they may have been faced with.

13          An officer on the scene in the position of Woods and

14   Quarello is presented with a unique set of circumstances on

15   that cold February night that may or may not have matched up

16   with what was going on a month earlier.  It may have been

17   similar, perhaps it wasn't.  The officers have no way of

18   cataloguing and evaluating those kinds of things.

19          The only thing that we can say is that, with or

20   without that additional information about what might have gone

21   on a month earlier.  Woods and Quarello are faced with a set of

22   facts that, that could have given a reasonable officer a level

23   of suspicion of illegal activity afoot that, at a minimum,

24   permitted them to approach and momentarily detain or ask

25   questions of the individuals coming out of the house, Mr.

1   Roberts and Mr. Sutherland.

2           Whereupon, Mr. Sutherland was asked to put the large,

3   what sounds like a pound's worth of brass and other keys in his

4   hand, a large collection of keys, to put them on the roof of

5   the vehicle and please, as we speak to you here, the officer

6   said.  And in doing that, his overcoat momentarily opened,

7   within which the officer could see that he had a firearm.  He

8   asked him, are you armed?  The answer was no.  The officer,

9   knowing what the situation was, simply reached in and got the

10  firearm.

11          Well, even without that series of encounters, even

12  without the coat swinging open, given the circumstances that

13  were within the knowledge of the officers by that time, even

14  before Mr. Sutherland was asked to put the keys on the roof of

15  the car, that a reasonable officer under *Terry vs. Ohio* could

16  simply have asked Mr. Sutherland just to stand still for a

17  moment, let me just do a quick pat-down, whereupon this

18  firearm, in the way of the language it was described, would

19  have been found by the officer and retrieved and safeguarded,

20  and the same result would have been obtained.

21          So with or without seeing it, it's -- I'm not prepared

22  to say that this is a case of inevitable discovery, but the

23  circumstances were such that it would have pretty clearly led

24  to just about to the same result.  I'll say no more about that.

25  I don't think that's likely to be part of the Court's analysis.

1          But from that point on, the events unfolded.  That

2    firearm was found.  The arrest was made.  Handcuffs were

3    applied.  The officer entered the home, which again still

4    appeared to be vacant, except for a person that had gone

5    inside; Ashley Will had gone inside.  There may still have been

6    others inside.  One or more officers entered the home,

7    encountered her, made a quick sweep of the downstairs, the

8    boarded-up downstairs, which by this time would have appeared

9    to the officers to be not, not so "abandoned" but still vacant,

10   vacated of legitimate residence because of the boarded-up

11   nature of the windows.  And up the stairs, sweeping the few

12   rooms in the upper level revealed in plain sight, standing

13   against the wall, the firearm that's the subject of the other

14   part of this motion.

15         A protective sweep is recognized as legitimate,

16   assuming it is indeed a sweep and not an invasive search

17   without a warrant.  There was no search beyond the sweep here,

18   as testified to by the officers.  The firearm was standing up

19   against the wall, near the window that was still open from

20   which the officers heard the voice, the voice earlier.

21         So there was ample reasonableness in my view in the

22   search-like activities engaged in here.  And that includes the

23   impoundment of the vehicle, with the arrests, the custodial

24   arrests now having been made.  The vehicle or any vehicle would

25   have been impounded, and before being impounded, would be

1    inventoried.  And upon being inventoried, the firearm in the

2    trunk was found and seized and whatever else was -- I don't

3    think there was anything else of evidentiary value in the

4    vehicle, but at least that, as one of the two officers, I think

5    Quarello testified.

6           So another, a backup officer that had come to the

7    scene by this time opened the trunk with a key, I believe, and

8    called him over and said you need to see this.  Look here.  In

9    which Quarello, again, I believe it was Quarello said he did,

10   walked over and saw it, the firearm which he described, which

11   was seized and which will be admitted as evidence in the case.

12          So the sum and substance of it is that I thank counsel

13   for their presentation and for their arguments.  And the

14   motions will be, in due course, denied for reasons that I've

15   briefly articulated here.  And the Court stands adjourned until

16   that matter is determined and docketed, at which point we will

17   reassess the scheduling of the case.  I don't know what other

18   dates we have currently set, but they will be reexamined as,

19   and then reset in consultation with counsel after I get the

20   order shaped up and entered, which will be probably in the

21   order of a week to ten days.  That will be my hope at least.

22          All right, counsel.  Anything else for the record?

23   For the Government, Ms. Mohsin?

24          MS. MOHSIN:  Nothing further, your Honor.  I do have

25   the exhibits should the Court require them.

EVIDENTIARY HEARING - 7/25/11

1         THE COURT:  Let's have them maintained in the event

2    I'll call on them, that will be the original.  I have

3    photocopies, the photographs you have.

4         MS. MOHSIN:  I don't believe you have photocopies of

5    the exhibits from this, but you do have --

6         THE COURT:  From today's session, no, I do not have

7    those.  I'll call upon you in the event that I will want to

8    inspect those.  I've heard them described.

9         MS. MOHSIN:  Okay.

10        THE COURT:  Mr. Hackett, anything else for the record,

11   before we close?

12        MR. HACKETT:  Just, Judge, just one thing.  It doesn't

13   really relate to this.  It relates to my client.  I was just

14   notified that my client's mother fell and broke her left hip

15   and her right shoulder.  Apparently she's in a Four Seasons

16   nursing home.  My client would like me to motion the Court for

17   emergency bond hearing.  This is the first that I've heard of

18   it.  I believe she's in Four Seasons Nursing Home right now.

19   And I'd like to get a date if the Court would indulge us.

20        THE COURT:  Well, under some circumstances, defendants

21   have been, who were in custody have been granted, for example,

22   a furlough, a brief period of time on which they are bonded out

23   of custody and permitted to attend, for example, a funeral or

24   something similar to that.

25         I would suggest that you speak first both with

1   Pretrial Services and with government counsel and see if an

2   agreement might be reached for the purpose that you're

3   suggesting here.  And if so, I'll certainly consider it.  But

4   if not, I'll consider a motion if you want to do -- well, I'm

5   not predicting a result, but I'll consider a motion if you want

6   to formulate one and lay out the specifics.  All right, sir?

7           MR. HACKETT:  Thank you, very much, Judge.

8           THE COURT:  Mr. Tank, anything else for the record?

9           MR. TANK:  I have nothing.  Thank you.

10          THE COURT:  We stand in recess.

11          THE CLERK:  All rise.  Court is now in recess.

12          (Proceedings adjourned at 12:30 p.m.)

13                      *      *      *

14

15                  **CERTIFICATE OF REPORTER**

16          As an official court reporter for the United States

17  District Court, appointed pursuant to provisions of Title 28,

18  United States Code, Section 753, I do hereby certify that the

19  foregoing is a correct transcript of the proceedings in the

20  above-entitled cause on the date hereinbefore set forth.

21

22

23              s/ Christin E. Russell

24          CHRISTIN E. RUSSELL, CSR, RPR, FCRR, CRR

25              Federal Official Court Reporter