

# UNTED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA

                Plaintiff,

v.

| | |
|---|---|
| D-1 | SCOTT WILLIAM SUTHERLAND<br>a/k/a "Scotty Z" |
| D-2 | RONALD RAYMOND ROBERTS<br>a/k/a "Rockin' Ronnie" |
| D-3 | DAVID THOMAS ROBERTS<br>a/k/a "Detroit Dave" |
| D-4 | PATRICK MICHAEL MCKEOUN<br>a/k/a "Magoo" |
| D-5 | JEFF GARVIN SMITH<br>a/k/a "Fat Dog" |
| D-6 | PAUL ANTHONY DARRAH<br>a/k/a "Pauli" |
| D-7 | CARY DALE VANDIVER<br>a/k/a "Gun Control" |
| D-8 | VINCENT JOHN WITORT<br>a/k/a "Holiday" |
| D-9 | MICHAEL WILLIAM<br>MASTROMATTEO<br>a/k/a "Iron Mike |
| D-10 | VERNON NELSON RICH<br>a/k/a "Vern" |
| D-11 | JOHN RENNY RIEDE<br>a/k/a "Bear" |
| D-12 | VICTOR CARLOS CASTANO<br>a/k/a "Vic" |

Criminal No.   11-20129

HON. ROBERT H. CLELAND

Violations:

18 U.S.C. §§2, 371, 922, 924(c), 1001,
1512, 1623, 1952, 1955, 1959, 1962(d)

21 U.S.C. §§ 841, 843, 846, 860a



1

D-13   GARY LEE NELSON

D-14   MICHAEL KENNETH RICH
             a/k/a "Tatu"

D-15   RAYMOND CHARLES MELIOLI
             a/k/a "Romeo"

D-16   TIMOTHY PAUL DOWNS
             a/k/a "Space"

D-17   DAVID RANDY DROZDOWSKI
             a/k/a "D"

D-18   SMILEY VILLA
             a/k/a "SA"

D-19   DEAN EDWARD JAKIEL
             a/k/a "Jesus"

D-20   TONY WAYNE KITCHENS
             a/k/a "Trouble"

D-21   SYLVESTER GERARD WESAW
             a/k/a "Sly Dog"

D-22   RONALD NICK PRELETZ
             a/k/a "Polar Bear"

D-23   HOWARD JOSEPH QUANT
             a/k/a "44"

D-24   SCOTT THOMAS PERKINS
             a/k/a "Scooter, Scotty P"

D-25   CLIFFORD CHANSEL RHODES II
             a/k/a "Cliff"

D-26   DAVID ROY DELONG
             a/k/a "Reverend"

D-27   CHRISTOPHER RAYMOND COOK
             a/k/a "Damien"

D-28   MICHAEL JOHN PALAZZOLA
             a/k/a "Utica Mike "

D-29   DANNY RUSSELL BURBY, JR.
             a/k/a "Thumbs"

D-30    RONALD LEON LAMBERT
                a/k/a "Crow"

D-31    JASON JOSEPH COOK
                a/k/a "Cookie"

D-32    EDWARD ALLEN TAYLOR
                a/k/a "Big Ed"

D-33    SALVATORE BATTAGLIA
                    a/k/a "Bando"

D-34    WILLIAM SCOTT LONSBY
                    a/k/a "Buck, Buckwheat"

D-35    WAYNE RUSSELL WERTH

D-36    LAURI ANN LEDFORD

D-37    JENNIFER LEE CICOLA

D-38    DEAN ANTHONY TAGLIAVIA

D-39    ALEXIS CATHERINE MAY

D-40    PAULA MILEHA FRISCIONI

D-41    JOHN CHARLES SCUDDER

                Defendants.
_____/

# THIRD SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## COUNT 1
(18 U.S.C. §§1962(d) – RACKETEER INFLUENCED CORRUPT ORGANIZATION - CONSPIRACY)

D-1    SCOTT WILLIAM SUTHERLAND
D-2    RONALD RAYMOND ROBERTS
D-3    DAVID THOMAS ROBERTS
D-4    PATRICK MICHAEL MCKEOUN
D-5    JEFF GARVIN SMITH
D-6    PAUL ANTHONY DARRAH
D-7    CARY DALE VANDIVER
D-8    VINCENT JOHN WITORT
D-9    MICHAEL WILLIAM MASTROMATTEO

3

D-10   VERNON NELSON RICH
D-11   JOHN RENNY RIEDE
D-12   VICTOR CARLOS CASTANO
D-13   GARY LEE NELSON
D-14   MICHAEL KENNETH RICH
D-15   RAY CHARLES MELIOLI
D-16   TIMOTHY PAUL DOWNS
D-17   DAVID RANDY DROZDOWSKI
D-19   DEAN EDWARD JAKIEL

## THE ENTERPRISE

1.      At all times material to this Indictment, the Devils Diciples Motorcycle Club (hereinafter referred to as DDMC) was a criminal organization, that is: an outlaw motorcycle club which existed geographically and territorially alongside, and in some instances, in a hostile co-existence with other outlaw motorcycle clubs in various parts of the United States of America.

2.      At all times material to this Indictment, the DDMC was comprised of regional "chapters" located in various cities in Michigan, Alabama, Arizona, California, Illinois, Indiana, Ohio, and elsewhere.

4.      At various times material to this Indictment, the State of Michigan Chapters were located in Ira Township/Chesterfield Township (referred to as "Blue Water"), Bay City (referred to as "Bay City"), Detroit (referred to as "West Side"), Grand Rapids (referred to as "Grand Rapids"), Clinton Township (referred to as "Mt. Clemens" or "Detroit"), Port Huron, (referred to as "Port Huron") and Utica (referred to as "Utica").

5.      At all times material to this Indictment, the Clinton Township, Michigan Chapter of the DDMC (referred to by members of the DDMC as "the Detroit Chapter" and "the Mt. Clemens Chapter") was regarded as the DDMC's national headquarters.

6.      At all times material to this Indictment, the DDMC, through its various chapters, engaged in criminal activities for financial gain which included distribution of narcotics, theft,

4

transportation and sale of stolen motorcycles, conducting illegal gambling businesses, robbery, extortion and acts of violence.

7.      From at least the early 1990s, and continuing through the date of this Indictment, the exact dates being unknown to the Grand Jury, in the Eastern District of Michigan and elsewhere, the Devils Diciples Motorcycle Club, including its leadership, members and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), namely a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate commerce.

## STRUCTURE OF THE ENTERPRISE AND THE ROLES OF THE DEFENDANTS

8.      At all times material to this Indictment, the DDMC was structured and operated in the following manner, and the Defendants and other persons employed by and associated with the DDMC functioned in the following roles:

A.      The DDMC was comprised of a group of individuals who were members and associates. Admission to membership in the DDMC was usually based in part on successfully completing a probationary period, followed by a formal approval by one or more members/leaders. Members, who were required to own Harley Davidson motorcycles, were commonly referred to as "full patched members."

B.      The DDMC was headed by a National President. The National President was elected by other members of the DDMC. The National President was responsible for overall management of the activities of the other DDMC Members and chapters, including giving final approval to any activity generally affecting the DDMC as a whole. The National President

5

represented the DDMC in dealings with other motorcycle clubs; in particular, other outlaw motorcycle clubs or gangs. The National President was responsible for arbitrating and finally deciding disputes between members and associates, and disputes between members and members or associates of other motorcycle clubs. Like any other member of the DDMC, the National President participated in criminal activities both for financial gain on behalf of the DDMC, and to protect the DDMC and its members.

C.      From in or about the late 1980's and continuing through the date of this Indictment, JEFF GARVIN SMITH, a/k/a Fat Dog, was the National President of the DDMC.

D.      Subordinate to the National President in the DDMC, and superior to the remaining members, was the position of National Vice President. The National Vice President stood as the second in command.

E.      From in or about approximately 2004 and continuing through the date of this Indictment, PAUL ANTHONY DARRAH, a/k/a Pauli, was the National Vice President of the DDMC.

F.      Other office holders and leaders included a National Treasurer, National Warlords, and each DDMC chapter had a President, Vice President, Treasurer, Warlord or Enforcer. The DDMC was also comprised of "Nomads" (who were not affiliated with a specific state chapter, but were DDMC members) and general members.

G.      Defendant JEFF GARVIN SMITH and PAUL ANTHONY DARRAH held positions as the National President and National Vice President, and were the leaders of the enterprise who directed other members of the enterprise in carrying out unlawful acts and other activities in furtherance of the conduct of the affairs of the enterprise.

6

H.    Under the direction of the national leaders of the enterprise, other leaders of the enterprise, including State Bosses, Chapter Presidents, Chapter Vice Presidents, Chapter Treasurers, Chapter Warlords or Enforcers, participated in unlawful acts and other activities in furtherance of the conduct of the affairs of the enterprise.

I.    Under the direction of the National, State, and Chapter leaders, members of the enterprise participated in unlawful acts and other activities in furtherance of the affairs of the enterprise.

J.    Under the direction of the leaders and members of the enterprise, associates of the enterprise participated in unlawful acts and other activities in furtherance of the affairs of the enterprise.

K.    There were stages of membership in the DDMC: "hangers-on" or associates, prospects (that is: individuals seeking membership in the DDMC who were then undergoing a probationary period), and full-patch wearing members, who often refer to one another as "brother."

L.    Prospects were required to submit to orders and/or directives from full-patch wearing members, up to and including allowing themselves to being physically assaulted by patch members.

M.    DDMC full patch members are, at some point either before or after receiving their full patch, identified by a "club name" or nickname for the express purpose of concealing their true identity and thwarting identification by law enforcement.  DDMC nicknames are used by DDMC members in letters, emails, and club communications.

N.    DDMC members were expected to follow orders from the National President, the National Vice-President, or their own Chapter President.  These orders included, but were not

7

limited to: orders to assault other individuals, including other DDMC members; orders to manufacture, transport and/or distribute drugs; orders to seize property of DDMC members who were ousted from the organization, or otherwise in disfavor; orders to use intimidation and threats against individuals, including witnesses; orders to make false statements to law enforcement and to lie under oath, in order to protect the DDMC organization or its members; and orders to hide and/or destroy evidence.

O.     DDMC members were also expected to abide by the DDMC by-laws, which included both written and oral rules, and attend regular meetings, referred to as "church," and special events referred to as "runs." Failure to attend "church" or a "run" subjected the member to disciplinary action. Punishment or disciplinary action for violations of DDMC by-laws included assaults, fines, seizure of property and/or expulsion from the DDMC.

P.     DDMC members were also required to pay periodic, or monthly dues to their chapter, a percentage of which went to the National Organization. Members were subjected to fines, taxes, or special assessments, for various purposes.

Q.     DDMC members were required to obtain a life insurance policy naming a DDMC "brother" as the beneficiary of the insurance policy.

R.     The DDMC utilized a cemetery in Coolidge, Arizona to bury DDMC members. DDMC members were required to contribute/pay into a "funeral fund" which purported to be used for the burial of DDMC members.

S.     DDMC members who generated a profit from illegal activities, such as trafficking in controlled substances and illegal gambling, were frequently required to give a portion of those proceeds to their chapter in the form of controlled substances, dues, expenses, contributions

8

to a bail and legal defense fund for members who had been arrested, and fines and penalties. DDMC members also gave stolen property and controlled substances as payment for back dues and penalties.

        T.      The vestments of membership in the DDMC, referred to as "colors," included leather vests with "rockers." The "top rocker" denotes the club's name, "Devils Diciples," and the "bottom rocker" denotes the State affiliation or Nomad status. These two rockers encircled the center patch, or emblem of the DDMC, which is a spoked wheel with two crossed tridents. The "colors" displayed other patches and/or pins such as "MC" (motorcycle club), "FTW" (Fuck The World, and Forever Together Wherever), a "44" patch which denotes the fourth letter of the alphabet, DD, and other "patches" signifying deeds performed on behalf of or for the benefit of the club, and events attended.

        U.      Wives or girlfriends of full-patched members were regarded as the personal property of the DDMC, and were given vestments, typically leather vests, with a "top rocker" reading "Property Of," and a "bottom rocker" specifying the DDMC nickname of the member to whom they belonged. However, the "Property Of" vests did not contain the DDMC emblem center wheel.

        V.      Wives, girlfriends, and female associates were required to provide financial and other support for DDMC members through various activities, including but not limited to, employment as prostitutes and exotic dancers, possessing, transporting and distributing illegal drugs, possessing, receiving and transporting the proceeds from drug transactions, possessing firearms and contraband, providing false information and committing perjury, and otherwise falsely implicating themselves in order to protect and shield DDMC members from the consequences of their own criminal activity.

W.    The DDMC required return of all vestments of membership when an individual was kicked out of the club or otherwise no longer an active member. The DDMC could also require that members remove or color-over DDMC tattoos, and surrender their motorcycles to the DDMC.

X.    The DDMC operated and maintained an Internet website, including www.devilsdiciples.org and www.devilsdicplesmc.us., which the DDMC used to communicate with DDMC members, associates and the public.

## PURPOSES OF THE ENTERPRISE

9.    The purposes of the Enterprise included, but were not limited to the following:

A.    Economically enriching the DDMC and its members through, among other things, the commission of crimes involving theft, the manufacture and distribution of narcotics, and the operation of illegal gambling businesses.

B.    Enforcing its authority and power by disciplining and punishing members and associates who did not comply with the DDMC rules, who did not follow orders, or who committed acts against another member of the Enterprise.

C.    Promoting, protecting, and enhancing the authority, reputation, and standing of the DDMC, and its interests, through violence, actual or implied threats of violence, acts of intimidation, possession of weapons, and the cultivation and exploitation of the Enterprise's reputation for violence.

D.    Maintaining control over DDMC territory (sometimes referred to as "turf") through acts of intimidation, threats, and violence.

E.    Protecting the DDMC and its members from detection and prosecution by law

10

enforcement authorities through acts of intimidation and violence against potential witnesses to crimes committed by the DDMC, and obstructing justice through the making of false statements, committing perjury and subornation of perjury.

## THE RACKETEERING CONSPIRACY

10.     Beginning on a date unknown, but at least as early as the 1990s, and continuing to on or about the date of this Indictment, the exact dates being unknown to the Grand Jury, in the Eastern District of Michigan, and the States of Arizona, Indiana, Alabama, California, and Ohio, and elsewhere, defendants SCOTT WILLIAM SUTHERLAND, a/k/a "Scotty Z," RONALD RAYMOND ROBERTS, a/k/a "Rockin' Ronnie," DAVID THOMAS ROBERTS, a/k/a "Detroit Dave," PATRICK MICHAEL MCKEOUN, a/k/a "Magoo," JEFF GARVIN SMITH, a/k/a "Fat Dog," PAUL ANTHONY DARRAH, a/k/a "Pauli," CARY DALE VANDIVER, a/k/a "Gun Control," VINCENT JOHN WITORT, a/k/a "Holiday," MICHAEL WILLIAM MASTROMATTEO, a/k/a "Iron Mike," VERNON NELSON RICH, a/k/a 'Vern," JOHN RENNY RIEDE, a/k/a "Bear," VICTOR CARLOS CASTANO, GARY LEE NELSON,  MICHAEL KENNETH RICH, a/k/a "Tatu," RAYMOND CHARLES MELIOLI, a/k/a "Romeo," TIMOTHY PAUL DOWNS, a/k/a "Space," DAVID RANDY DROZDOWSKI, a/k/a "D," and DEAN EDWARD JAKIEL, a/k/a "Jesus," being persons employed by and associated with the Devils Diciples Motorcycle Club, an enterprise as defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with persons known and unknown to the Grand Jury, to commit an offense against the United States, to wit: to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly,

11

in the conduct of the affairs of the Devils Diciples Motorcycle Club through a pattern of racketeering activity consisting of multiple acts:

    A.    Indictable under the following provisions of Title 18 of the United States Code:

        (1).    18 U.S.C. § 1503 (obstruction of justice);

        (2).    18 U.S.C. § 1510 (obstruction of criminal investigations);

        (3).    18 U.S.C. § 1512 (witness tampering);

        (4).    18 U.S.C. § 1513 (retaliating against a witness);

        (5).    18 U.S.C. § 1591 (sex trafficking by force, fraud, or coercion);

        (6).    18 U.S.C. § 1952 (interstate travel in aid of racketeering);

        (7).    18 U.S.C. § 1955 (operating an illegal gambling business);

        (8).    18 U.S.C. § 2312 (interstate transportation of stolen vehicles);

        (9).    18 U.S.C. § 2313 (sale or receipt of stolen vehicles); and

    B.    Involving:

        (1).    murder, in violation of Arizona Revised Statutes, Sections 13-302, 13-1001, 13-1003, 13-1104, 13-1105; Indiana Code Sections 35-41-5-1, 35-41-5-2, 35-42-1; Michigan Compiled Laws, Sections 750.83, 750.92, 750.157a, 750.316, 750.317, 767.39;

        (2).    robbery, in violation of Arizona Revised Statutes, Sections 13-302, 13-1001, 13-1003, 13-1902, Section 13-1904; Michigan Compiled Laws, Sections 750.92, 750.157a, 750.530, 767.39;

        (3).    extortion, in violation of Arizona Revised Statutes, Sections 13-302, 13-1001, 13-1003, 13-1804, Michigan Compiled Laws, Sections 750.92,

750.157a, 750.213, 767.39;

(4).    kidnaping, in violation of Arizona Revised Statutes, Sections 13-302, 13-1001, 13-1003, 13-1304;

(5).    bribery, in violation of Michigan Compiled Laws, Sections 750.92, 750.117, 750.122, 750.157a, 767.39;

(6).    trafficking in controlled substances, in violation of Arizona Revised Statutes, Sections 13-302, 13-1001, 13-1003, 13-3407; and Michigan Compiled Laws, Sections 750.157a, 767.39, 333.7401; and

C.    Multiple acts involving trafficking in controlled substances in violation of Title 21, United States Code, Sections 841 and 846.

11.    It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## MANNER, MEANS AND METHODS OF THE CONSPIRACY

12.    Among the means and methods by which the defendants and their associates agreed to conduct and participate in the conduct of the affairs of the enterprise were the following:

A.    Members of the enterprise and their associates committed acts involving murder, attempted murder, kidnaping, robbery, extortion, assault, intimidation, and threats of violence as a form of discipline and punishment.

B.    Members of the enterprise and their associates promoted a climate of fear through the commission of acts involving intimidation, threats and acts of violence designed to maintain, enhance and promote the authority, reputation, and standing of the DDMC and its members.

C.      Members of the enterprise and their associates committed acts involving attempted murder, robbery, extortion, assault, intimidation, and threats of violence in connection with maintaining the territory of the DDMC.

D.      Members of the enterprise and their associates committed acts involving the trafficking in controlled substances, including the manufacture, distribution, transportation of controlled substances, as well as conspiracies to manufacture, distribute, and possess with intent to distribute controlled substances in connection with generating income for the enterprise and its members.

E.      Members of the enterprise and their associates committed acts involving illegal gambling in connection with generating income for the enterprise and its members.

F.      Members of the enterprise committed acts of theft, transportation and receipt or possession of stolen property in connection with generating income for the enterprise and its members.

G.      Members of the enterprise and their associates committed acts of intimidation, threats, and assaults and other acts of violence, as a means of deterring or punishing any potential witnesses to their crimes, and in connection with protecting the DDMC and its members from detection and prosecution by law enforcement authorities.

H.      Members of the enterprise and their associates protected the DDMC and its members from law enforcement detection, prosecution, and punishment through the destruction or disposal of evidence and the receipt of information regarding witnesses and law enforcement actions.

I.      Members of the enterprise and their associates traveled between states and DDMC chapters for the purpose of obtaining, manufacturing and distributing methamphetamine.

14

It was part of the conspiracy that at various times beginning in the 1990s, DDMC members and associates traveled between Michigan, Arizona, Alabama, Ohio, California and elsewhere to obtain methamphetamine for distribution to DDMC members and associates.

    J.  Members of the enterprise and their associates traveled between states and DDMC chapters for the purpose of obtaining, transporting, and providing methamphetamine and precursor chemicals, including red phosphorus and pseudoephedrine, to DDMC members and associates for the purpose of manufacturing methamphetamine.

    K.  Members of the enterprise and their associates manufactured methamphetamine for the benefit of the enterprise, themselves and their associates.

    L.  It was part of the conspiracy that members of the enterprise used violence, threats, force, and intimidation to steal motorcycles and property from DDMC members who were kicked out of the DDMC, left in "bad standing," or were otherwise in disfavor with the DDMC leadership.

## **OVERT ACTS**

  In furtherance of the conspiracy, and to effect the objects thereof, the Defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, in the Eastern District of Michigan and elsewhere:

  1.  On August 14, 1993, DDMC member William Bartell, a/k/a "Stumpy," murdered Charles Isler, by shooting him with a firearm at the DDMC's Cadillac Chapter clubhouse in Clam Lake Township, Michigan.

  2.  On or about August 14, 1993, DDMC members Scott Ambrose Jones, a/k/a "Scooter," Richard Kiosterud, a/k/a "Tramp," and Stephen Christopher Jarvis, a/k/a "Flea," moved

the body of Charles Isler from the DDMC Cadillac Clubhouse in Clam Lake Township, to a location near 44 ½ Road, Clam Lake Township.

3.     Between approximately August 14, 1993 and August 15, 1993, DDMC members at the Cadillac Chapter clubhouse concealed, removed and destroyed evidence of the Charles Isler murder.

4.     On or about July 18, 1994, DDMC member Albert Paille and Sherry Whitehouse attempted to transport 3 pounds of methamphetamine from California to Michigan on behalf of the DDMC, and the methamphetamine was supplied by defendant VINCENT JOHN WITORT.

5.     On or about November 9, 1994, DDMC member Billy Sharon, a/k/a "Rubber Room Reject," received a package in the mail that contained 340 grams of methamphetamine in Pensacola, Florida.  The package was sent from California.

6.     On or about October 21 to 22, 1995, Grand Rapids, Michigan DDMC member Larry Lee Morgan, a/k/a "Clyde," murdered former South Bend, Indiana DDMC member William Bausch, a/k/a "Wild Bill," for purportedly violating DDMC rules.

7.     On or about October 22, 1995, Michigan DDMC member Larry Lee Morgan, a/k/a "Clyde," murdered South Bend, Indiana DDMC member Thomas Thacker, a/k/a "Double T," who had been witness to and had participated in the William Bausch murder.

8.     On or about October 27, 1995, DDMC members Larry Morgan, a/k/a "Clyde," and Bennie Rich, a/k/a "Sportcoat," possessed approximately 150 grams of methamphetamine and firearms in Grand Rapids, Michigan.

9.     On April 8, 1996, DDMC member Michael Belkiewicz, a/k/a "Joker," possessed methamphetamine outside the Port Huron DDMC Chapter clubhouse in Port Huron, Michigan.

16

10.     In 1997, DDMC member Charles Casey and Karen Casey maintained a methamphetamine laboratory and possessed 500 grams of methamphetamine at their residence at 4491 Avalon Road, Rushville, Ohio.

11.     On January 9, 1998, DDMC members Jeffry Armstrong, a/k/a "Detroit Red," defendant SYLVESTER GERARD WESAW, and others were present at Armstrong's Kimball Township, Michigan residence when Armstrong possessed approximately 33 grams of methamphetamine, firearms, drug packaging material and paraphernalia, and cash.

12.     At or near the end of 1997 through June 8, 1998, the exact date being unknown to the Grand Jury, former DDMC member Person A sought permission from (now deceased) National Vice-President Kenneth Roll, a/k/a "Spike," to resign his membership in the DDMC, and Roll ordered Person A to surrender his motorcycle, his club patches, and to pay a fine to the DDMC.

13.     On various dates at or near the end of 1997 and prior to June 8, 1998, the exact dates being unknown to the Grand Jury, former DDMC member Person A received handwritten notes from DDMC members at his Mt. Clemens residence.

14.     Between approximately the end of 1997 and prior to June 8, 1998, defendant MICHAEL WILLIAM MASTROMATTEO and another DDMC member drove to former DDMC member Person A's residence, armed with a revolver.

15.     Between approximately the end of 1997 and prior to June 8, 1998, defendant DAVID THOMAS ROBERTS approached former DDMC member Person A's residence.

16.     Between approximately the end of 1997 and prior to June 8, 1998, defendant JEFF GARVIN SMITH approached former DDMC member Person A's residence, armed with a firearm.

17.     Between approximately the end of 1997 and prior to June 8, 1998, defendant PAUL

17

ANTHONY DARRAH, approached former DDMC member Person A's residence, armed with a firearm.

18.     On or about June 8, 1998, defendant JEFF GARVIN SMITH, and (now deceased) DDMC National Vice President Kenneth Roll, a/k/a "Spike," traveled in a van to former DDMC member Person A's Mt. Clemens, Michigan residence and while at that residence, JEFF GARVIN SMITH shot Person A with a firearm for failing to abide by DDMC rules.

19.     On or about June 8, 1998, (now deceased) DDMC National Vice President Kenneth Roll, a/k/a "Spike," defendants JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, and DDMC member Person B brought the van that had been used by SMITH and Roll during the Person A shooting to defendant RONALD NICK PRELETZ's residence to alter the appearance of the van, and to hide the van.

20.     A few days after June 8, 1998, the exact date being unknown to the Grand Jury, defendant JEFF GARVIN SMITH gave defendant RONALD NICK PRELETZ a double barrel shotgun to store at his residence.

21.     On July 8, 1998, DDMC associate Allen Mancini operated a methamphetamine manufacturing laboratory in Anaheim, California.

22.     In or about August 1999, DDMC member John Bondy, a/k/a "Batman," possessed methamphetamine in Louisiana, and was transporting the methamphetamine from Arizona to Alabama.

23.     Between approximately 1998 and prior to 2000, the exact date being unknown to the Grand Jury, DDMC member Person C received a shipment in the mail that contained a computer monitor with pound quantities of methamphetamine secreted inside on behalf of defendant

18

MICHAEL WILLIAM MASTROMATTEO, and Person C delivered these shipments to MASTROMATTEO.

24.     On one occasion after approximately 1998 and prior to 2000, the exact date being unknown to the Grand Jury, defendant MICHAEL WILLIAM MASTROMATTEO gave Person C approximately one ounce of methamphetamine and an automatic Uzi machine gun to deliver to defendant SYLVESTER GERARD WESAW, which Person C delivered to WESAW inside a trailer at the DDMC Mt. Clemens Clubhouse.

25.     In or about August 1999, the exact date being unknown to the Grand Jury, defendant JEFF GARVIN SMITH ordered DDMC member Person D to set up a methamphetamine manufacturing laboratory in Detroit, Michigan.

26.     Between August 1999 and August 30, 2001, the exact dates being unknown to the Grand Jury, DDMC member Person D manufactured methamphetamine.

27.     Between August 1999 and August 30, 2001, the exact date being unknown to the Grand Jury, DDMC member Person D distributed methamphetamine to defendant JEFF GARVIN SMITH.

28.     Between August 1999 and August 30, 2001, the exact date being unknown to the Grand Jury, DDMC member Person D distributed methamphetamine to RAYMOND CHARLES MELIOLI.

29.     At various dates between approximately Fall 1999 through about February 18, 2000, the exact dates being unknown to the Grand Jury, defendant PATRICK MICHAEL MCKEOUN and other DDMC members and associates manufactured methamphetamine in an underground laboratory in Alabama, and MCKEOUN and his associates sold the methamphetamine to DDMC members in

Alabama, Michigan, and elsewhere, any single act of which constitutes an overt act.

30.     At various dates during approximately 2000 to 2001, the exact dates being unknown to the Grand Jury, DDMC members, including defendants JOHN RENNY RIEDE, SCOTT WILLIAM SUTHERLAND, and SYLVESTER GERARD WESAW, sold methamphetamine to members of the Highwaymen Motorcycle Club, any single act of which constitutes an overt act.

31.     In approximately the summer of 2000, the exact date being unknown to the Grand Jury, defendant JEFF GARVIN SMITH ordered SYLVESTER GERARD WESAW to assault DDMC member Person C and WESAW assaulted Person C, causing Person C to suffer the loss of teeth.

32.     In approximately July 2001, the exact date being unknown to the Grand Jury, DDMC member Person C was ordered to surrender his motorcycle, his DDMC "colors" and related possessions to the DDMC, and when Person C refused to surrender his motorcycle, defendant JEFF GARVIN SMITH ordered DDMC member (now deceased) Larry Oswald, a/k/a "Big Larry," to seize Person C's motorcycle.

33.     Between approximately July 30-31, 2001, former DDMC member Person C's 2000 Harley Davidson motorcycle was stolen from Person C's residence in Shelby Township, Michigan and brought to MICHAEL JOHN PALAZZOLA's home and disassembled.

34.     In approximately 2001, the exact date being unknown to the Grand Jury, in the City of Detroit, after members of the Jokers Motorcycle Club showed disrespect to the DDMC and the Highwaymen Motorcycle Clubs, defendant JEFF GARVIN SMITH ordered DDMC member Person E to take DDMC members to Vicky's Bar, a Jokers Motorcycle Club hang-out in Detroit, Michigan, and to confront members of the Jokers Motorcycle Club.

20

35.     In approximately 2001, the exact date being unknown to the Grand Jury, Person E, defendants RONALD RAYMOND ROBERTS, DAVID THOMAS ROBERTS, other DDMC members, as well as members of the Highwaymen Motorcycle Club, traveled to Vicky's bar to confront members of the Jokers Motorcycle Club, where RONALD RAYMOND ROBERTS and DAVID THOMAS ROBERTS assaulted a Joker's Motorcycle Club associate. A Vicky's bartender and a member of the Highwaymen Motorcycle Club each pulled out and displayed firearms during the incident.

36.     On various dates between approximately January 2000 through January 18, 2002, the exact dates being unknown to the Grand Jury, defendant PAUL ANTHONY DARRAH supplied defendant JENNIFER LEE CICOLA with methamphetamine for sale and distribution at the Hitching Post Bar in Warren, Michigan, any single act of which constitutes an overt act.

37.     On various dates between the winter 2001 through February 2006, the exact dates being unknown to the Grand Jury, DDMC member Person F transported marijuana from defendant VICTOR CARLOS CASTANO to defendant MICHAEL KENNETH RICH in Alabama, any single trip of which constitutes an overt act

38.     On January 25, 2001, (now deceased) DDMC National Vice President Kenneth Roll ordered defendant SCOTT WILLIAM SUTHERLAND to assault DDMC member Person D for violating DDMC rules. SUTHERLAND's assault on Person D resulted in a fracture of Person D's nose.

39.     In approximately March 2001, the exact date being unknown to the Grand Jury, defendant JEFF GARVIN SMITH ordered defendant MICHAEL WILLIAM MASTROMATTEO and SCOTT WILLIAM SUTHERLAND to seize Person D's motorcycle.

40.     In approximately March 2001, the exact date being unknown to the Grand Jury, defendants MICHAEL WILLIAM MASTROMATTEO and SCOTT WILLIAM SUTHERLAND seized DDMC member Person D's motorcycle from his tattoo parlor on Lahser Road, in Detroit, Michigan.

41.     On or about March 4, 2001, DDMC member Person G, purchased a slot machine from Games People Play for $3,922.

42.     Between approximately June 2001 and April 2003, the exact date being unknown to the Grand Jury, DDMC members Person H, Person I, and Person J transported methamphetamine from Arizona to defendant JEFF GARVIN SMITH.

43.     Between approximately June 2001 and April 2003, the exact date being unknown to the Grand Jury, DDMC members Person H, Person I, and Person J transported methamphetamine from Arizona to defendant  PAUL ANTHONY DARRAH.

44.     Between approximately June 2001 and April 2003, the exact date being unknown to the Grand Jury, DDMC members Person H, Person I, and Person J transported methamphetamine from Arizona to defendant MICHAEL WILLIAM MASTROMATTEO.

45.     Between approximately June 2001 and April 2003, the exact date being unknown to the Grand Jury, DDMC members Person H, Person I, and Person J transported methamphetamine from Arizona to DDMC member Person E.

46.     On or about August 9, 2001, defendant RONALD NICK PRELETZ purchased a Draw Poker slot machine from Games People Play for approximately $1,372.70.

47.     On approximately December 27, 2001, former DDMC member Person D received a threatening letter from defendant RAYMOND CHARLES MELIOLI.

48.     On approximately January 25, 2002, former DDMC member Person D received a threatening letter from defendant SCOTT WILLIAM SUTHERLAND.

49.     On March 10, 2002, defendants CARY DALE VANDIVER, TONY WAYNE KITCHENS, and DDMC associate Person K possessed approximately 400 grams of methamphetamine, a quantity of marijuana and other controlled substances, a loaded firearm and two additional magazines, a loaded 9 mm magazine, inside a vehicle in Taylor, Michigan.

50.     On March 10, 2002, defendant CARY DALE VANDIVER possessed three "pawn slips" regarding the transfer of firearms to pawn shops in Alabama.

51.     On or about June 9, 2002, Tucson, Arizona DDMC members Person H, Person I, and Person L, and others, both known and unknown to the Grand Jury, assaulted Person M, and Person H shot Person M, all in Tucson, Arizona because Person M falsely claimed to be selling drugs under the protection of the DDMC.

52.     Sometime after January 18, 2002 and after his girlfriend JENNIFER LEE CICOLA was arrested for drug dealing, on a date unknown to the Grand Jury, defendant PAUL ANTHONY DARRAH threatened to kill her and take her child if CICOLA told the police about DARRAH's role in her drug trafficking activities.

53.     In or about September 2002, on a date unknown to the Grand Jury, defendant VINCENT JOHN WITORT provided DDMC member Person E with approximately one half ounce of methamphetamine to transport back to Michigan.

54.     On or about April 27, 2003, defendant VINCENT JOHN WITORT and DDMC members Person I, Person N, Person O, Person P, Person Q, Person R, Person S, Person T, Person U, and others robbed, kidnaped, and attempted to murder DDMC Arizona Chapter members Person

23

H, Person J, Person L, and Person W for violating DDMC rules.

55.    On or about April 27, 2003, defendant VINCENT JOHN WITORT and DDMC members Person I, Person N, Person O, Person P, Person Q, Person R, Person S, Person T, Person U, and others robbed, kidnaped, assaulted, and extorted DDMC Arizona Chapter member Person V for violating DDMC rules.

56.    On or about April 28, 2003, DDMC members Person N, Person R, Person S, and others cleaned up the DDMC Tucson, Arizona Chapter clubhouse and attempted to dispose of evidence related to the kidnaping, robbery, assault, and attempted murder of Person H, Person J, Person L, and Person W and the kidnaping, robbery, assault and extortion of Person V.

57.    On or about April 28, 2003, DDMC members possessed firearms and ammunition, tasers, knives, martial arts-style and other weapons, all at the DDMC Tucson Chapter clubhouse.

58.    On November 6, 2003, DDMC member Person N maintained and possessed Person V's Harley Davidson Panhead Motorcycle at his Tucson, Arizona residence.

59.    On November 6, 2003, Person N maintained and possessed letters/emails from DDMC chapters/members, and from the DDMC's National Headquarters, congratulating him, members of the DDMC Southern California Chapter, and Nomads who participated in the offenses involving kidnaping, assault, attempted murder, robbery and/or extortion offenses against DDMC Arizona members Person H, Person J, Person L, Person W, and Person V in April 2003.

60.    In May 2003, (now deceased) DDMC National Vice President Kenneth Roll wired defendant VINCENT JOHN WITORT $800, and maintained a receipt for this wire transaction at his home in Michigan.

61.    In November 2003, (now deceased) DDMC National Vice President Kenneth Roll

24

wired defendant VINCENT JOHN WITORT $600, and maintained a receipt for this wire transaction at his home in Michigan.

62.     On February 19, 2004, defendant MICHAEL WILLIAM MASTROMATTEO maintained records relating to slot machines, two handguns, two shotguns, a rifle, a list of Michigan police radio-frequencies, information regarding companies offering pseudoephedrine for sale, a heat sealer and drug packaging material, a scale, airline boarding pass for trip to Phoenix, Arizona, methamphetamine and marijuana, at his home in Mt. Clemens, Michigan, as well as drug trafficking related materials.

63.     On February 19, 2004, defendant JEFF GARVIN SMITH maintained and possessed records relating to slot machines, state and federal law enforcement manuals regarding outlaw motorcycle gangs marked "Sensitive," "For Official Use Only," and/or "Law Enforcement Sensitive," letters warning DDMC members about government cooperators, videotaped recorded news reports related to the August 14, 1993 homicide of Charles Isler by DDMC member William Bartell, and the March 24, 1994 recovery of Isler's body, handwritten notes regarding an investigation involving Racketeering and Conspiracy, handwritten notes on an Alcohol, Tobacco and Firearms (ATF) search warrant affidavit regarding the possible identity of a government informant, a printout of an email regarding the April 27, 2003 kidnaping, assault, attempted murder, robbery and/or extortion of Arizona DDMC members Person H, Person J, Person L, Person W, and Person V , a list of DDMC members in prison, and numerous documents dated between 1990 and 2003 related to criminal matters involving members of the DDMC, including newspaper articles, letters, police reports, search warrants, affidavits, indictments, witness interview transcripts, and a bulletproof vest at his home in Mt. Clemens, Michigan.

64.     On February 19, 2004, defendant MICHAEL JOHN PALAZZOLA maintained and possessed records relating to slot machines, and records relating to the DDMC Utica Chapter's finances and income, at his home in Utica, Michigan.

65.     On February 19, 2004, (now deceased) DDMC member Timothy Anjoski maintained and possessed two handguns, letters from defendant SCOTT WILLIAM SUTHERLAND, and ATF/FBI reports/documents regarding SUTHERLAND's prior federal firearms prosecution, all at his home in Canton, Michigan.

66.     On February 19, 2004, (now deceased) DDMC member Kenneth Roll maintained police reports regarding a double murder case involving defendant SCOTT WILLIAM SUTHERLAND, newspaper articles regarding DDMC prosecutions, a letter to DDMC members requesting a $100 contribution for JEFF GARVIN SMITH.

67.     On February 19, 2004, defendant RONALD NICK PRELETZ maintained and possessed records relating to slot machines, life insurance paperwork for DDMC members, bills related to expenses for the Mt. Clemens clubhouse, "IOU's" from DDMC members, cash designated for an individual's court date, articles on DDMC related prosecutions, marijuana, cocaine, methamphetamine, and controlled substances at his home in Roseville, Michigan.

68.     On February 19, 2004, various members of the DDMC maintained a bullet-proof vest, ammunition for a handgun and a shotgun, an empty firearms case for a .380 caliber firearm, an empty box for a 9 mm handgun, a compact disc entitled "Real World Survival" containing instructions on bomb-making, and on how to change your identity, all at the Mount Clemens Clubhouse.

69.     On or before June 17, 2004, defendants VERNON NELSON RICH, VICTOR

26

CARLOS CASTANO, WILLIAM SCOTT LONSBY, EDWARD ALLEN TAYLOR, and others packaged pound quantities of marijuana at locations including VERNON NELSON RICH's residence in Kimball, Michigan.

70.     On or about June 17, 2004, defendant VICTOR CARLOS CASTANO possessed and attempted to distribute approximately 50 pounds of marijuana while in possession of a loaded .44 caliber Smith and Wesson revolver, $1,749 in U.S. currency, a scale, various drug packaging materials, and a Western Union money order receipt for $100 sent to CARY DALE VANDIVER in Michigan, from Alabama, all in a pickup truck in Avoca, Michigan.

71.     In or about August 2004, the exact date being unknown to the Grand Jury, defendants JEFF GARVIN SMITH and PAUL ANTHONY DARRAH approached DDMC member Person F to assist VICTOR CARLOS CASTANO, who had been arrested and charged with marijuana distribution and firearms related offenses.  SMITH and DARRAH asked Person F to have his girlfriend, Person X, falsely claim ownership of the firearm recovered from defendant VICTOR CARLOS CASTANO on June 17, 2004.

72.     In or about August 2004, the exact date being unknown to the Grand Jury, defendants CARY DALE VANDIVER, DEAN EDWARD JAKIEL, and MICHAEL KENNETH RICH approached Person X, the girlfriend of DDMC member Person F, and asked her to give a false statement to a law enforcement officer claiming that the firearm seized on June 17, 2004 from defendant VICTOR CARLOS CASTANO belonged to her.  Defendant MICHAEL KENNETH RICH threatened that if Person X did not make the false statement, he would turn Person X's daughter into a prostitute.

73.     On various dates prior to March 10, 2005, the exact dates being unknown to the

27

Grand Jury, DDMC associate Demetrius Meffer, a/k/a "Demi," obtained precursor chemicals and other items required in the manufacturing of methamphetamine from DDMC members, including defendants MICHAEL WILLIAM MASTROMATTEO, RONALD RAYMOND ROBERTS, DDMC member Person Y, and DDMC associate Patricia Schoeninger, any single act of which constitutes an overt act.

74.     On various dates prior to March 10, 2005, the exact dates being unknown to the Grand Jury, DDMC associate Demetrius Meffer, a/k/a "Demi," manufactured methamphetamine for the DDMC for sale and distribution at a building on Gratiot Avenue in New Haven, Michigan, any single act of which constitutes an overt act.

75.     Shortly before March 10, 2005,  the exact date being unknown to the Grand Jury, after being tipped off that police intended to execute a raid at the Gratiot Avenue laboratory, DDMC associate Demetrius Meffer, a/k/a "Demi," relocated his methamphetamine manufacturing laboratory to a building owned by defendant MICHAEL WILLIAM MASTROMATTEO's family, on Lenfesty in Harrison Township, Michigan.

76.     On or about March 10, 2005, defendant MICHAEL WILLIAM MASTROMATTEO maintained and possessed pseudoephedrine, a methamphetamine manufacturing laboratory, and other items to manufacture methamphetamine at his shop in Harrison Township, Michigan.

77.     On or about March 10, 2005, DDMC member Person Y maintained and possessed a large quantity of match-boxes used in the manufacturing of  methamphetamine, a loaded firearm, methamphetamine, two scales and drug paraphernalia at his home in Algonac, Michigan.

78.     On or about March 10, 2005, various DDMC members maintained slot and video poker machines, a loaded shotgun, a loaded handgun, and walkie-talkies, at the DDMC Mt. Clemens

28

Clubhouse.

79.     On or about March 11, 2005, defendant VERNON NELSON RICH maintained and possessed firearms, ammunition, a "bullet-proof" vest, a wireless "bug" detector, and documents relating to federal sentencing in drug cases, documents related to acquiring methamphetamine precursor chemicals, articles concerning outlaw motorcycle gangs, and a publication from the Arizona Department of Public Safety on outlaw motorcycle gangs in Arizona containing a section devoted to the DDMC and their criminal activities.

80.     On or about June 28, 2005, defendant MICHAEL WILLIAM MASTROMATTEO maintained and possessed firearms including an Norinco SKS 7.62 assault rifle, a MAC-11 9mm assault rifle, and approximately 2000 rounds of ammunition, instructions on how to manufacture methamphetamine, methamphetamine precursor chemicals, scales, and equipment for a methamphetamine laboratory, as well as copies of approximately six state search warrants issued in March 2005 for six DDMC-affiliated locations, the supporting affidavit, copies of federal Grand Jury subpoenas that had been served upon DDMC member Person Y and DDMC associate Patricia Schoeninger, and articles regarding the execution of federal search warrants in February 2004 at DDMC-affiliated locations, all at his home in Mt. Clemens, Michigan.

81.     In or about the fall of 2005, the exact dates being unknown to the Grand Jury, after VICTOR CARLOS CASTANO was indicted in the Eastern District of Michigan on June 17, 2005 with firearms and drug distribution charges, defendants CARY DALE VANDIVER and MICHAEL KENNETH RICH approached DDMC member Person F to ask him to make false statements to law enforcement on behalf of VICTOR CARLOS CASTANO, and asked Person F to have his girlfriend, Person X, falsely claim to law enforcement that she was the owner of the firearm found in VICTOR

CARLOS CASTANO's possession on June 17, 2004.

82.     On various dates in or about January 2006, the exact dates being unknown to the Grand Jury, defendants MICHAEL KENNETH RICH, CARY DALE VANDIVER, and DEAN EDWARD JAKIEL, and DDMC member Person F prepared and counseled Person X to give false testimony during the trial of DDMC member VICTOR CARLOS CASTANO on firearms charges, any single of which constitutes an overt act.

83.     On April 12, 2006, DDMC member Person Y maintained and possessed the 2001 federal Grand Jury transcript of the testimony of former DDMC member Person D, Michigan State Police (MSP), Drug Enforcement Administration (DEA) and Federal Bureau of Investigation (FBI) reports regarding interviews with Person D, MSP confidential source documents regarding Person D, and an instruction manual for a "wire transmission detector," that is, what could be commonly described as a recording device detector, all at his home in Algonac, Michigan.

84.     In or about February 2006, defendant MICHAEL WILLIAM MASTROMATTEO prepared and counseled DDMC member Person F and his girlfriend, Person X, to give false testimony during the trial of DDMC member VICTOR CARLOS CASTANO on firearms charges.

85.     In or about February 2006, the exact date being unknown to the Grand Jury, defendant VICTOR CARLOS CASTANO offered DDMC member Person F five pounds of marijuana in exchange for giving false testimony during CASTANO's trial on firearms charges.

86.     On or about February 7, 2006, DDMC member Person F and his girlfriend, Person X, made false statements to FBI agents concerning the firearm which was recovered from DDMC member VICTOR CARLOS CASTANO on June 17, 2004.

87.     On or about February 22, 2006, DDMC member Person F, and his girlfriend, Person

X, both falsely testified under oath in U.S. District Court in the Eastern District of Michigan, during the trial of defendant VICTOR CARLOS CASTANO on firearms charges.

88.     On or about March 29, 2006, defendant CHRISTOPHER RAYMOND COOK purchased a slot machine for $900 from Games People Play.

89.     In approximately July 2006, the exact date being unknown to the Grand Jury, DDMC Mt. Clemens Chapter President, defendant CHRISTOPHER RAYMOND COOK resigned his membership in the DDMC by surrendering his motorcycle, DDMC colors and apparel to DDMC members at a "church" meeting.

90.     Shortly after the July 2006 "church" meeting, defendant RAYMOND CHARLES MELIOLI ordered COOK to resign his DDMC membership at a state "church" meeting, and when COOK arrived at the state "church" meeting, he was ordered by defendant JEFF GARVIN SMITH to have the DDMC tattoo on his left forearm removed, or blacked out.  COOK submitted to the removal/blacking out of his tattoo by a DDMC member.

91.     On or about August 3, 2007, defendants VERNON NELSON RICH and EDWARD ALLEN TAYLOR moved slot machines into the Mt. Clemens clubhouse.

92.     On or about August 4, 2007, defendants VERNON NELSON RICH and CARY DALE VANDIVER sold approximately 9 grams of methamphetamine to Person LL for $500.

93.     On or about September 6, 2007, defendants VERNON NELSON RICH and PAUL ANTHONY DARRAH sold approximately 12 grams of methamphetamine to Person LL for $1,000.

94.     On September 27, 2007, defendant RAYMOND CHARLES MELIOLI had a telephone conversation with defendant VERNON NELSON RICH during which MELIOLI complained that "the slot machines have been down like since I told you . . . and I had a lot of people

31

that wanted to play them so we lost money." RICH promised to "try to get out there tomorrow and do the machines."

95.     On September 28, 2007, defendant RAYMOND CHARLES MELIOLI had a second telephone conversation with defendant VERNON NELSON RICH regarding the broken slot machines. MELIOLI reminded RICH, "when you get a chance, you gonna come look at the slots."

96.     On September 29, 2007, defendant VERNON NELSON RICH had a telephone conversation with defendant MICHAEL WILLIAM MASTROMATTEO's friend/girlfriend regarding the proceeds from the slot machines. MASTROMATTEO's friend/girlfriend provided RICH with MASTROMATTEO's address in prison so that RICH could send MASTROMATTEO his share of the proceeds from the slot machines.

97.     On September 29, 2007, defendant VERNON NELSON RICH received a voicemail message from defendant HOWARD JOSEPH QUANT. QUANT told RICH that he would bring him "that."

98.     On September 29, 2007, defendant VERNON NELSON RICH had a telephone conversation with ALEXIS CATHERINE MAY concerning the sale of methamphetamine. MAY asked RICH if he picked up "those cookies [methamphetamine] for me?" RICH replied that he did and made arrangements to meet MAY later in the day to deliver the methamphetamine. Later that day, RICH called MAY and told her to go to his house and look inside the grill by his back door.

99.     On September 30, 2007, defendant HOWARD JOSEPH QUANT left a voicemail message for VERNON NELSON RICH to call him back because they need to "do that" again.

100.    On October 1, 2007, defendants VERNON NELSON RICH and JOHN RENNY RIEDE had a telephone conversation. RICH asked RIEDE if he had gone "down that way" yet

32

because RICH had a "guy" and "money's burning a hole in his pocket." RIEDE told RICH he had not, but offered RICH "some of the old."

101.    In early October and November, 2007, VERNON NELSON RICH told various members of the DDMC that he had $60,000 worth of methamphetamine that he transported in a fake exhaust pipe welded to his motorcycle, and he was selling the methamphetamine for $2,000 per ounce.

102.    On October 3, 2007, defendant VERNON NELSON RICH had a telephone conversation with DDMC member HOWARD JOSEPH QUANT, a/k/a "44." RICH told QUANT that he had to "take some quarters down there [the DDMC clubhouse] for that fucking slot machine."

103.    On October 3, 2007, VERNON NELSON RICH had a telephone conversation with DANNY RUSSELL BURBY, JR. BURBY told RICH he would give him $100 tomorrow after he got his check, but asked RICH to give him "one" till tomorrow.

104.    On October 3, 2007, defendant VERNON NELSON RICH had a telephone conversation with ALEXIS MAY about obtaining some Vicodin pills for him. MAY promised RICH that she would order more Vicodin pills from "the doctors" and would have it for him "tomorrow."

105.    On October 12, 2007, defendant JEFF GARVIN SMITH called defendant VERNON NELSON RICH and left him a voicemail that he needed "$100." Later that day, RICH called SMITH and promised to give him the money.

106.    On October 25, 2007, defendant VERNON NELSON RICH had a telephone conversation with defendant MICHAEL WILLIAM MASTROMATTEO's girlfriend regarding the slot machine proceeds. During the phone call, MASTROMATTEO's girlfriend told RICH that

33

MASTROMATTEO appreciated RICH's payments because "if anyone else would have took them slot machines, I would have never got a penny for them."

107.    On October 14, 2007, various DDMC members, including defendants CLIFFORD CHANSEL RHODES, RAYMOND CHARLES MELIOLI, Person Z, and Person LL, participated in a "church" meeting at the Mt. Clemens Clubhouse, during which Chapter President CLIFFORD CHANSEL RHODES ran the meeting and they discussed which members had paid dues, and which members owed dues, having a raffle to raise money, and upcoming DDMC events, including the November 17, 2007 Officers meeting in Illinois for presidents and warlords.

108.    On October 25, 2007, defendants JOHN RENNY RIEDE and VERNON NELSON RICH had a telephone conversation in which RICH asked RIEDE if he planned to attend the meeting at the Mt. Clemens Chapter.  RIEDE stated he would attend the meeting, and RICH told RIEDE that they could "probably kill a couple birds with one stone, then."  RICH explained that he wants to get "this" out of his pocket.

109.    On October 25, 2007, defendant VERNON NELSON RICH received a call from DDMC member Person LL regarding a pending transaction for 25 grams of methamphetamine. RICH and Person LL agreed to meet the next day to complete the transaction.

110.    On October 26, 2007, defendant VERNON NELSON RICH sold approximately 25 grams of methamphetamine to DDMC member Person LL for $2,000.

111.    On October 29, 2007, defendant VERNON NELSON RICH had a telephone conversation with defendant JOHN RENNY RIEDE, during which RICH told RIEDE that he intended to give the proceeds from the slot machines that night to the relatives of a (now deceased) DDMC member.

112.    On October 29, 2007, defendant VERNON NELSON RICH had a telephone conversation with PAULA MILEHA FRISCIONI at approximately 10:26 a.m.  FRISCIONI asked RICH if he was returning that day.  RICH said he was not, but that he will have "it," and he will "try to do that in the morning for you."  RICH told FRISCIONI, "you'll like this."

113.    On October 29, 2007, at approximately 12:35 p.m., defendant VERNON NELSON RICH possessed 1.01 grams of methamphetamine, .30 grams of marijuana, and $1,993 in currency.

114.    On October 29, 2007, after VERNON NELSON RICH's arrest earlier that day, RICH had numerous telephone conversations with defendants LAURI ANN LEDFORD, Person AA, and Person GG regarding removing and concealing items from RICH's house in case a police search resulted from RICH's arrest for possession of methamphetamine and marijuana, any single act of which constitutes an overt act.

115.    On October 30, 2007, VERNON NELSON RICH and JEFF GARVIN SMITH had a telephone conversation regarding RICH's arrest.  SMITH wanted details about the arrest and told RICH to be careful.

116.    On October 30, 2007, defendant JOHN RENNY RIEDE had a telephone conversation with defendant VERNON NELSON RICH during which RIEDE told RICH that the proceeds from the slot machines totaled $333.00.  RIEDE told RICH that they "were having trouble getting them [the slot machines] to take bills.  They'd take the 1's, but they wouldn't take the 5's, 10's, or 20's."

117.    In or about November 2007, the exact date being unknown to the Grand Jury, defendant VICTOR CARLOS CASTANO mailed from federal prison a letter addressed to defendant VERNON NELSON RICH.  RICH testified during CASTANO's February 2006 federal trial, and

35

CASTANO mailed a letter threatening RICH. CASTANO threatened to provide "paperwork" from the trial showing RICH testified against CASTANO to members of the Outlaws Motorcycle Club, and told RICH that CASTANO had an uncle in the Zulu's Motorcycle Club, an uncle in the Highwaymen Motorcycle Club, and two uncles in the Vietnam Vets Motorcycle Club and CASTANO threatened to tell all of these individuals that RICH testified against CASTANO "if you guys want to fuck me around." CASTANO told RICH that he did not want the paperwork sent around because "you don't want people to know you testified against me when you could have just plead the 5th." CASTANO further threatened RICH telling him, "[p]art of me hopes you fucking die but that would be too good for you. I want you out there when I get out so I can take care of this with a ball bat or a bullet either way I will watch you bleed."

118.    In or about November 2007, the exact date being unknown to the Grand Jury, defendant VERNON NELSON RICH asked PAULA MILEHA FRISCIONI to make a false statement to a law enforcement officer to falsely claim that the currency seized from RICH on October 29, 2007, was money he earned working at ABZ Steel.

119.    On November 2, 2007, defendant VERNON NELSON RICH had a telephone conversation with PAULA MILEHA FRISCIONI where they discussed meeting for a drug transaction.

120.    On November 6, 2007, defendant VERNON NELSON RICH had a telephone conversation with DANNY RUSSELL BURBY, JR. BURBY asked RICH if the "shit" RICH showed him the other night was the same, "or did you step on that?" RICH told BURBY it was the same. BURBY told RICH he recently purchased a new scale.

121.    On November 15, 2007 various DDMC members maintained a loaded 9 millimeter

36

handgun found in CLIFFORD CHANSEL RHODES' colors, ammunition, slot machines, paperwork and records related to slots, records relating to dues and clubhouse finances at the Mt. Clemens' clubhouse.

122.    On November 15, 2007, various DDMC members maintained methamphetamine and slot machines at the Blue Water Chapter clubhouse.

123.    On November 15, 2007, various DDMC members maintained a loaded shotgun, loaded handgun, ammunition, records related to dues and clubhouse finances, $469 currency, surveillance cameras and system, letter warning of federal investigation, "The Feds are On Us, Be Sharp," and slot machines and paperwork, at the Port Huron Chapter clubhouse.

124.    On or about November 15, 2007, defendant JOHN RENNY RIEDE possessed approximately 17 grams of methamphetamine, 1 kilogram of marijuana, pills containing an assortment of controlled substances, powder used to cut methamphetamine, instructions on how to make methamphetamine, a scale, drug packaging materials, $120 in quarters, instructions on how to determine if your phone is tapped, instructions on how to send money to a federal prisoner, articles related to DDMC criminal activities, note that says, "be sharp, feds are trying to jam us," a California Department of Justice manual on outlaw motorcycle gangs, note with instructions to sell raffle tickets for a motorcycle raffle in Ohio, all in his residence in Bay City, Michigan.

125.    On November 15, 2007, defendant VERNON NELSON RICH possessed a shotgun, ammunition, $2,356 in currency, motorcycle parts store-related ink stamp, false motorcycle exhaust pipe used to transport drugs, a methamphetamine grinding device, .20 grams of methamphetamine, 4 grams of marijuana, 63 Vicodin pills, and other controlled substances, two stolen motorcycles, note stating, "if you happen to get more pills, think of me," note on how to detect a phone tap, police

37

radio frequencies, pill manual with photos of pills available for sale in Canada, slot machines, slot machine parts, slot machine tools, and slot-machine related paperwork all at his home in Kimball, Michigan.

126.    On November 15, 2007, defendant VERNON NELSON RICH had a telephone conversation with defendant JOHN RENNY RIEDE during which they discussed the FBI's seizure of the slot machines.  RICH related to RIEDE that RICH told the FBI agents that they only used that money to pay for funeral expenses for DDMC members.

127.    On November 15, 2007, defendant VERNON NELSON RICH had a telephone conversation with PAUL ANTHONY DARRAH to discuss the fact that the FBI seized his false muffler (which he used to transport drugs.)  Implying that the FBI had an informant within DDMC, RICH tells DARRAH, "Not fucking many people knew about that."

128.    On November 15-16 2007, defendant VERNON NELSON RICH had numerous telephone conversations with DDMC members and associates, including defendants DAVID ROY DELONG, JOHN RENNY RIEDE, PAUL ANTHONY DARRAH, PAULA MILEHA FRISCIONI, HOWARD JOSEPH QUANT, DANNY RUSSELL BURBY, JR., (now deceased) Kenneth Roll, and SALVATORE BATTAGLIA regarding the FBI searches and RICH admits to ownership of slot machines, any single conversation of which constituting an overt act.

129.    On November 19, 2007, defendant VERNON NELSON RICH spoke with PAULA MILEHA FRISCIONI regarding the FBI searches and slot machines and RICH admits to ownership of slot machines.

130.    On November 21, 2007, defendant VERNON NELSON RICH spoke with DDMC member Person HH regarding the FBI searches and slot machines and RICH admits to ownership

of slot machines.

131.   On December 11, 2007, defendant VERNON NELSON RICH maintained drug paraphernalia, ammunition, and a motorcycle used to transport drugs at his home in Kimball, Michigan.

132.   On December 11, 2007, defendant HOWARD JOSEPH QUANT maintained a stolen shotgun, ammunition, and drug paraphernalia, and controlled substances at his home in Jeddo, Michigan.

133.   On December 11, 2007, defendant DANNY RUSSELL BURBY, JR. maintained shotgun ammunition, marijuana and a marijuana grow operation at his residence in Algonac, Michigan.

134.   On December 11, 2007, defendant JOHN RENNY RIEDE maintained marijuana, $6,470 in currency, a digital scale, drug paraphernalia, a letter from VICTOR CARLOS CASTANO to VERNON NELSON RICH, a letter from JEFF GARVIN SMITH to VICTOR CARLOS CASTANO, referencing the CASTANO letter to RICH, with a notation to RIEDE from JEFF GARVIN SMITH.

135.   On April 1, 2008, defendant PAUL ANTHONY DARRAH and DDMC associate Person II had a telephone conversation in which DARRAH told Person II that he should be able to get them (Vicodin pills) in the morning.

136.   On April 2, 2008, defendants PAUL ANTHONY DARRAH and Person II had a telephone conversation during which Person II asked DARRAH if he has any of those things (Vicodin pills) yet.  P. DARRAH told Person II that he will have them tomorrow morning.

137.   On April 4, 2008, defendants PAUL ANTHONY DARRAH, DDMC member

39

Person HH, and RAYMOND CHARLES MELIOLI had several telephone conversations – any single conversation constitutes an overt act – in which Person HH told DARRAH he was at a bar with MELIOLI, and MELIOLI violated DDMC rules.  DARRAH told Person HH to get MELIOLI back to the clubhouse and "punch" him "right in the fucking head."  DARRAH told MELIOLI to "deal with him the fucking way he needs to be dealt with."  Shortly thereafter, Person HH called DARRAH to report that he took care of it.  DARRAH told Person HH to assault MELIOLI again if he continues "to fucking be like that."  Person HH then called DARRAH later to told him that "I hit him pretty good," "I knocked him down twice," and "I hit him and then he went down, covered his head up."  Person HH told DARRAH that MELIOLI's conversation with a member of the Liberty Riders Motorcycle Club and his conduct at the bar made the DDMC look bad.

138.    On April 5, 2008, PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation and DARRAH updated SMITH about the assault on RAYMOND CHARLES MELIOLI.

139.    On April 24, 2008, defendants PAUL ANTHONY DARRAH and SCOTT THOMAS PERKINS had a telephone conversation and discussed Vicodin.

140.    On May 3, 2008, defendants PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation and discussed the sale of [raffle] tickets.

141.    On May 14, 2008, defendants PAUL ANTHONY DARRAH and DEAN ANTHONY TAGLIAVIA had a telephone conversation and discussed an increase in price for [Vicodin pills].

142.    On May 20, 2008, defendants PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation and discussed DARRAH leaving Vicodin pills for GARY

40

LEE NELSON in the saddlebags of his motorcycle and that NELSON would leave money in same location.

143.    On June 10, 2008, defendant PAUL ANTHONY DARRAH and GARY LEE NELSON discussed DARRAH leaving Vicodin pills with defendant JENNIFER LEE CICOLA for NELSON to obtain.

144.    On June 30, 2008, defendants PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation regarding a slot machine. DARRAH told SMITH that he was going to go to defendant TIMOTHY PAUL DOWNS's house to pick up a slot machine. DARRAH asked SMITH to send defendant CARY DALE VANDIVER to help move the slot machine.

145.    On June 30, 2008, defendants PAUL ANTHONY DARRAH and TIMOTHY PAUL DOWNS had a telephone conversation regarding the slot machines. DARRAH told DOWNS that he and defendant CARY DALE VANDIVER were coming to pick up the slot machine and "take it to a place to get it fixed."

146.    On July 4, 2008, defendants PAUL ANTHONY DARRAH and Person JJ had a telephone conversation in which DARRAH asked Person JJ for "60 of them [drugs] one things," and clarified, "not what I usually get."

147.    On July 6, 2008, at approximately 11:11 a.m., defendants PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation regarding the Next of Kin Riding Club (NOK). The president of the NOK asked DARRAH (and the DDMC) for permission to convert their riding club, or "RC" to a motorcycle club, or "MC."

148.    On July 6, 2008, at approximately 12:13 a.m., defendants PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation wherein DARRAH told NELSON that the NOK wanted to put an "MC" patch on. DARRAH told NELSON he wanted to

41

find out what relationship the NOK has with the Outlaws Motorcycle Club.

149.    On July 6, 2008, at approximately 3:11 p.m., defendants PAUL ANTHONY DARRAH and JOHN CHARLES SCUDDER had a telephone conversation regarding the NOK. DARRAH asked SCUDDER if the NOK has a relationship with the Outlaws Motorcycle Club. DARRAH told SCUDDER he will tell NOK that if they have anything to do with the Outlaws Motorcycle Club, the [DDMC] will "fucking take that shit off right now."

150.    On July 6, 2008, at approximately 3:48 p.m., defendant PAUL ANTHONY DARRAH had a telephone conversation regarding the NOK. DARRAH discussed the NOK's request for an MC patch. DARRAH said if the NOK brings the Outlaws Motorcycle Club around [DDMC territory] then the [DDMC] will "take their shit."

151.    On July 6, 2008, at approximately 10:01 p.m., defendant PAUL ANTHONY DARRAH had a telephone conversation regarding the NOK. DARRAH discussed a meeting between the NOK and the DDMC in which the NOK agreed that the DDMC would have to get to know the NOK better before they gave their approval for the NOK to wear an "MC" patch.

152.    On July 6, 2008, defendant PAUL ANTHONY DARRAH had a telephone conversation in which he asked another member of the DDMC to contact the president of the Hells Our Home (HOH) Motorcycle Club regarding NOK's request for an MC patch.

153.    On July 7, 2008, at approximately 12:48 p.m. defendants PAUL ANTHONY DARRAH and DEAN ANTHONY TAGLIAVIA had a telephone conversation and discussed meeting for the purpose of distributing of Vicodin pills.

154.    On July 11, 2008, DDMC member Person CC possessed methamphetamine after leaving a DDMC national party in Goodells, Michigan.

155.    On July 18, 2008, at approximately 12:19 p.m., defendants PAUL ANTHONY

42

DARRAH and DANNY RUSSELL BURBY, JR., had a telephone conversation in which they discussed information that the NOK intended to put the MC patch on their colors without waiting for DDMC authorization. DARRAH told BURBY they need to talk to (NOK) to find out if the NOK president lied to the DDMC. If so, then DARRAH told BURBY, "we just fucking take his shit." DARRAH told BURBY they will wait to hear it from the NOK first.

156.   On July 18, 2008, at approximately 1:33 p.m., defendants PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation and discussed DARRAH's earlier conversation with DANNY RUSSELL BURBY, JR. regarding the NOK patch.

157.   On July 19, 2008, at approximately 7:04 p.m., defendants PAUL ANTHONY DARRAH and SCOTT THOMAS PERKINS had a telephone conversation and DARRAH told PERKINS that the NOK had agreed not to put the MC patch on (absent DDMC approval), and if they do, "we're just takin their shit from 'em. They ain't gonna be a club out there."

158.   On July 22, 2008, defendants PAUL ANTHONY DARRAH and RAYMOND CHARLES MELIOLI had a telephone conversation in which DARRAH told MELIOLI he had "medicine" for sale, and asked if MELIOLI knew of anyone that is looking for any.

159.   On July 25, 2008, at approximately 8:38 p.m., defendants PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a telephone conversation and discussed meeting with the NOK to discuss the request for an MC patch.

160.   On July 26, 2008, at approximately 5:17 p.m., defendants PAUL ANTHONY DARRAH and JOHN CHARLES SCUDDER had a telephone conversation and SCUDDER told DARRAH he had heard that the NOK plans to put the MC patch on (without waiting for DDMC approval). SCUDDER told DARRAH that if he saw [the NOK president], SCUDDER will threaten him by telling [the NOK president] if SCUDDER learns that [the NOK president] lied, then

SCUDDER would "yank your fucking shit here by myself." DARRAH told SCUDDER to "tell him that anyway." SCUDDER agreed to "call him right now and fucking tell him that."

161.    On July 26, 2008, at approximately 8:50 p.m., defendants PAUL ANTHONY DARRAH and TIMOTHY PAUL DOWNS had a telephone conversation wherein DOWNS described to DARRAH his conversation with [the NOK president]. DOWNS told DARRAH that SCUDDER called and threatened [the NOK president] that if the NOK wear the MC, "they'll be done tomorrow." DOWNS told DARRAH the NOK were worried about it.

162.    On July 27, 2008, at approximately 10:20 p.m., defendants PAUL ANTHONY DARRAH and JOHN CHARLES SCUDDER had a telephone conversation and DARRAH advised SCUDDER that he "scared the shit" out of the NOK, and SCUDDER replied, "well he's got the point." DARRAH tells SCUDDER, "hey, fuck them, and that's the truth, you know what I mean? I mean, and just how you told them is how it is, fuck that."

163.    On or about August 3, 2008, defendants JEFF GARVIN SMITH and PAUL ANTHONY DARRAH had a telephone conversation regarding DANNY RUSSELL BURBY, JR. in which they discussed the fact that BURBY had been telling his girlfriend club business in violation of club rules.

164.    On August 5, 2008, defendant TIMOTHY PAUL DOWNS called PAUL ANTHONY DARRAH and left a voicemail message that he wanted to know if DARRAH got his "prescript" filled.

165.    On August 9, 2008, defendant PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation regarding DANNY RUSSELL BURBY, JR. and discussed BURBY's possession of and refusal to return NELSON's DDMC club ring. DARRAH told NELSON, "if he sold the motherfucker [ring], he's out of the club." NELSON replied, "He sold that

44

motherfucker. I'm going to do damage to his house. . . and I'll do damage to his old lady's [body part]."

166.    On August 12, 2008, defendants PAUL ANTHONY DARRAH and SYLVESTER GERARD WESAW had telephone conversations regarding "pain medicine." DARRAH told WESAW that he was trying to get some, and WESAW responded that he has some.

167.    On August 12, 2008, defendants PAUL ANTHONY DARRAH and RAYMOND CHARLES MELIOLI had a telephone conversation and DARRAH told MELIOLI that he wanted MELIOLI to obtain some "white ones."

168.    On August 24, 2008, defendant JEFF GARVIN SMITH assaulted DDMC member DANNY RUSSELL BURBY, JR.'s girlfriend, Person DD, by slapping her, grabbing and pulling her by her hair, throwing her to the ground, climbing atop her and punching Person DD in the face, causing Person DD to sustain injury to her face, eyes, and elsewhere, after Person DD threw BURBY's DDMC colors to the ground at the Mt. Clemens clubhouse. BURBY pulled SMITH off of Person DD during the assault, and several DDMC members told BURBY to leave the party and surrender his motorcycle.

169.    Between August 24, 2008 and September 24, 2008, defendant JEFF GARVIN SMITH forced DDMC member DANNY RUSSELL BURBY, JR. out of the DDMC for failing to abide by club rules and ordered him to turn over his motorcycle and club paraphernalia.

170.    On August 26, 2008, defendant JEFF GARVIN SMITH had a conversation with PAUL ANTHONY DARRAH and admitted assaulting Person DD.

171.    On or about September 2, 2008, defendants PAUL ANTHONY DARRAH and TIMOTHY PAUL DOWNS had a telephone conversation and discussed going over to DANNY RUSSELL BURBY, JR.'s house to collect DDMC property.

45

172.    On September 4, 2008, defendants PAUL ANTHONY DARRAH and SCOTT THOMAS PERKINS had telephone conversations wherein DARRAH made threats against members of the Next of Kin Riding Club.

173.    On or about September 7, 2008, defendants PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation regarding DANNY RUSSELL BURBY, JR. DARRAH told NELSON, "you need to fucking get a hold of fucking Thumbs [BURBY] and get our shit back and tell him to shut his motherfucking mouth before he doesn't have one to shut." DARRAH further told NELSON, "Tell him we want our shit or we're coming over there fucking and I'll burn his fucking house down."

174.    On or about September 8, 2008, defendants PAUL ANTHONY DARRAH and GARY LEE NELSON had  a telephone conversation and DARRAH told NELSON to send four DDMC members to BURBY'S house to collect DDMC property.

175.    On or about September 8, 2008, defendants CARY DALE VANDIVER and PATRICK MICHAEL MCKEOUN had a telephone conversation regarding the purchase of cold pills (pseudoephedrine), a methamphetamine precursor.

176.    On September 14, 2008, defendants JEFF GARVIN SMITH and PAUL DARRAH discussed the fact that DDMC member Person CC had been arrested and that RONALD LEON LAMBERT was going to look into the matter.  However, SMITH told DARRAH that "things aren't right," and DARRAH told SMITH that they should "run [Person CC] down the road before he fucking has something to tell on."  SMITH replied that they should get Person CC's motorcycle, and DARRAH agreed, "that's mine and yours."

177.    On September 23, 2008, defendant PAUL ANTHONY DARRAH maintained hydrocodone (Vicodin pills) and numerous empty hydrocodone bottles at his residence in Macomb

46

Township, Michigan.

178.    On September 23, 2008, (now deceased) DDMC member Christopher Marrocco possessed and maintained hydrocodone, a shotgun, photos, and records related to obtaining "scripts" at his residence in Algonac, Michigan.

179.    On September 23, 2008, defendant GARY LEE NELSON maintained hydrocodone, notes regarding sale of 50/50 tickets, photos, and DDMC raffle tickets, at his residence in Marine City, Michigan.

180.    On September 23, 2008, defendant JEFF GARVIN SMITH possessed DDMC raffle tickets, photos, case law on: search and seizure, use of informants, and federal leadership role enhancement.

181.    On September 24, 2008, former DDMC member DANNY RUSSELL BURBY, JR. reported to police the theft of his 2007 Harley Davidson motorcycle, worth approximately $27,000.

182.    On October 17, 2008, defendants CARY DALE VANDIVER and Person KK transported in a vehicle in Chesterfield Township, Michigan, approximately 4.92 grams of methamphetamine, approximately 42.4 grams of red phosphorus (a methamphetamine precursor chemical), an electronic digital scale, 16 pills containing assorted controlled substances, and various drug packaging materials.

183.    On January 30, 2009, defendants JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, CARY DALE VANDIVER, and other DDMC members traveled to the Hells Our Home and Next of Kin clubhouses in St. Clair County, Michigan.

184.    In or about February 2009, the exact dates being unknown to the Grand Jury, various DDMC members circulated flyers containing a photograph of DANNY RUSSELL BURBY, JR., which stated that BURBY is a "snitch."

47

185.    On or about February 15, 2009, defendants RONALD RAYMOND ROBERTS, CHRISTOPHER RAYMOND COOK, and WAYNE RUSSELL WERTH assaulted DANNY RUSSELL BURBY, JR., with a box cutter and a bottle, at the Lighthouse Tavern in Fair Haven, Michigan.

186.    On April 1, 2009, DDMC associates DEAN ANTHONY TAGLIAVIA, Person EE, and Person II possessed hydrocodone, Person II possessed a firearm, and TAGLIAVIA possessed marijuana and cocaine, at their residences in Port Huron, Roseville, and Marine City, Michigan.

187.    On April 1, 2009, defendant DAVID ROY DELONG possessed a loaded firearm.

188.    On April 1, 2009, defendant JOHN RENNY RIEDE possessed marijuana and drug paraphernalia.

189.    On April 2, 2009, defendant SCOTT THOMAS PERKINS possessed hydrocodone.

190.    On March 9, 2010, defendant PAUL ANTHONY DARRAH maintained DDMC raffle tickets, ticket stubs, Mt. Clemens tax bill receipt, and a raffle ticket ledger at his residence in Macomb Township, Michigan.

191.    On March 9, 2010, a motorcycle (raffle prize) was seized in Goodells, Michigan.

192.    During 2010 to in or about February 12, 2011, the exact dates being unknown to the Grand Jury, defendant RONALD RAYMOND ROBERTS operated a methamphetamine manufacturing laboratory on Dresden Street, Detroit, and at various times, several DDMC members, including DAVID THOMAS ROBERTS, DAVID RANDY DROZDOWSKI, JASON COOK, and DDMC associates including WAYNE RUSSELL WERTH, supplied RONALD RAYMOND ROBERTS with pseudoephedrine and other methamphetamine manufacturing materials.

193.    On or about February 12, 2011, defendants RONALD RAYMOND ROBERTS and SCOTT WILLIAM SUTHERLAND possessed several firearms including a 9 mm handgun, a

48

shotgun, and an assault rifle which they used to protect their methamphetamine laboratory located in Detroit, Michigan.

194.    On February 14 and 15, 2011, RONALD RAYMOND ROBERTS possessed methamphetamine manufacturing materials, including pseudoephedrine, lithium batteries, drain cleaner, Coleman (camp stove) fuel, rubber gloves, masks, kosher salt, cold packs, coffee filters and methamphetamine at the Dresden address.

195.    On or about September 24, 2011, defendant PATRICK MICHAEL MCKEOUN taught defendant DAVID THOMAS ROBERTS how to better manufacture methamphetamine by using a fish tank pump to change the liquid methamphetamine into a powder.

196.    On or about September 26, 2011, defendants PATRICK MICHAEL MCKEOUN and DAVID THOMAS ROBERTS manufactured approximately 5 grams of methamphetamine.

197.    Between approximately September 24-26, 2011, defendant PATRICK MICHAEL MCKEOUN attended the DDMC Steak Fry Party at the Mt. Clemens clubhouse.

198.    On September 27, 2011, defendant DAVID THOMAS ROBERTS placed trash bags containing methamphetamine manufacturing materials, including empty boxes of pseudoephedrine, empty boxes of batteries, charred/burnt aluminum foil that field tested positive for methamphetamine, and drug paraphernalia at the curb at D. ROBERTS' house for trash pickup.

199.    On or about October 3, 2011, defendant DAVID THOMAS ROBERTS possessed at his home in Roseville, Michigan, pseudoephedrine pills, lithium batteries, mason jars, and a fish tank air pump all of which is used to manufacture methamphetamine, and a scale.

200.    On or about January 8, 2012, defendants DAVID RANDY DROZDOWSKI and SMILEY VILLA assaulted an individual they believed was a member of a rival motorcycle club for being present in DDMC territory, causing him injury, at a bar in Chesterfield Township, Michigan.

201.    On or about January 18, 2012, defendant DAVID RANDY DROZDOWSKI

possessed at his house in Fair Haven, Michigan, various methamphetamine manufacturing products

such as iodine, brake cleaner, cutting agents, and cold medicine containing pseudoephedrine.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT 2
### (18 U.S.C. §§ 371, 1955 – CONSPIRACY TO CONDUCT AN ILLEGAL GAMBLING BUSINESS)

D-5    JEFF GARVIN SMITH
D-6    PAUL ANTHONY DARRAH
D-7    CARY DALE VANDIVER
D-9    MICHAEL WILLIAM MASTROMATTEO
D-10   VERNON NELSON RICH
D-11   JOHN RENNY RIEDE
D-13   GARY LEE NELSON
D-15   RAYMOND CHARLES MELIOLI
D-16   TIMOTHY PAUL DOWNS
D-22   RONALD NICK PRELETZ
D-23   HOWARD JOSEPH QUANT
D-25   CLIFFORD CHANSEL RHODES II
D-26   DAVID ROY DELONG
D-27   CHRISTOPHER RAYMOND COOK
D-28   MICHAEL JOHN PALAZZOLA
D-32   EDWARD ALLEN TAYLOR

From in or about the early 1990s, the exact date being unknown to the Grand Jury, and

continuing through the date of this Indictment, in the Eastern District of Michigan and elsewhere,

JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, CARY DALE VANDIVER, MICHAEL

WILLIAM MASTROMATTEO, VERNON NELSON RICH, JOHN RENNY RIEDE, GARY LEE

NELSON, RAYMOND CHARLES MELIOLI, TIMOTHY PAUL DOWNS, RONALD NICK

PRELETZ, HOWARD JOSEPH QUANT, CLIFFORD CHANSEL RHODES II, DAVID ROY

DELONG, CHRISTOPHER RAYMOND COOK, MICHAEL JOHN PALAZZOLA, EDWARD

ALLEN TAYLOR, defendants herein, and others both known and unknown to the Grand Jury, did

50

unlawfully, willfully, and knowingly combine, conspire, confederate, and agree among themselves and others to commit an offense against the United States, to wit: to violate Title 18, United States Code, Section 1955.

## MANNER, MEANS AND METHODS OF THE CONSPIRACY

1.      It was a part of the conspiracy that the defendants herein would conduct, finance, manage, supervise, direct, and own all or part of an illegal gambling business, said illegal gambling business involving the maintaining of slot machines; in violation of the laws of the State of Michigan, Mich. Comp. Law §750.157a (b) and §§ 750.301 through 750.303, in which said business was conducted; which illegal gambling business involved, during the period aforesaid, five or more persons who conducted, financed, managed, supervised, directed and owned all or a part thereof; and which gambling business remained in substantially continuous operation for a period in excess of thirty days.

2.      It was further a part of the conspiracy that MICHAEL WILLIAM MASTROMATTEO would purchase, own, and maintain certain gambling machines (hereinafter "slot machines") located in several DDMC clubhouses in Michigan, including but not limited to the Mt. Clemens, Blue Water and Port Huron Clubhouses.

3.      It was further a part of the conspiracy that JOHN RENNY RIEDE would assist MICHAEL WILLIAM MASTROMATTEO with the maintenance and repair of the slot machines.

4.      It was further part of the conspiracy in approximately 2006, that VERNON NELSON RICH would take over for MICHAEL WILLIAM MASTROMATTEO, and purchase, own and maintain the slot machines located in several DDMC clubhouses in Michigan, including but not limited to the Mt Clemens and Port Huron Clubhouses to generate income for the DDMC and its members.

5.      It was further a part of the conspiracy that TIMOTHY PAUL DOWNS would purchase, own, and maintain the slot machines located in the Blue Water Clubhouse, to generate income for the DDMC and its members.

6.      It was further a part of the conspiracy that GARY LEE NELSON would maintain the slot machines located in the Blue Water Clubhouse, to generate income for the DDMC and its members.

7.      It was further a part of the conspiracy that the slot machines would be altered to pay out cash and/or coins, in violation of the laws of the State of Michigan, in order to generate income to the DDMC and its members.

8.      It was further a part of the conspiracy that the slot machines would be placed in DDMC clubhouses in Michigan, Arizona, and Alabama in order to generate income for the DDMC and its members.

9.      It was further a part of the conspiracy that the slot machines would be transported to DDMC parties, events, and functions by various DDMC members, including but not limited to PAUL ANTHONY DARRAH, CARY DALE VANDIVER, and TIMOTHY PAUL DOWNS, to generate income for the DDMC and its members.

10.     It was further a part of the conspiracy that the slot machines would be available for use by DDMC members and associates, and to individuals who were permitted inside DDMC clubhouses or at DDMC events.

11.     It was further a part of the conspiracy that MICHAEL WILLIAM MASTROMATTEO and VERNON NELSON RICH would divide a percentage of the proceeds generated from the slot machines between themselves and the DDMC.

12.     It was further a part of the conspiracy that DDMC officers including RONALD NICK

52

PRELETZ, and others known and unknown to the Grand Jury, would use the proceeds from the slot machines for numerous DDMC related expenses, including but not limited to: to pay club related costs, to pay DDMC funeral costs, to fund DDMC events, and as a "road fund" to assist members with costs associated with travel between chapters

13.     It was further a part of the conspiracy that the proceeds from the machines would be made available to JEFF GARVIN SMITH, and other DDMC officers upon request.

14.     It was further a part of the conspiracy that the machines would be brought to businesses, including Games People Play for repair.

15.     It was further a part of the conspiracy that slot machines would be purchased by several different DDMC members, including JOHN RENNY RIEDE, RONALD NICK PRELETZ, CHRISTOPHER RAYMOND COOK, and Person GG.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its objects, the defendants and others committed and caused to be committed, among others, the following overt acts in the Eastern District of Michigan, and elsewhere:

1.     From approximately the mid 1990s until sometime after July 31, 2007, the exact dates being unknown to the Grand Jury,  MICHAEL WILLIAM MASTROMATTEO, operated, controlled, and serviced slot machines at several DDMC clubhouses in Michigan.

2.     Sometime several years prior to 2008, the exact date being unknown to the Grand Jury, MICHAEL WILLIAM MASTROMATTEO, and others unknown to the Grand Jury, stole a slot machine from Games People Play, located at 26445 Gratiot, Roseville, Michigan.  A few days later, MICHAEL WILLIAM MASTROMATTEO returned to Games People Play to purchase a manual for the machine MASTROMATTEO had stolen.

53

3.      On or about February 19, 2004, MICHAEL WILLIAM MASTROMATTEO, possessed gambling records, and gambling devices.

4.      On or about February 19, 2004, RONALD PRELETZ, possessed gambling records.

5.      On or about February 19, 2004, MICHAEL PALAZZOLA, possessed gambling records.

6.      On September 27, 2007, at approximately 10:09 p.m., VERNON NELSON RICH had a conversation with RAYMOND CHARLES MELIOLI.

7.      On September 29, 2007, at approximately 6:11 p.m., VERNON NELSON RICH had a telephone conversation with a DDMC associate.

8.      On October 3, 2007, at approximately 2:51 p.m., VERNON NELSON RICH had a telephone conversation with HOWARD QUANT.

9.      On October 12, 2007, at approximately 2:52 p.m., VERNON NELSON RICH received a voicemail message from JEFF GARVIN SMITH.

10.     On October 12, 2007, at approximately 4:40 p.m., VERNON NELSON RICH had a telephone conversation with JEFF GARVIN SMITH.

11.     On October 12, 2007, at approximately 6:02 p.m., VERNON NELSON RICH had a telephone conversation with JEFF GARVIN SMITH.

12.     On October 25, 2007, at approximately 4:13 p.m., VERNON NELSON RICH had a telephone conversation with Person LL.

13.     On October 29, 2007, at approximately 12:17 p.m., VERNON NELSON RICH had a telephone conversation with JOHN RENNY RIEDE.

14.     On October 29, 2007, at approximately 5:04 p.m., VERNON NELSON RICH had a telephone conversation with JOHN RENNY RIEDE.

15.     On October 30, 2007, at approximately 3:21 p.m., VERNON NELSON RICH had a telephone conversation with JOHN RENNY RIEDE.

16.     On November 15, 2007, at approximately 12:06 p.m. VERNON NELSON RICH had a telephone conversation with DAVID ROY DELONG.

17.     On November 15, 2007, at approximately 12:17 p.m., VERNON NELSON RICH had a telephone conversation with JOHN RENNY RIEDE.

18.     On November 16, 2007, at approximately 2:36 p.m., VERNON NELSON RICH had a telephone conversation with SALVATORE BATTAGLIA.

19.     On November 15, 2007, VERNON NELSON RICH possessed a toolbox containing parts and tools used to maintain and repair slot machines, slot machine keys, gambling records, and other related items.

20.     On November 15, 2007, VERNON NELSON RICH possessed slot machines, including a Double Fortune, a Malibu Fortune, and a High Roller, which paid out cash and contained coins and currency, records/documents related to slot/poker machines, keys, cash, and tools and parts for slot/poker machines.

21.     On November 15, 2007, JOHN RENNY RIEDE possessed gambling proceeds.

22.     On November 21, 2007, at approximately 2:17 p.m. VERNON NELSON RICH had a telephone conversation with Person HH.

23.     On November 15, 2007, DAVID ROY DELONG and other DDMC members maintained and possessed five slot machines containing coins and currency, documents related to slot machines, and club-related financial records at the Port Huron Clubhouse.

24.     On November 15, 2007, DAVID ROY DELONG possessed club-related financial records, cash in his residence, located on the Port Huron Clubhouse property.

25.     On November 15, 2007, various members of the DDMC possessed and maintained one slot machine containing coins, currency, and documents, all at the Blue Water Clubhouse.

26.     On November 15, 2007, various members of the DDMC possessed and maintained two slots, and two poker machines, each containing coins, currency, and documents, and club-related financial records at the Mt. Clemens/Detroit Clubhouse.

27.     On June 30, 2008, at approximately 11:31 a.m., PAUL ANTHONY DARRAH had a telephone conversation with JEFF GARVIN SMITH.

28.     On June 30, 2008, at approximately 11:40 a.m., PAUL ANTHONY DARRAH had a telephone conversation with TIMOTHY PAUL DOWNS.

29.     On June 30, 2008, at approximately 2:34 p.m., PAUL ANTHONY DARRAH had a telephone conversation with TIMOTHY PAUL DOWNS.

30.     On October 30, 2008, TIMOTHY PAUL DOWNS possessed two slot machines and keys.

All in violation of Title 18, United States Code, Sections 371 and 1955.

**COUNT 3**
(21 U.S.C. §§ 846, 841(a)(1) – CONSPIRACY TO MANUFACTURE, DISTRIBUTE, AND POSSESS
WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES)

| | |
|---|---|
| D-1 | SCOTT WILLIAM SUTHERLAND |
| D-2 | RONALD RAYMOND ROBERTS |
| D-3 | DAVID THOMAS ROBERTS |
| D-4 | PATRICK MICHAEL MCKEOUN |
| D-5 | JEFF GARVIN SMITH |
| D-6 | PAUL ANTHONY DARRAH |
| D-7 | CARY DALE VANDIVER |
| D-8 | VINCENT JAMES WITORT |
| D-10 | VERNON NELSON RICH |
| D-11 | JOHN RENNY RIEDE |
| D-13 | GARY LEE NELSON |
| D-15 | RAYMOND CHARLES MELIOLI |
| D-16 | TIMOTHY PAUL DOWNS |
| D-17 | DAVID RANDY DROZDOWSKI |
| D-18 | SMILEY VILLA |
| D-21 | SYLVESTER GERARD WESAW |
| D-23 | HOWARD JOSEPH QUANT |
| D-24 | SCOTT THOMAS PERKINS |
| D-29 | DANNY RUSSELL BURBY, JR. |
| D-31 | JASON JOSEPH COOK |
| D-33 | SALVATORE BATTAGLIA |
| D-34 | WILLIAM SCOTT LONSBY |
| D-35 | WAYNE RUSSELL WERTH |

That from in or about 1992, through on or about the date of this indictment, in the Eastern

District of Michigan, and elsewhere; including Alabama, Arizona, California, Indiana and Ohio,

SCOTT WILLIAM SUTHERLAND, RONALD RAYMOND ROBERTS, DAVID THOMAS

ROBERTS, PATRICK MICHAEL MCKEOUN, JEFF GARVIN SMITH, PAUL ANTHONY

DARRAH, CARY DALE VANDIVER, VINCENT JAMES WITORT, VERNON NELSON RICH,

JOHN RENNY RIEDE, GARY LEE NELSON, RAYMOND CHARLES MELIOLI, TIMOTHY

PAUL DOWNS, DAVID RANDY DROZDOWSKI, SMILEY VILLA, SYLVESTER WESAW,

HOWARD JOSEPH QUANT, SCOTT THOMAS PERKINS, DANNY RUSSELL BURBY, JR.,

JASON JOSEPH COOK, SALVATORE BATTAGLIA, WILLIAM SCOTT LONSBY, WAYNE

RUSSELL WERTH, defendants herein, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other, and with other persons, whose names are both known and unknown to the Grand Jury, to commit offenses against the United States, that is, to manufacture, distribute, and possess with the intent to distribute, more than 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and hydrocodone, Schedule II controlled substances, all in violation of Title 21, United States Code, Sections 841(a)(1), 846.

## COUNT 4
### (21 U.S.C. §841 (a)(1), 18 U.S.C. §2 – DISTRIBUTION OF METHAMPHETAMINE)

D-7    CARY DALE VANDIVER
D-10   VERNON NELSON RICH

On or about August 4, 2007, in the Eastern District of Michigan, VERNON NELSON RICH, and CARY DALE VANDIVER, defendants herein, aided and abetted by one another, did knowingly, intentionally and unlawfully, distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNT 5
### (21 U.S.C. §841 (a)(1), (b)(1)(C), 18 U.S.C. §2 – DISTRIBUTION OF METHAMPHETAMINE, AIDING AND ABETTING)

D-6    PAUL ANTHONY DARRAH
D-10   VERNON NELSON RICH

On or about September 6, 2007, in the Eastern District of Michigan, PAUL ANTHONY DARRAH and VERNON NELSON RICH, defendants herein, aided and abetted by one another, did knowingly, intentionally and unlawfully, distribute methamphetamine, a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNT 6
### (21 U.S.C. §§ 841(a)(1), 846 – CONSPIRACY TO POSSESS AND DISTRIBUTE HYDROCODONE)

D-10   VERNON NELSON RICH
D-36   LAURI ANN LEDFORD

Between approximately September 25, 2007 through November 15, 2007, the exact dates being unknown to the Grand Jury, in the Eastern District of Michigan, VERNON NELSON RICH, and LAURI ANN LEDFORD, defendants herein, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other, and with other persons, whose names are both known and unknown to the Grand Jury, to commit an offense against the United States, that is to possess with the intent to distribute hydrocodone, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1), 846.

## COUNTS 7-14
### (21 U.S.C. §843(b) – USE OF A COMMUNICATIONS FACILITY TO CAUSE AND FACILITATE A FELONY DRUG TRANSACTION)

D-37   JENNIFER LEE CICOLA
D-38   DEAN TAGLIAVIA
D-39   ALEXIS CATHERINE MAY
D-40   PAULA MILEHA FRISCIONI

On the dates listed below, in the Eastern District of Michigan and elsewhere, the defendants listed below, and others known and unknown to the Grand Jury, did knowingly and intentionally use a communication facility, that is, a telephone, to commit, cause, and facilitate the commission of the offenses of conspiracy to manufacture, distribute, and to possess with intent to distribute controlled substances, including methamphetamine, hydrocodone, and other prescription medications, which

is a felony under Title 21, United States Code, Sections 846 and 841(a)(1), as follows:

| COUNT | DATE AND APPROXIMATE TIME | FROM | TO |
|-------|---------------------------|------|-----|
| 7 | Sept. 29, 2007 1:14 p.m. | ALEXIS CATHERINE MAY | VERNON NELSON RICH |
| 8 | Oct. 19, 2007 12:44 p.m. | ALEXIS CATHERINE MAY | VERNON NELSON RICH |
| 9 | Oct. 29, 2007 10:26 a.m. | PAULA MILEHA FRISCIONI | VERNON NELSON RICH |
| 10 | Nov. 13, 2007 7:48 a.m. | PAULA MILEHA FRISCIONI | VERNON NELSON RICH |
| 11 | May 14, 2008 12:16 p.m. | PAUL ANTHONY DARRAH | DEAN ANTHONY TAGLIAVIA |
| 12 | May 20, 2008 5:02 p.m. | PAUL ANTHONY DARRAH | JENNIFER LEE CICOLA |
| 13 | July 23, 2008 10:54 a.m. | PAUL ANTHONY DARRAH | DEAN ANTHONY TAGLIAVIA |
| 14 | Sept. 5, 2008 7:11 p.m. | PAUL ANTHONY DARRAH | JENNIFER LEE CICOLA |

All in violation of Title 21, United States Code, Section 843(b).

## COUNT 15
### (21 U.S.C. §841 (a)(1), (b)(1)(C) – DISTRIBUTION OF METHAMPHETAMINE)

D-10   VERNON NELSON RICH

On or about October 26, 2007, in the Eastern District of Michigan, VERNON NELSON

RICH, defendant herein, did knowingly, intentionally and unlawfully, distribute methamphetamine,

a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1),

(b)(1)(C).

60

## COUNT 16
### (21 U.S.C. §841 (a)(1), (b)(1)(C) – POSSESSION WITH INTENT TO DELIVER METHAMPHETAMINE)

D-10    VERNON NELSON RICH

On or about October 29, 2007, in the Eastern District of Michigan, VERNON NELSON

RICH, defendant herein, did knowingly, intentionally and unlawfully, distribute methamphetamine,

a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1),

(b)(1)(C).

## COUNT 17
### (21 U.S.C. § 841(a)(1), (b)(1)(C) – POSSESSION WITH INTENT TO DISTRIBUTE METHAMPHETAMINE)

D-11    JOHN RENNY RIEDE

On or about November 15, 2007, in the Eastern District of Michigan, JOHN RENNY

RIEDE, defendant herein, did knowingly, intentionally and unlawfully possess with the intent to

distribute a mixture or substance containing methamphetamine, in violation of Title 21, United

States Code, Section 841(a)(1), (b)(1)(C).

## COUNT 18
### (21 U.S.C. § 841(a)(1), (b)(1)(D) – POSSESSION WITH INTENT TO DISTRIBUTE MARIJUANA)

D-11    JOHN RENNY RIEDE

On or about November 15, 2007, in the Eastern District of Michigan, JOHN RENNY

RIEDE, defendant herein, did knowingly, intentionally and unlawfully possess with the intent to

distribute a mixture or substance containing marijuana, in violation of Title 21, United States Code,

61

Section 841(a)(1), (b)(1)(D).

## COUNT 19
(18 U.S.C. §§922(g)(1) – FELON IN POSSESSION OF FIREARMS AND AMMUNITION)

D-10     VERNON NELSON RICH

On or about November 15, 2007, in the Eastern District of Michigan, VERNON NELSON

RICH, defendant herein, having been previously convicted of a crime punishable by imprisonment

for a term exceeding one year (a felony offense), did knowingly possess firearms and ammunition,

to wit, a Remington Model 1100 shotgun, serial number 229G31X and ammunition, which were

manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce,

all in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT 20
(18 U.S.C. § 1001(a) – FALSE STATEMENTS TO FEDERAL OFFICER)

D-26   DAVID ROY DELONG

1.     On or about November 15, 2007, in the Eastern District of Michigan, DAVID ROY

DELONG, defendant herein, did knowingly make and cause to be made materially false, fictitious,

and fraudulent statements and representations in a matter within the jurisdiction of a department or

agency of the United States by stating: (1) that he did not know who the current National President

of the DDMC was; (2) that he did not know who brought the four slot machines into the clubhouse

and that the machines were used for amusement only and only DDMC members were permitted to

use the machines; (3) and that when he received a telephone call on his cellular telephone from a

caller with telephone number (XXX) XXX-6858 at approximately 8:38 a.m., DELONG stated that

he did not know who the number belonged to and did not recognize the telephone number, all to a

62

Special Agent of the Federal Bureau of Investigation in Port Huron, Michigan.

      2.    The statements and representations were false because, as DAVID ROY DELONG

then and there knew, (1) JEFF GARVIN SMITH, a/k/a "Fat Dog" is the National President of the

DDMC, (2) VERNON NELSON RICH owned, operated, and maintained all of the slot machines

at the Port Huron Clubhouse and the slot machines paid out winnings in cash, and were used by

DDMC members and non-members alike; and (3) telephone number (XXX) XXX-6858 was a

number used by JEFF GARVIN SMITH, a/k/a "Fat Dog" and DELONG recognized the number as

"Fat Dog's" telephone number.

      All in violation of Title 18, United States Code, Section 1001(a).


### COUNT 21
(18 U.S.C. §§ 922(g)(1) -- FELON IN POSSESSION OF FIREARMS AND AMMUNITION)

D-23   HOWARD JOSEPH QUANT

      On or about December 11, 2007, in the Eastern District of Michigan, HOWARD QUANT,

defendant herein, having been previously convicted of a crime punishable by imprisonment for a

term exceeding one year (a felony offense), did knowingly possess firearms and ammunition, to wit,

a Topper, Model 158 shotgun, serial number AJ263142, and ammunition, which were manufactured

outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation

of Title 18, United States Code, Section 922(g)(1).


### COUNT 22
(18 U.S.C. §§922(g)(1) – FELON IN POSSESSION OF AMMUNITION)

D-10   VERNON NELSON RICH

      On or about December 11, 2007, in the Eastern District of Michigan, VERNON NELSON

RICH, defendant herein, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year (a felony offense), did knowingly possess ammunition, to wit: a .357 caliber bullet, a .38 caliber bullet, 9 millimeter bullets, and shotgun shells which were manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation of Title 18, United States Code, Section 922(g)(1).

### COUNT 23
(18 U.S.C. §922(g)(1)
FELON IN POSSESSION OF AMMUNITION)

D-29   DANNY RUSSELL BURBY, JR.

On or about December 11, 2007, in the Eastern District of Michigan, DANNY RUSSELL BURBY, JR., defendant herein, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year (a felony offense), did knowingly possess ammunition, to wit: shotgun shells, which were manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation of Title 18, United State Code, Section 922(g)(1).

### COUNT 24
(21 U.S.C. §841(a)(1), (b)(1)(C) -- POSSESSION WITH INTENT TO DISTRIBUTE
METHAMPHETAMINE)

D-32   EDWARD ALLEN TAYLOR

On or about January 28, 2008, in the Eastern District of Michigan, EDWARD ALLEN TAYLOR, defendant herein, did knowingly, intentionally, and unlawfully possess with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

**COUNT 25**

(18 U.S.C. §§ 2, 1952(a) – USING A FACILITY IN INTERSTATE COMMERCE TO FURTHER AN
UNLAWFUL ACTIVITY, AIDING AND ABETTING)

D-6     PAUL ANTHONY DARRAH
D-41    JOHN CHARLES SCUDDER

On or about July 26-27, 2008, in the Eastern District of Michigan, and elsewhere, defendants

PAUL ANTHONY DARRAH and JOHN CHARLES SCUDDER, aided and abetted by one another,

used a facility in interstate commerce, namely a telephone, with the intent to commit a crime of

violence to further an unlawful activity, that is, to commit an extortion in violation of Michigan

Compiled Laws 750.213, and thereafter committed and attempted to commit the crime of violence

to further such unlawful activity, all in violation of Title 18, United States Code, §§ 2,1952(a)(2).

**COUNT 26**

(18 U.S.C. § 1512(b)(3), (k) – CONSPIRACY TO OBSTRUCT JUSTICE BY WITNESS TAMPERING)

D-2     RONALD RAYMOND ROBERTS
D-5     JEFF GARVIN SMITH
D-6     PAUL ANTHONY DARRAH
D-7     CARY DALE VANDIVER
D-13    GARY NELSON
D-16    TIMOTHY PAUL DOWNS
D-27    CHRISTOPHER RAYMOND COOK
D-30    RONALD LEON LAMBERT
D-35    WAYNE RUSSELL WERTH

Between approximately August 2008 and February 2009, in the Eastern District of Michigan,

JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, GARY NELSON, CARY DALE

VANDIVER, TIMOTHY PAUL DOWNS, RONALD RAYMOND ROBERTS, CHRISTOPHER

RAYMOND COOK, RONALD LEON LAMBERT, and WAYNE RUSSELL WERTH, defendants

herein, and others known and unknown to the Grand Jury, did knowingly, intentionally and

unlawfully combine, conspire, confederate, and agree with each other to commit an offense against

65

the United States, that is, to intimidate, threaten, and assault DANNY RUSSELL BURBY, JR. with the intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of Federal offenses, including but not limited to: violations of Title 18 United States Code, Section 1959; Violent Crimes in Aid of Racketeering, and Title 18, United States Code, Section1962, Racketeering.

## OVERT ACTS

In furtherance of the conspiracy, and to achieve its objects, the defendants and others committed and caused to be committed, among others, the following overt acts in the Eastern District of Michigan:

1.      On August 3, 2008, PAUL ANTHONY DARRAH and JEFF GARVIN SMITH had a conversation and discussed DDMC member DANNY RUSSELL BURBY, JR. and his girlfriend, Person DD, and the fact that Person DD was "runnin' her mouth" about matters that had been discussed during a DDMC "church" meeting.

2.      On August 9, 2008, defendant PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation regarding DANNY RUSSELL BURBY, JR. and discussed BURBY's possession of and refusal to return NELSON's DDMC club ring.  DARRAH told NELSON, "if he sold the motherfucker [ring], he's out of the club." NELSON replied, "He sold that motherfucker.  I'm going to do damage to his house. . . and I'll do damage to his old lady's [body part]."

3.      On August 24, 2008, defendant JEFF GARVIN SMITH assaulted DDMC member DANNY RUSSELL BURBY, JR.'s girlfriend, Person DD, by slapping her,  grabbing and pulling her by her hair, throwing her to the ground, climbing atop her and punching Person DD in the face

and head, causing Person DD to sustain injury to her face, eyes, head, and elsewhere, after the girlfriend threw BURBY's DDMC colors to the ground at the Mt. Clemens clubhouse. BURBY pulled SMITH off of Person DD during the assault, and several DDMC members told BURBY to leave the party and surrender his motorcycle.

4.      Between August 24, 2008 and September 24, 2008, defendant JEFF GARVIN SMITH kicked DDMC member DANNY RUSSELL BURBY, JR. out of the DDMC for failing to abide by club rules and ordered him to turn over his motorcycle and club paraphernalia.

5.      On August 25, 2008, defendant PAUL ANTHONY DARRAH had several conversations about the assault of Person DD:

a.      A conversation with defendant GARY LEE NELSON in which DARRAH asked if anyone had talked with BURBY or his girlfriend since the assault. DARRAH questioned whether BURBY or Person DD had reported the assault to the police. NELSON stated that it wouldn't be a good thing for the girlfriend to call the police, and NELSON and DARRAH discussed what they would say if questioned about the incident. NELSON told DARRAH, "but as far as I'm concerned she wasn't even there I don't even know what the fuck she's talking about."

b.      A conversation with NELSON where NELSON advised DARRAH that Person DD's face was swollen and that she could not open up her eyes.

c.      A conversation with defendant JEFF GARVIN SMITH where SMITH admitted to assaulting Person DD, and stated that "the way I look at it, you leave your. . . drunk ol' lady, disrespectful ol 'lady for me to deal with her and you don't wanna deal with her, I'll deal with her." In this conversation, DARRAH advised SMITH that he ordered GARY NELSON to communicate with BURBY that if he wants to quit the club, he must do so at a "church" meeting,

67

and that he must surrender his motorcycle and his DDMC property (colors).

6.     On August 26, 2008, defendant JEFF GARVIN SMITH had a conversation with PAUL DARRAH and told DARRAH that BURBY will "get" the "same thing that fucking, that no good [profanity] [Person DD] got too. . ." and SMITH told DARRAH that BURBY cannot quit the club because he is kicked out of the club. After this conversation, PAUL ANTHONY DARRAH advised DDMC members and members of other motorcycle clubs that BURBY was kicked out of the club and was in "bad standing."

7.     On September 2, 2008, PAUL ANTHONY DARRAH had a conversation with TIMOTHY PAUL DOWNS and discussed going over to BURBY's house to "get our shit back" from BURBY.

8.     On September 7, 2008, PAUL ANTHONY DARRAH called GARY LEE NELSON regarding BURBY. DARRAH told NELSON, "you need to fucking get a hold of fucking Thumbs [BURBY] and get our shit back and tell him to shut his motherfucking mouth before he doesn't have one to shut." DARRAH also told NELSON, "tell him we want our shit or we're coming over there fucking and I'll burn his fucking house down."

9.     On September 7, 2008, defendant PAUL ANTHONY DARRAH had a conversation with an individual and warned Hell's Our Home (HOH) Motorcycle Club that Person DD called the police on BURBY and on the club, and that DARRAH did not know if BURBY called the police or if he's "saying anything" but that if he's condoning it [cooperation], then it's the same thing.

10.     On or about September 8, 2008, defendants PAUL ANTHONY DARRAH and GARY LEE NELSON had a telephone conversation and DARRAH told NELSON to send four DDMC members to BURBY'S house to collect DDMC property.

11.     On September 22, 2008, PAUL ANTHONY DARRAH and GARY LEE NELSON

68

had a conversation regarding Burby's scheduled court appearance. DARRAH told NELSON to find out what he could because, DARRAH explained, if BURBY was not in jail, then something was wrong.

12.     On September 23, 2008, after federal search warrants were executed at the residences of JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, GARY LEE NELSON, and (now deceased) DDMC prospect Christopher Marrocco, DARRAH had several conversations with SMITH, NELSON and Marrocco and others to discuss the execution of the search warrants. During one conversation, DARRAH told Marrocco to cut the conversation short since they are on the telephone, and that since DARRAH's place was also searched, "it's probably from that fucking Burby." The following day, on September 24, 2008, DANNY RUSSELL BURBY, JR. reported to police the theft of his 2007 Harley Davidson motorcycle, worth approximately $27,000.

13.     On September 29, 2008, PAUL ANTHONY DARRAH recounted to JEFF GARVIN SMITH his conversation with the President of the Next of Kin (NOK) Motorcycle Club. DARRAH told SMITH he warned the NOK that DANNY BURBY was a snitch, and DARRAH remarked that three weeks after BURBY provided information about the DDMC, search warrants were executed at DDMC locations.

14.     On January 28, 2009, PAUL ANTHONY DARRAH had a conversation with EDWARD TAYLOR and told TAYLOR there was something he wants TAYLOR to take care of in Marine City, Michigan, but DARRAH did not want to discuss the matter over the telephone.

15.     Between January 28, 2009 and January 30, 2009, TAYLOR had a conversation with RONALD LAMBERT, who advised TAYLOR that BURBY was working with the "feds" and running his mouth, and that DARRAH wanted TAYLOR to assault/beat-up BURBY. LAMBERT told TAYLOR that a meeting had been scheduled for January 30, 2009 at 7:00 p.m. at the Marwood

69

Bar to discuss the matter and to locate and assault BURBY.

16.     On January 30, 2009, JEFF GARVIN SMITH, PAUL ANTHONY DARRAH, CARY DALE VANDIVER, and several other DDMC members met at the Marwood Bar at approximately 7:00 p.m.  After the meeting, SMITH told DDMC members that they were heading to the HOH clubhouse.

17.     On January 30, 2009, three cars full of DDMC members traveled to the HOH clubhouse in Marine City, Michigan and SMITH, DARRAH, VANDIVER and other DDMC members entered the HOH clubhouse for approximately 20 minutes and provided HOH with flyers that contained BURBY's photograph and stated that he is a "snitch."

18.     On January 30, 2009, SMITH, DARRAH, VANDIVER and other DDMC members then traveled to the NOK clubhouse in Algonac, Michigan, where SMITH, DARRAH, and VANDIVER and other members entered the NOK clubhouse and provide NOK with flyers that contained BURBY's photograph and stated that he is a "snitch."

19.     On February 10, 2009, defendant PAUL ANTHONY DARRAH told the FBI that he was unaware that flyers containing BURBY's photograph and the word "snitch" were being posted at various locations in St. Clair County, and denied ever having seen the flyer.  DARRAH told the FBI that he would use the FBI's visit to stop this activity from occurring.

20.     On or about February 14, 2009, defendants RONALD RAYMOND ROBERTS, CHRISTOPHER RAYMOND COOK, and WAYNE RUSSELL WERTH went to the Lighthouse Bar in Fair Haven, Michigan to locate DANNY RUSSELL BURBY, JR.

21.     On or about February 15, 2009, defendants RONALD RAYMOND ROBERTS, CHRISTOPHER RAYMOND COOK, and DDMC associate WAYNE RUSSELL WERTH returned to the Lighthouse Bar in Fair Haven, Michigan, and assaulted DANNY RUSSELL BURBY, JR. with

70

dangerous weapons, including a box cutter and a bottle. COOK arrived at the Lighthouse Bar wearing body armor, and carrying a firearm.

All in violation of Title 18, United States Code, Section 1512(b)(3), (k).


### COUNT 27
(21 U.S.C. §§841(a)(1), (b)(1)(C) – POSSESSION WITH INTENT TO DISTRIBUTE METHAMPHETAMINE)

D-7    CARY DALE VANDIVER

On or about October 17, 2008, in the Eastern District of Michigan, CARY DALE VANDIVER, defendant herein, did knowingly, intentionally, and unlawfully possess with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).


### COUNT 28
(21 U.S.C. § 843(a)(6) – POSSESSION OF METHAMPHETAMINE PRECURSORS)

D-7    CARY DALE VANDIVER

On or about October 17, 2008, in the Eastern District of Michigan, CARY DALE VANDIVER, defendant herein, did knowingly and intentionally possess equipment, chemicals, products, and materials, including red phosphorus, used to manufacture a controlled substance, to-wit: methamphetamine; defendant knowing and having reasonable cause to believe that said equipment, chemicals, products, and materials would be used to manufacture methamphetamine, all in violation of Title 21, United States Code, Section 843(a)(6).

## COUNT 29
(18 U.S.C. §§1959(a)(6) – ATTEMPTED ASSAULT IN AID OF RACKETEERING ACTIVITY)

D-5   JEFF GARVIN SMITH

1.     At all times relevant to this Indictment, the DDMC criminal enterprise, as described more particularly in paragraphs 1 through 9 of Count 1, which paragraphs are incorporated and re-alleged herein as if set forth in full, constituted an enterprise as that term is defined in Title 18, United States Code, Section 1959 (b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2.     At all times relevant to this Indictment, the DDMC criminal enterprise, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846, 856, and acts involving murder, robbery, extortion, kidnaping, bribery, and trafficking in controlled substances chargeable under the provisions of the Michigan Compiled Laws, Indiana Code, and Arizona Revised Statutes, and acts  indictable under Title 18, United States Code, Sections 1503 (obstruction of justice), 1510 (obstruction of criminal investigations), 1512 (tampering with a witness, victim, or informant), 1513 (retaliation against a witness, victim, or informant), 1591 (sex trafficking by force, fraud or coercion), 1952 (interstate travel in aid of racketeering), 1955 (illegal gambling), 2312 (interstate transportation of stolen vehicles), and 2313 (sale or receipt of stolen vehicles).

3.     On or about August 24, 2008, in the Eastern District of Michigan, for the purpose of maintaining and increasing position in the DDMC enterprise, an enterprise engaged in racketeering

72

activity, JEFF GARVIN SMITH, defendant herein, and others known and unknown to the Grand Jury, did unlawfully and knowingly attempt to commit an assault resulting in seriously bodily injury on Person DD, in violation of Michigan Penal Code, Sections 750.84, 750.92, all in violation of Title 18, United States Code, Section 1959 (a)(6).

## COUNT 30
### (18 U.S.C. §§1959(a)(3), 2 – ASSAULT IN AID OF RACKETEERING ACTIVITY, AIDING AND ABETTING)

D-5    JEFF GARVIN SMITH
D-6    PAUL ANTHONY DARRAH
D-7    CARY DALE VANDIVER

1.      Paragraphs 1 through 9 of Count 1, and Paragraphs 1 and 2 of Count 29 are incorporated and re-alleged herein as if set forth in full.

2.      Between approximately September and December 2008, in the Eastern District of Michigan, for the purpose of maintaining and increasing position in the DDMC enterprise, an enterprise engaged in racketeering activity, JEFF GARVIN SMITH, aided and abetted by PAUL ANTHONY DARRAH, CARY DALE VANDIVER, defendants herein, and others known and unknown to the Grand Jury, did unlawfully and knowingly assault Scott Thomas Perkins with a dangerous weapon, that is, a metal pipe or auto-club, in violation of Michigan Penal Code, Sections 750.82(1), 767.39, all in violation of Title 18, United States Code, Sections 2 and 1959(a)(3).

## COUNT 31
### (18 U.S.C. §§1959(a)(3), 2 – ASSAULT IN AID OF RACKETEERING ACTIVITY, AIDING AND ABETTING)

D-2    RONALD RAYMOND ROBERTS
D-27   CHRISTOPHER RAYMOND COOK
D-35   WAYNE RUSSELL WERTH

1.      Paragraphs 1 through 9 of Count 1, and Paragraphs 1 and 2 of Count 29 are

incorporated and re-alleged herein as if set forth in full.

2.      On or about February 14-15, 2009, in the Eastern District of Michigan, for the purpose of maintaining and increasing position in the DDMC enterprise, an enterprise engaged in racketeering activity, RONALD RAYMOND ROBERTS, CHRISTOPHER RAYMOND COOK, and WAYNE RUSSELL WERTH, defendants herein, aided and abetted by each other, did unlawfully and knowingly assault DANNY BURBY with dangerous weapons, to wit: a knife/box-cutter and a bottle, all in violation of Michigan Penal Code, Sections 750.82 (1) and 767.39, all in violation of Title 18, United States Code, Sections 2 and 1959 (a)(3).

### COUNT 32
#### (18 U.S.C. §924(c) – USING, CARRYING AND POSSESSING A FIREARM DURING A CRIME OF VIOLENCE)

D-27   CHRISTOPHER RAYMOND COOK

On or about February 14-15, 2009, in the Eastern District of Michigan, CHRISTOPHER RAYMOND COOK, defendant herein, did knowingly use and carry a firearm, that is a handgun, during and in relation to a crime of violence, and did knowingly possess a firearm in furtherance of a crime of violence, that is, Violent Crime in Aid of Racketeering, as alleged in Count 31 of this indictment, all in violation of Title 18, United States Code, Section 924(c).

### COUNT 33
#### (18 U.S.C. § 1623 – PERJURY)

D-20   TONY WAYNE KITCHENS

1.      On or about July 22, 2009, in the Eastern District of Michigan, TONY WAYNE KITCHENS, defendant herein, while under oath and testifying in a proceeding before a Grand Jury

of the United States in the Eastern District of Michigan, knowingly did make a false material declaration, that is to say:

2.      At the time and place aforesaid the Grand Jury was conducting an investigation to determine whether violations of Title 18, United States Code, Section 1962, Title 21, United States Code, Section 841, and other offenses, had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations.

3.      It was material to the said investigation that the Grand Jury ascertain if TONY WAYNE KITCHENS had ever received approximately one pound of methamphetamine from JEFF GARVIN SMITH and PATRICK MICHAEL MCKEOUN during a party in Port Huron, Michigan on or about March 9, 2002; if JEFF GARVIN SMITH gave the defendant said methamphetamine so that defendant could profit from the sale of the methamphetamine and apply the profits from the sale to satisfy debts and to pay to rebuild a clubhouse that had burned during a fire; and if PATRICK MICHAEL MCKEOUN manufactured said methamphetamine.

4.      At the time and place alleged, TONY WAYNE KITCHENS, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matters alleged in paragraph 3 as follows:

"Q:      So when Magoo came to you and sat in your truck at this wild game feed, he indicated to you that he had something that could help satisfy the debt to you, the six to eight thousand that you have referenced.

A:      Yes.

Q:      Help pay for the rebuilding of the Sand Mountain Clubhouse?

A:      Yes.

Q:      Provide some money for [Person FF], because of his medical condition?

/5

A:     Yes.

Q:     And also satisfy debts that were owed to other members of the Devil's Disciples?

A:     Yes.

Q:     And pay dues that were owed to the state?

A:     Yes.

Q:     What was this something?

A:     It turned out that it was a pound of methamphetamine."

5.     At the time and place alleged, TONY WAYNE KITCHENS, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matters alleged in paragraph 3 as follows:

"A:     And Fat Dog gave his word that there was going to be enough money made to help – we would also be able to get [Person FF] some money."

6.     At the time and place alleged, TONY WAYNE KITCHENS, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matters alleged in paragraph 3 as follows:

"Q:     Did you accept the pound of meth with the intent of staying with the club."

A:     Yes.

Q:     Was the meth manufactured by Magoo, if you know?"

A:     Yes, it was."

7.     At the time and place alleged, TONY WAYNE KITCHENS, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matters alleged in paragraph 3 as follows: TONY WAYNE KITCHENS was asked, "so they were putting the stuff in the truck?" and Kitchens replied,

"Yeah.  Gun Control had the keys to lock the truck up and stuff."

8.      The aforesaid underscored testimony of TONY WAYNE KITCHENS, as he then and there well knew and believed, was false in that, on or about March 2002, defendant purchased methamphetamine in North Carolina, transported the methamphetamine to the party in Port Huron, Michigan during March 2002 with the intent to distribute the methamphetamine, and did not receive approximately one pound of methamphetamine from JEFF GARVIN SMITH or PATRICK MICHAEL MCKEOUN, or for the purpose of rebuilding the burned clubhouse.

All in violation of 18 United States Code, Section 1623.

## COUNT 34
(21 U.S.C. §860a, 18 U.S.C. §2
MANUFACTURING METHAMPHETAMINE WHERE CHILDREN RESIDE OR ARE PRESENT)

D-2   RONALD RAYMOND ROBERTS
D-35  WAYNE RUSSELL WERTH

Between approximately January 2011 through February 2011, in the Eastern District of Michigan, RONALD RAYMOND ROBERTS, defendant herein, did knowingly and intentionally manufacture a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, while an individual, who was under the age of 18 years was present and residing at 17378 Dresden, Detroit, Michigan, all in violation of Title 21, United States Code, Sections 841(a)(1), 860a, and Title 18 United States Code, Section 2.

## COUNT 35
(18 U.S.C. §922(g)(1) – FELON IN POSSESSION OF FIREARMS AND AMMUNITION)

D-2   RONALD RAYMOND ROBERTS

On or about February 12, 2011, in the City of Detroit, in the Eastern District of Michigan,

77

RONALD RAYMOND ROBERTS, defendant herein, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year (a felony offense), did knowingly possess firearms and ammunition, to wit: a Mossberg 500A 12 Gauge pistol grip shotgun, and ammunition, which were manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation of Title 18, United States Code, Section 922(g).

## COUNT 36
(18 U.S.C. §§1959(a)(3), 2 – ASSAULT IN AID OF RACKETEERING ACTIVITY, AIDING AND ABETTING)

D-17   DAVID DROZDOWSKI
D-18   SMILEY VILLA

1.      Paragraphs 1 through 9 of Count 1, and Paragraphs 1 and 2 of Count 29 are incorporated and re-alleged herein as if set forth in full.

2.      On or about January 8, 2012, in the Eastern District of Michigan, for the purpose of maintaining and increasing position in the DDMC enterprise, an enterprise engaged in racketeering activity, DAVID DROZDOWSKI and SMILEY VILLA, defendants herein, aided and abetted by each other, did unlawfully and knowingly assault Person MM, resulting in serious bodily injury, all in violation of Michigan Penal Code, Sections 750.84, 767.39, all in violation of Title 18, United States Code, Sections 2 and 1959 (a)(3).

## COUNT 37
(18 U.S.C. §922(g)(1) – FELON IN POSSESSION OF AMMUNITION)

D-17   DAVID RANDY DROZDOWSKI

On or about January 18, 2012, in Fair Haven, in the Eastern District of Michigan, DAVID RANDY DROZDOWSKI, defendant herein, having been previously convicted of a crime punishable

by imprisonment for a term exceeding one year (a felony offense), did knowingly possess ammunition, to wit: 20 gauge shotgun ammunition and rifle ammunition, which were manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation of Title 18, United States Code, Section 922(g).

## COUNT 38
(18 U.S.C. §922(g)(1) – FELON IN POSSESSION OF FIREARMS AND AMMUNITION)

D-31   JASON JOSEPH COOK

On or about June 8, 2012, in City of Warren, in the Eastern District of Michigan, JASON JOSEPH COOK, defendant herein, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year (a felony offense), did knowingly possess a firearm, to wit: a Sears & Roebuck, J.C. Higgins Model 583,12 gauge shotgun, and ammunition, which were manufactured outside the State of Michigan, and thus traveled in interstate and foreign commerce, all in violation of Title 18, United States Code, Section 922(g)(1).

## FORFEITURE ALLEGATIONS
(18 U.S.C. §§ 924, 981, 982, 1955, 1963 and 3665,
21 U.S.C. § 853 and 28 U.S.C. § 2461)

1.       The allegations set forth above in this Indictment are hereby incorporated by reference as if they were set forth in full herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 924(d), 981(a)(1)(C), 982(a)(5), 1955(d), 1963(a)(1)-(3) and 3665, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).

2.       Upon conviction of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) as alleged in this Indictment, the convicted defendants shall forfeit to the

United States, pursuant to Title 18, United States Code, Section 1963(a)(1)-(3):

    a.    any and all interest defendants have acquired or maintained in violation of 18 U.S.C. § 1962;

    b.    any and all interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any Enterprise named and described herein which defendants established, operated, controlled, conducted or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

    c.    any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

3.    Property subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1)-(3) includes all money and property which represents the value of the interests acquired and the gross proceeds obtained through the violation of Title 18, United States Code, Section 1962 as alleged in this Indictment.

4.    Pursuant to Title 21, United States Code, Section 853(a), upon conviction of any of the controlled substance offenses in violation of Title 21, United States Code, Sections 841, 843, 846, 856, and/or 860a, and/or Title 18, United States Code, Section 2, as alleged in this Indictment, the convicted defendant(s) shall forfeit to the United States: (a) any property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of such violations; and (b) any property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violations.

5.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 1955(d), and Title 28, United States Code, Section 2461(c), upon conviction of Title 18, United States Code,

Sections 371 and 1955 as alleged in this Indictment, the convicted defendant(s) shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, and any property, including money, used or involved in such violation.

6.      Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 924(d) and 1955(d), and Title 28, United States Code, Section 2461(c), upon conviction of Title 18, United States Code, Sections 2 and 1952(a) as alleged in this Indictment, the convicted defendant(s) shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, and any firearm(s) or ammunition used or involved in such violation.

7.      Upon being convicted of any of the firearms offenses alleged in this Indictment, in violation Title 18, United States Code, Sections 922(g)(1), 922(j) and/or 924(c), the convicted defendant(s) shall forfeit to the United States, any firearm and ammunition involved in or used in the knowing commission of such violation(s), pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c).

8.      Pursuant to Title 18, United States Code, Sections 982(a)(5) and 3665, upon being convicted of violating Title 18, United States Code, Section 2312 and/or 2313 as alleged in this Indictment, the convicted defendant(s) shall forfeit to the United States any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as a result of such violation(s), and any firearms and ammunition involved in such violation(s) or found in the possession of, or under the immediate control of, the convicted defendant(s) at the time of arrest.

81

9.     Upon being convicted of violating Title 18, United States Code, Section 1512 as alleged in this Indictment, the convicted defendant(s) shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

10.     <u>Substitute Assets</u>:  Pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), defendants shall forfeit any of their other property, real or personal, up to the value of property described above, if, by any act or omission of the defendant, the property subject to forfeiture:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred, sold to or deposited with a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 1963, Title 21, United States Code, Section 853(p), Title 18, United States Code, Section 982(b), Title 28, United States Code, Section 2461(c), and Rule 32.2, Federal Rules of Criminal Procedure.

11.     <u>Money Judgment</u>.  Upon conviction of one or more violations alleged in this Indictment, the Government will seek a forfeiture money judgment against the convicted defendants in an amount as is proved at trial in this matter representing the total amount of

proceeds obtained as a result of defendants' offenses, for which defendants shall be jointly and

severally liable.

THIS IS A TRUE BILL.

*s/Foreperson*
FOREPERSON

BARBARA L. McQUADE
United States Attorney

*s/Saima S. Mohsin*
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9100

*s/Eric M. Straus*
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9100

*s/Robert J. Livermore*
Trial Attorney
U.S. Department of Justice
Organized Crime and Gang Section

Dated: June 13, 2012

| United States District Court Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number** 11-CR-20129 |
| --- | --- | --- |

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

**Reassignment/Recusal Information** This matter was opened in the USAO prior to August 15, 2008   [ ]

| **Companion Case Information** | **Companion Case Number:** |
| --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** |
| ☐ Yes            ☐ No | **AUSA's Initials:** |

**Case Title:** USA v.
D-1   SCOTT WILLIAM SUTHERLAND, a/k/a "Scotty Z"
D-2   RONALD RAYMOND ROBERTS, a/k/a "Rockin' Ronnie"
D-3   DAVID THOMAS ROBERTS, a/k/a "Detroit Dave"
D-4   PATRICK MICHAEL MCKEOUN, a/k/a "Magoo"
D-5   JEFF GARVIN SMITH, a/k/a "Fat Dog"
D-6   PAUL ANTHONY DARRAH, a/k/a "Pauli"
D-7   CARY DALE VANDIVER, a/k/a "Gun Control"
D-8   VINCENT JOHN WITORT, a/k/a "Holiday"
D-9   MICHAEL WILLIAM MASTROMATTEO, a/k/a "Iron Mike"
D-10  VERNON NELSON RICH, a/k/a "Vern"
D-11  JOHN RENNY RIEDE, a/k/a "Bear"
D-12  VICTOR CARLOS CASTANO, a/k/a "Vic"
D-13  GARY LEE NELSON
D-14  MICHAEL KENNETH RICH, a/k/a "Tatu"
D-15  RAYMOND CHARLES MELIOLI, a/k/a "Romeo"
D-16  TIMOTHY PAUL DOWNS, a/k/a "Space"
D-17  DAVID RANDY DROZDOWSKI, a/k/a "D"
D-18  SMILEY VILLA, a/k/a "SA"
D-19  DEAN EDWARD JAKIEL, a/k/a "Jesus"
D-20  TONY WAYNE KITCHENS, a/k/a "Trouble"
D-21  SYLVESTER GERARD WESAW,  a/k/a "Sly Dog"
D-22  RONALD NICK PRELETZ, a/k/a "Polar Bear"
D-23  HOWARD JOSEPH QUANT, a/k/a "44"
D-24  SCOTT THOMAS PERKINS, a/k/a "Scooter, Scotty P"
D-25  CLIFFORD CHANSEL RHODES II, a/k/a "Cliff"
D-26  DAVID ROY DELONG, a/k/a "Reverend"
D-27  CHRISTOPHER RAYMOND COOK, a/k/a "Damien"
D-28  MICHAEL JOHN PALAZZOLA, a/k/a "Utica Mike"
D-29  DANNY RUSSELL BURBY, JR., a/k/a "Thumbs"
D-30  RONALD LEON LAMBERT, a/k/a "Crow"
D-31  JASON JOSEPH COOK, a/k/a "Cookie"
D-32  EDWARD ALLEN TAYLOR, a/k/a "Big Ed"
D-33  SALVATORE BATTAGLIA, a/k/a "Bando"
D-34  WILLIAM SCOTT LONSBY, a/k/a "Buck, Buckwheat"
D-35  WAYNE RUSSELL WERTH
D-36  LAURI ANN LEDFORD
D-37  JENNIFER LEE CICOLA
D-38  DEAN ANTHONY TAGLIAVIA
D-39  ALEXIS CATHERINE MAY

D-40   PAULA MILEHA FRISCIONI
D-41   JOHN CHARLES SCUDDER

_____

**County where offense occurred :**  Wayne _____

**Check One:**      **X Felony**            ☐ **Misdemeanor**          ☐ **Petty**

_____Indictment/_____Information --- **no** prior complaint.
_____Indictment/_____Information --- based upon prior complaint [Case number: ]
 X   Superseding Indictment --- based upon LCrR 57.10 (d) *[Complete Superseding section below].*

# Superseding Case Information

**Superseding to Case No: 11-CR-20129** _____      **Judge:** **Robert H. Cleland** _____
☐   Original case was terminated; no additional charges or defendants.
☐   Corrects errors; no additional charges or defendants.
☐   Involves, for plea purposes, different charges or adds counts.
**X**   Embraces same subject matter but adds the additional defendants or charges below:

**Defendant name**                                          **Charges**

D-5    JEFF GARVIN SMITH, a/k/a "Fat Dog"
D-6    PAUL ANTHONY DARRAH, a/k/a "Pauli"
D-7    CARY DALE VANDIVER, a/k/a "Gun Control"
D-8    VINCENT JOHN WITORT, a/k/a "Holiday"
D-9    MICHAEL WILLIAM MASTROMATTEO, a/k/a "Iron Mike"
D-10   VERNON NELSON RICH, a/k/a "Vern"
D-11   JOHN RENNY RIEDE, a/k/a "Bear"
D-12   VICTOR CARLOS CASTANO, a/k/a "Vic"
D-13   GARY LEE NELSON
D-14   MICHAEL KENNETH RICH, a/k/a "Tatu"
D-15   RAYMOND CHARLES MELIOLI, a/k/a "Romeo"
D-16   TIMOTHY PAUL DOWNS, a/k/a "Space"
D-17   DAVID RANDY DROZDOWSKI, a/k/a "D"
D-18   SMILEY VILLA, a/k/a "SA"
D-19   DEAN EDWARD JAKIEL, a/k/a "Jesus"
D-20   TONY WAYNE KITCHENS, a/k/a "Trouble"
D-21   SYLVESTER GERARD WESAW,  a/k/a "Sly Dog"
D-22   RONALD NICK PRELETZ, a/k/a "Polar Bear"
D-23   HOWARD JOSEPH QUANT, a/k/a "44"
D-24   SCOTT THOMAS PERKINS, a/k/a "Scooter, Scotty P"
D-25   CLIFFORD CHANSEL RHODES II, a/k/a "Cliff"
D-26   DAVID ROY DELONG, a/k/a "Reverend"
D-27   CHRISTOPHER RAYMOND COOK, a/k/a "Damien"
D-28   MICHAEL JOHN PALAZZOLA, a/k/a "Utica Mike"
D-29   DANNY RUSSELL BURBY, JR., a/k/a "Thumbs"
D-30   RONALD LEON LAMBERT, a/k/a "Crow"
D-31   JASON JOSEPH COOK, a/k/a "Cookie"
D-32   EDWARD ALLEN TAYLOR, a/k/a "Big Ed"
D-33   SALVATORE BATTAGLIA, a/k/a "Bando"
D-34   WILLIAM SCOTT LONSBY, a/k/a "Buck, Buckwheat"
D-35   WAYNE RUSSELL WERTH

D-36   LAURI ANN LEDFORD
D-37   JENNIFER LEE CICOLA
D-38   DEAN ANTHONY TAGLIAVIA
D-39   ALEXIS CATHERINE MAY
D-40   PAULA MILEHA FRISCIONI
D-41   JOHN CHARLES SCUDDER

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

| | |
|---|---|
| June 13, 2012 | *(signature)* |
| Date | SAIMA MOHSIN |
| | ERIC STRAUS |
| | Assistant United States Attorney |
| | 211 W. Fort Street, Suite 2001 |
| | Detroit, MI  48226-3277 |
| | Phone:  (313) 226-9163/(313) 226-9648 |
| | Fax: (313) 226-5464 |
| | E-Mail address: saima.mohsin@usdoj.gov |
| | eric.straus@usdoj.gov |
| | Attorney Bar numbers: P73990/P38266 |

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

10/13/09